**STUTZ ARTIANO SHINOFF & HOLTZ**
*A Professional Corporation*
Ray J. Artiano, Esq. (SBN 88916)
rartiano@sashlaw.com
Ljubisa Kostic, Esq. (SBN 226668)
lkostic@sashlaw.com
Melissa A. Lewis, Esq. (SBN 282579)
2488 Historic Decatur Road, Suite 200
San Diego, California  92106
Telephone: (619) 232-3122
Facsimile: (619) 232-3264

Attorneys for Plaintiffs, DENNIS RUTHERFORD, PETER
KLUNE and TARA BARTH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STUTZ ARTIANO SHINOFF & HOLTZ**
*A Professional Corporation*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD, an individual;
PETER KLUNE, an individual; TARA BARTH,
an individual,

             Plaintiffs,

      v.

PALO VERDE HEALTH CARE DISTRICT, a
public entity; TRINA SARTIN, an individual;
SANDRA HUDSON, an individual; and DOES
1 to 50, inclusive,

Case No. 5:13-cv-01247 JAK(SPx) [LEAD
CASE] Consolidated with ED CV13-1249 JAK(OPX)
and ED CV13-1250 JAK(OPx)

**PLAINTIFFS' CLOSING BRIEF**

Judge:  Hon. John A. Kronstadt
Action Date:    July 16, 2013

Trial:  April 21, 2015

STUTZ ARTIANO SHINOFF & HOLTZ
*A PROFESSIONAL CORPORATION*

# TABLE OF CONTENTS

Page

I. Introduction ...................................................................................... 1

II. Protected Activity Was Uncontroverted ........................................ 2

III. Untruthful Denials Aside, Sartin, Hudson and Burton Were Aware of Protected Activity.. 3

    A. Meeting Minutes ...................................................................... 3

        (i.) November 28, 2012 ............................................................ 3

        (ii.) December 5, 2012 ............................................................. 3

        (iii.) December 11, 2012 .......................................................... 4

        (iv.) February 19, 2012 ........................................................... 4

    B. The Testimony of Suzette Creighton ...................................... 4

    C. Rutherford's Uncontroverted Testimony ................................. 4

    D. Hudson's Testimony About the "Trask Memo" ....................... 5

    E. The Testimony of Sartin and Hudson about Conflicts of Interest .............................. 5

    F. The Testimony of PVHD Attorneys Oppenheim and Jackson ............................ 6

    G. Key Inconsistencies in Testimony of Sartin, Hudson and Burto ................................. 6

IV. Plaintiffs Proved Retaliation ........................................................... 8

V. All Allegedly Legitimate Reasons Were Proven False and Pretextual.......................... 10

VI. The Supposedly After-Acquired Evidence Proved Nothing ............................ 11

VII. Evidence of Post-Termination Events Was Proven Irrelevant ...................................... 12

VIII. Plaintiffs Are Entitled to Substantial Damages ........................................... 14

    a. Klune's Economic Damages .................................................. 14

    b. Rutherford's Economic Damages .......................................... 15

    c. Non-economic Damages ........................................................ 15

i

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*McKennon v. Nashville Banner Publ. Co.*
    513 U.S. 352 (1995) ................................................................... 12

*Nationwide Ins. Co. v. Richards*
    541 F.3d 903 (9th Cir. 2008) ...................................................... 9

*Oberson v. United States*
    311 F.Supp.2d 917 (Dist. Mont. 2004) ...................................... 15

*O'Day v. McDonnell Douglas Helicopter Co.*
    79 F.3d 756 (9th Cir. 1996) ........................................................ 12

**Federal Statutes**

45 Code of Federal Regulations section 164.501 ............................ 12

45 Code of Federal Regulations section 164.502 ............................ 12

45 Code of Federal Regulations section 164.506(c)(1) ................... 12

45 Code of Federal Regulations section 164.506(c)(4)(ii) ............... 12

45 Code of Federal Regulations section 164.512(d)(1) ................... 12

31 United States Code section 3730(h) .................................. 1, 9, 14

**California Statutes**

Government Code section 1090 ........................................... 1, 3

Government Code section 12653 ......................................... 1, 9, 14

Government Code section 12653(a) ........................................... 9

Labor Code section 1102.5 .............................................. 1, 12, 14

Labor Code section 1102.6 ........................................................ 1

**Other Authorities**

CACI 2731 ................................................................................. 1

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

ii

**I. Introduction** – This is a case about small town corruption, getting "caught" and then eliminating those who discovered, reported, and made dedicated efforts to stop these violations of law. Notwithstanding the fact that defense witnesses at times provided blatantly untruthful testimony, conveniently could "not recall" certain key facts, and offered nonsensical justification for certain actions, the overwhelming evidence in this case established that both plaintiffs met their burden of proof on all elements of their claims for retaliation.

"To establish a claim under § 3730(h)(1) or § 12653, a plaintiff must prove he: (i) was engaging in protected activity; (ii) the employer knew the employee was doing so; and (iii) the employer discriminated against the employee for engaging in such protected activity." Dkt. 408, p. 18. Elements of proof under Labor Code § 1102.5 are substantially similar, albeit broader. Under § 1102.5, the suspected violations of Govt. Code § 1090 and EMTALA support a finding of retaliation. *Id.*, pp. 31-33. Significantly, once it has been established by a preponderance of the evidence that an activity proscribed by § 1102.5 was a contributing factor[1], the employer has the burden of proof to demonstrate by clear and convincing evidence that the alleged adverse action would have occurred regardless of protected activities. Cal. Labor Code § 1102.6; see CACI 2731.

Here, the only conclusion which can be drawn from the evidence is obvious. Both Hudson and Sartin were the benefactors and beneficiaries of Dr. Sahlolbei. The illegal upcoding, the illegal kickback scheme and the conflicts of the Board members were identified, reported, and

---

[1] The Court has asked the parties to brief the causation standard under the various statutes. The two California statutes are clear:  Under § 1102.5(b), the causation requirement is that the protected activity be a "contributing factor." Labor Code § 1102.5(b); CACI 2730.  Under § 12653 the defendants' conduct must be a "substantial factor in causing the harm." CACI 2440. Neither statute involves a "but-for" analysis.  No Ninth Circuit or U.S. Supreme Court case has directly addressed the causation standard under § 3730(h). The clear expression of Congressional intent recognizes that under the Federal whistleblower statues retaliation must be motivated, "at least in part," by the employee engaging in protected activity. S. Rep. 99-245, at p. 35. Thus, it is unlikely that either the Ninth Circuit or the U.S. Supreme Court will ultimately adopt the "but-for" test. In this case, the issue is purely an academic one as neither California statute embraces the "but-for" standard. Notwithstanding, Plaintiffs here have met any causation standard to be applied.

Plaintiffs have been unable to find any recent U.S. Supreme Court case regarding causation that would appear to apply here.

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

1

1  addressed. An EMTALA-compliant policy was implemented. The hospital filed suit against Dr.

2  Sahlolbei to recover the kickbacks. The hospital passed a resolution for an exclusive

3  transportation contract so that patients could be transported more quickly by helicopter (which

4  Desert Air does not have). In order to increase revenues, the hospital passed a resolution for an

5  exclusive surgical services agreement so that the scope of services at the hospital could be

6  greatly expanded. Before she was even elected, Sartin sought to stop the adoption of the new

7  EMTALA policy. Sartin's domestic partner, Jeff Gatchell, later succeeded in convincing CalTrans

8  to issue a Cease and Desist order to prevent helicopters from landing at the hospital. Hudson

9  provided a false declaration to Sahlolbei to assist him in keeping the kickbacks. Once sworn,

10  Sartin and Hudson (1) removed the lawyers who authored the conflict memo; (2) rescinded both

11  resolutions; (3) terminated Klune, Rutherford, Barth and Creighton (Murphy resigned to avoid

12  termination); (4) dismissed the lawsuit against Sahlolbei; (5) renewed or extended Sahlolbei's

13  contracts; and (6) sat back as Sahlolbei reinstituted the old "preference card" policy and

14  "outlawed" the new EMTALA-compliant policy.

15  II. Protected Activity Was Uncontroverted – It was uncontested at trial that both Klune and

16  Rutherford received credible complaints from several sources including ER physicians, the

17  Director of Quality, and hospital staff all alleging the same thing—Dr. Sahlolbei's interference with

18  patient care for the purpose of forcing medically unnecessary use of Desert Air's fixed-wing

19  transportation.  It was uncontested that attorney Judith Waltz advised the patient transfer policy

20  involving Dr. Sahlolbei's "preference cards" required revision to comply with EMTALA; and that

21  attorney Jay Christensen opined that the patient transportation issues likely amounted to Medicare

22  fraud and needed to be reported. It was uncontested that both Klune and Rutherford reported the

23  suspected illegalities, first to the Board and then to the U.S. Attorney, the OIG and the District

24  Attorney. It was also uncontested that the same process occurred with respect to potential

25  kickbacks: first they were reported to the Board, then legal counsel advised there was likely a

26  violation of Federal and state laws that needed to be reported, and finally reports were made to

27  the same agencies. The Court previously ruled that the matters investigated and reported possibly

28  amounted to false claims, and the evidence adduced at trial fully supports those rulings.

2

1    PVHD did not produce any contradictory evidence, and stipulated to myriad facts establishing

2    protected activity. Plaintiffs' Appendix, pp. 650-51 ("PA650-51"); see PA649, 652. PVHD later tried

3    to rescind the stipulation, but the Court should enforce it. PA653; see Dkt. 479, pp. 2-3.

4    III. Untruthful Denials Aside, Sartin, Hudson and Burton Were Aware of Protected Activity

5        **A. Meeting Minutes –** (i.) November 28, 2012: Hudson and Sartin testified that they attended

6    on November 28, 2012, while Burton was a Board member, and the minutes reflect all there

7    attended. PA785, 836-37; see PA541, 556-57, PA707. During open session, Board President

8    Carney stated "Mr. Klune has courageously taken on some serious legal compliance issues at the

9    hospital," and that the Board had given Klune "a mandate to rectify the serious legal concerns that

10   have been identified by independent contractors[,] lawyers and consultants…." PA555. Carney

11   added that, "these are serious issues that [the Board] ha[s] discussed …." *Id.*

12       Klune also spoke at the November 28 meeting, stating in open session that, "[t]he Board has

13   had a lengthy discussion [in closed session] regarding legal and patient safety issues having to do

14   with air transports at the hospital[,]" noting that, "the hospital has obtained opinions of an

15   independent emergency room physician and a healthcare attorney that identify legal compliance

16   issues that this resolution is designed to address." PA558-9. Klune explained that, "[b]y obtaining

17   an exclusive contract for patient air transport, it is hoped that the hospital can eliminate those

18   compliance issues that could lead to significant legal liability for the hospital." *Id.*

19       Carney and Klune referenced discussions in closed session, with Burton present. See PA547.

20   Carney corroborated Klune's testimony that, while Burton was on the Board in 2012, the Board

21   was apprised of the investigation and approved reports to government agencies. PA683-4, 722-3.

22       (ii.) December 5, 2012: At the meeting of December 5, 2012, the Board approved a Second

23   Amendment to Klune's contract (Ex. 501), and the minutes (Ex. 90) reflect Burton, Sartin and

24   Hudson all attended the meeting. PA586-7, 594, 599; see also PA711-12. In open session,

25   Patterson stated that the reason for the Second Amendment was to ensure the hospital complied

26   with Federal and state laws, including the "anti-kickback laws, the Political Reform Act, and

27   Government Code section 1090," and to ensure cooperation with Federal and state audits and

28   investigations. PA593. Patterson then stated, "I am not at liberty to talk about legal compliance

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

3

1   issues in public but we have discussed in closed session and they are in need of being

2   addressed." *Id.* The closed session Patterson referenced occurred earlier in the same meeting,

3   with Burton present. See PA574; 587; see also PA586-7 (comments from Burton).

4       The minutes of December 5, 2012, also reflect a discussion between Patterson and Sartin, in

5   open session, regarding "legal topics ...which you will become aware of [] when you get on the

6   Board." PA585. Ms. Sartin tells Mr. Patterson, "I am already very aware of them." *Id.*

7       (iii.) <u>December 11, 2012</u>: At the very first meeting after Sartin and Hudson were sworn in,

8   "Director Hudson motion[ed] to suspend legal counsel *until the new Board members are brought*

9   *up to speed with <u>all</u> legal issues*, President Sartin seconds." PA604 (Emphasis added). The

10   motion did not carry, and Patterson attended the closed session later that evening. PA604, 606.[2]

11       (iv.) <u>February 19, 2012</u>: The meeting minutes of February 19, 2013, reflect that immediately

12   before he was fired in closed session, in the preceding open session "Mr. Dennis Rutherford,

13   Interim CEO, discuss[ed] ...Continued financial and compliance issues[.]" PA619 (Agenda Item 6).

14       **B. The Testimony of Suzette Creighton –** Suzette Creighton testified that, at the conclusion

15   of the January 16, 2013, meeting, Hudson questioned her about a document that Creighton

16   identified as pages two and three of the Warhaft report (Ex. 266).[3] PA674-78. The Warhaft report

17   references six patient transfers and, true or not, states that these transfers failed to meet medical

18   necessity or comport with CMS billing guidelines. PA676-7. Ms. Creighton prepared a

19   memorandum immediately after the incident (Ex. 286). PA673. Creighton's testimony proves that

20   Hudson was aware of the inquiry into patient transfers as of January 16, 2013.

21       **C. Rutherford's Uncontroverted Testimony –** On cross-examination, Rutherford testified

22   that in one of the December 2102 Board meetings, when Klune was on vacation, Rutherford

_____

[2] Before Patterson and BB&K were replaced with Jeff Scott and Blaise Jackson, there was another closed session on December 14, 2012, and Patterson was present. See PA607-08.

[3] The Court did not admit Exhibit 266, because it contains opinions. Plaintiffs renew their request that this exhibit be admitted, not for the truth of the matters asserted or for any opinions, but to demonstrate Hudson's <u>knowledge</u> of protected activity regarding patient transfer issues.

STUTZ ARTIANO SHINOFF & HOLTZ
*A PROFESSIONAL CORPORATION*

4

1    discussed with Sartin and Hudson matters he thought were "unlawful conduct or legal problem[s],
2    legal compliance issues …." PA740.

3      Rutherford also testified that he received a copy of a letter from Dr. Sahlolbei to an ER
4    physician at the hospital dated February 4, 2013, in which Dr. Sahlolbei denied that any revised
5    patient transfer policy was ever adopted and threatened an investigation and discipline against
6    anyone who failed to follow the prior policy involving "preference cards." PA738-9; see Ex. 284.[4]
7    Rutherford testified he discussed Sahlolbei's letter with Sartin and Hudson. PA739:8-11.

8      Rutherford also testified that one or two days before he was fired, he was summoned to a
9    meeting with Sartin, Hudson and Sahlolbei. PA807-811. Rutherford was asked directly whether he
10    "would be able to quit …opposing what was going on in the patient transfer area." PA810-11.
11    Rutherford responded that, "as long as it's a compliance issue, I would …keep moving towards a
12    compliant resolution." PA811:5-7; see PA819. Hudson confirmed that, "a few days before [she]
13    voted not to renew Mr. Rutherford's contract," she had a meeting with Rutherford. PA803.

14    **D. Hudson's Testimony About the "Trask Memo" –** Hudson testified that, prior to
15    December 11, 2012, she consulted her own attorney because she had learned from friends that,
16    "what is referred to as the Trask Memo" was posted on the internet. PA371:14–372:7. If Ms.
17    Hudson saw an attorney prior to December 11, 2012, because she read the "Trask Memo" on the
18    internet, then she must have read it prior to that date. The only memorandum related to PVHD
19    that Mr. Trask authored prior to December 11, 2012, was the November 19, 2012, memorandum
20    addressed to Deputy DA Vickie Hightower, which was provided to the DA when Klune, Trask and
21    Patterson met in person with the DA. See Ex. 251; see also PA390:12-25. Ms. Hudson testified "it
22    was obvious who prepared the report" to the DA. PA373:2-25.

23    **E. The Testimony of Sartin and Hudson about Conflicts of Interest –** Both Sartin and

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

[4] Exhibit 284 was admitted provisionally subject to arguments about authenticity in closing briefs. See PA738:18-21. The sole purpose for which this exhibit is offered is to establish what Rutherford received and then discussed with Sartin and Hudson. For this limited purpose, Rutherford's testimony that Exhibit 284 is what he received and discussed while he was the interim CEO sufficiently establishes the required foundation. See PA738-9.

STUTZ ARTIANO SHINOFF & HOLTZ
*A PROFESSIONAL CORPORATION*

1   Hudson acknowledged that, sometime in December of 2012, Patterson provided each of them a

2   copy of the conflict of interest opinion from BB&K dated December 11, 2012 (Ex. 274). PA147-48,

3   797-8; see PA377. This memorandum discusses all of the potential illegalities plaintiffs reported.

4   Ex. 274. Plaintiffs request the admission of Exhibit 274 solely to show knowledge of protected

5   activity, and not for the truth of anything stated or for any opinions.

6      **F. The Testimony of PVHD Attorneys Oppenheim and Jackson –** Attorney Oppenheim

7   testified that in "the Spring of 2013"—while Sartin and Hudson were Board member (see PA610,

8   615, and 618[5])—he was retained to "conduct an investigation" into the report to the OIG. PA812,

9   816-18; see PA818. During his "investigation," Oppenheim had direct contact with Board

10   members. PA818:21-22. Attorney Jackson testified that he was contacted by the OIG in April of

11   2013, at which time he obtained a copy of Christensen's October 17, 2012, letter to the OIG.[6]

12   PA823-24. Jackson then immediately "contact[ed] the Board …to verify whether or not anyone

13   knew anything about this[,]" and after that he "obtain[ed] Board direction to hire outside counsel."

14   PA825. The testimony of each attorney is direct evidence that Sartin and Hudson were not truthful

15   when they claimed to have had *no knowledge whatsoever* of any reporting of legal issues to *any*

16   Federal agency at any time prior to Klune's deposition in 2014. PA805-6, 813-14, 840-841.

17      **G. Key Inconsistencies in Testimony of Sartin, Hudson and Burton –** In Volume I of

18   her deposition, Sartin testified she had no knowledge whether her domestic and business partner,

19   Jeff Gatchell, was making complaints to Caltrans to shut down the hospital's helipad. PA55:10-25.

20   _____

21   [5] The Board meeting minutes of Jan. 16 (Ex. 98, PA610), Jan. 22 (Ex. 100, PA615), and Feb. 19,

22   2013 (Ex. 103, PA618) were discussed extensively but were not moved into evidence. See Dkt.

23   502. The parties mutually stipulated before trial that these exhibits were admissible. See Dkt. 482, p. 9/10. On these grounds, plaintiffs seek leave to move these exhibits into evidence at this time.

24   [6] Christensen's October 17, 2012 letter to the OIG was properly identified as Exhibit 269, and

25   plaintiffs' counsel confirmed to the Court he intended to move it into evidence. See PA687:18-23;

26   PA621-28 (Ex. 269). It was later offered into evidence but incorrectly identified and admitted as Exhibit 384, which in reality is Christensen follow-up letter to the OIG dated October 30, 2012. See

27   PA688-89. Plaintiffs request the Court to correct this clerical error, and to admit Exhibit 269 (PA688-89) on the same limited terms as Exhibits 251, 383 and 384.

28

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

1   In Volume II of her deposition she testified that she found out about Gatchell's communications

2   with Caltrans, that she was "upset over it" and that the two of them discussed it. PA231:10–232:2.

3       Sartin testified at trial that she has *personal knowledge* of helicopters landing at Blythe Airport

4   to pick up patients who are brought there from the hospital via her ground ambulance. PA834:10–

5   835:15. In her deposition, Sartin testified she had no idea whether helicopters land at Blythe

6   Airport to pick up patients brought there via her ground ambulance. PA56:9–58:15.

7       At trial, Sartin testified she never conferred with Dr. Sahlolbei regarding the patient transfer

8   policy. PA839:21-23. In her deposition, Sartin testified she could not recall whether she discussed

9   the policy with Sahlolbei. PA185:12-22.

10      At trial, Sartin testified that, in late November of 2012, she attended a Board meeting and was

11  concerned about "a surgical exclusion and a transportation exclusion," related Board resolutions

12  and "an order that was issued from the Court in Indio." PA836:20–837:14. In her deposition, Sartin

13  testified that she attended the TRO hearing but could not recall if it had anything to do with

14  exclusive agreements for surgical or transportation services, or even whether it had anything at all

15  to do with transportation. PA127:18–128:8. Sartin also testified in her deposition that the only thing

16  she knew about an RFP for exclusive transportation was a rumor she had heard. PA232:3-17.

17      Hudson testified that she voted to rescind resolutions authorizing RFPs for exclusive surgical

18  services and exclusive transportation services, because of "an injunction issued to prevent the

19  Board and Mr. Klune from going forward with those resolutions" which she claimed "had been

20  done illegally and improperly." PA789:12-790:4. The initial TRO issued on November 28, 2012,

21  only prohibited entering into contracts. Ex. 515, pp. 1-3. On the same date, the Board passed

22  resolutions allowing Klune to seek proposals. See PA708:6-16, 709:6–710:8. On December 13,

23  2012, a preliminary injunction issued prohibiting *only Klune* and "his agents, employees," etc.,

24  from exercising authority purportedly given to Klune at the meetings on November 28, 2012, and

25  December 5, 2012, to enter into contracts on behalf of the District without Board approval. PA654-

26  656. The resolutions were rescinded on the same day Klune was terminated. PA617, PA789-90.

27      Hudson and Burton testified they voted not to renew Rutherford's contract because, in the

28  three weeks he was interim CEO, he did not formulate "a plan" to address declining finances.

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

1   PA827, 791:3-10. The February 19, 2013, meeting minutes reflect that just before the trio voted to

2   non-renew Rutherford in closed session, he discussed in open session "several cost cutting

3   measures and revenue enhancement including management consolidation, charge capture

4   projects, continued solicitation of prison business and Delivery System Reform Incentive

5   Payments (DSRIP) plan submission[,]" and "not[ed] that a formal report will be provided at the

6   next regular Board of Directors meeting." PA619-20 (Agenda Item No. 7 - Finance).

7       Hudson testified that on January 16, 2013, she learned Klune was making $477,000 annually,

8   and this was a concern to her because "it was practically doubled where Peter had started[.]"

9   PA788:7-15. Hudson voted to approve and *signed* Klune's contract as of October 1, 2009, which

10   provided for potential total compensation of over $490,000, and she voted to approve at least one

11   raise for Klune. PA794:21–795:22; Ex. 425, pp. 1, 9; see also, PA703:6-706:16; Ex. 109, p. 15.

12       Burton testified at trial that he knew absolutely nothing about any investigation or reporting to

13   any government agencies. PA828:13-18. This is truly incredible given his tenure on the Board in

14   2012 and the testimony of Carney, Klune and Rutherford that the Board was fully informed and

15   approved the reporting. See PA689a:20-24, 722:14–722a:7, 723:11-25. It is also directly contrary

16   to Burton's deposition testimony that he knew about the suspected illegalities and the need to

17   report them. See PA302:12–322:2; see also PA332:22 –333:16, 343:14–345:15.

18   **IV. Plaintiffs Proved Retaliation –** The patient transportation issues undeniably affect Ms. Sartin

19   directly. She admitted in trial that when she learned in May of 2012 that the transfer policy was to

20   be revised, she was "concerned for both of [her] companies" with respect to "an adverse effect on

21   …revenues." PA839. She also testified that all or virtually all of her revenues are derived from

22   transporting patients from Palo Verde hospital. PA838-39. This tracks Ms. Sartin's comments at

23   the Board meeting of June 27, 2012, when she said that her business is "dedicated 100%" to Palo

24   Verde, and that the new policy had "take[n] away 50% of [her] small company," causing "a severe

25   impact." Ex. 264, p. 5. It also tracks her testimony in deposition that the only time Desert Air's

26   expenses exceeded its revenues was in 2012, contemporaneous with the change in policy.

27   PA39:6-17. And it tracks the testimony of Mike Murphy, PVHD's ER Director, who testified based

28   on personal knowledge that the adoption of the EMTALA-compliant patient transfer policy in 2012

1  caused a "substantial decrease" in the number of patient transfers via Desert Air. PA489:3-18.

2      Sartin first hired lawyers to challenge the adoption on the new policy based on claimed Brown

3  Act violations. PA832-33. When that failed, she announced her candidacy for the Board in August

4  of 2012, together with Hudson. PA103:18-21, 119:14-19, 784. Before announcing her candidacy,

5  Sartin spoke to Dr. Sahlolbei about running and he told her she should not run because "they will

6  go after you." PA182:20-184:2. Once Sartin and Hudson were seated on the Board, they promptly

7  fired Klune and the upcoding resumed in full force. By the first week of February, less than two

8  weeks after Klune was terminated, Dr. Sahlolbei had personally rescinded the new EMTALA-

9  compliant policy and was making threats in writing to investigate and discipline any ER physician

10  or staff member who did not follow the old policy involving "preference cards" preordaining the use

11  of Desert Air. Ex. 284; PA738-39. Dr. Sahlolbei 's on–call and directorship agreements were then

12  renewed, and the lawsuit against him was dismissed. PA743, 748-49, 778-79.

13      Notwithstanding the exclusion of evidence regarding criminal proceedings, the Court may draw

14  negative inferences form Hudson's invoking the Fifth Amendment in her deposition and at trial,

15  including as to: (i) whether she ever spoke to Dan Stack, the DA investigator who met with Klune

16  and Rutherford; (ii) whether she received any money from Sahlolbei in 2012; (iii) the nature of her

17  interactions as a board member with Dr. Sahlolbei between 2008 and 2010; (iv) whether the

18  December 11, 2012, BB&K memorandum regarding conflicts covered the issue of her renting a

19  house to Dr. Sahlolbei; (v) whether, after reading that memorandum, she understood that she was

20  perceived as having a conflict with Sahlolbei; (vi) any and all questions about a declaration she

21  provided to Dr. Sahlolbei to assist him in defending the lawsuit PVHD had filed against him; and

22  (vii) perhaps most importantly, whether her vote to terminate Klune was based on her desire to

23  repay a financial favor to Sahlolbei. PA355-56, 376-77, 414, PA796, 798-99; see *Nationwide Ins.*

24  *Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008).

25      Given the 3-2 vote, if just one Board member voted to terminate because of protected activity,

26  causation is established. Likewise, both the FCA and the CFCA protect any employee who makes

27  any "efforts to stop 1 or more" suspected false claims. See 31 U.S.C. § 3730(h); Cal. Govt. Code

28  § 12653(a). As such, if any one of the three votes was cast to terminate because of *any one* of

STUTZ ARTIANO SHINOFF & HOLTZ
*A PROFESSIONAL CORPORATION*

1  plaintiffs' efforts to stop either the perceived upcoding of patient transfers or the suspected

2  kickbacks, causation is established.

3      Plaintiffs' efforts to stop medically unnecessary transportation by Desert Air and the kickbacks

4  to Sahlolbei included: (a) implementation of the revised patient transfer policy; (b) the RFP for

5  exclusive transportation and exclusive surgical services agreements; and (c) the lawsuit against

6  Dr. Sahlolbei. If any one of the three votes in favor of termination was because of any one of these

7  efforts to stop upcoding and kickbacks, causation is established.

8  <u>V. All Allegedly Legitimate Reasons Were Proven False and Pretextual</u> – James Carney, the

9  retired town sheriff and Board President until December 7, 2012, testified that Klune and

10  Rutherford performed their duties in exemplary fashion. Each consistently received positive

11  evaluations and merit raises, and the hospital continued to improve. See PA719:14–721:1. It is

12  *undisputed* that Klune inherited a troubled hospital (see PA659:2-13,660:2–668:1), and that he

13  improved its finances, human resources, equipment, operations and the facility (see PA662:21-23,

14  668:11-670:1, 679:10-682:15, 716:5-718:6). Hudson was on the Board in 2009 and 2010, and she

15  interviewed Klune, approved his 2009 contract with total potential compensation in excess of

16  $490,000, evaluated Klune positively and approved at least one raise. See PA794:21– 795:22; Ex.

17  425, pp. 1, 9. Prior to the protected activity, Hudson also had a cordial, professional relationship

18  with Klune, and she knew he worked well with others. PA795:12-16, 801:7-11.

19      Catalina McLain was on the Board from 2010 until after Klune and Rutherford were fired.

20  PA724. She evaluated and was aware of their performance throughout the relevant period, and

21  she voted against termination as to each plaintiff. PA725-27, 729-30, 733. McLain testified that

22  both plaintiffs did a good job and there was no reason to terminate either of them. *Id*. She

23  explained that *there was a plan* to increase revenues so as to replace what was lost in prison

24  business, and that she understood the surgical services RFP was the cornerstone of that plan.

25  See PA728. McLain was troubled that anyone would be fired without being told what they had

26  done wrong and given an opportunity to respond. She testified there was no discussion

27  whatsoever about performance in connection with the terminations. See PA725:6–726:15, 727:7-

28  18, 729:3-23, 731:24–732:1.

S᷒ᴛᴜᴛᴢ Aʀᴛɪᴀɴᴏ Sʜɪɴᴏꜰꜰ & Hᴏʟᴛᴢ
*A Pʀᴏꜰᴇssɪᴏɴᴀʟ Cᴏʀᴘᴏʀᴀᴛɪᴏɴ*

10

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

Klune explained why dismantling what he had built over a period of years, by aggressively cutting costs without first attempting to increase revenues, was not the best course of action. PA690:7–695:14. Nonetheless, Klune explained that cost-cutting measures were available, and also why he did not discuss such measures in open session. PA692:24–694:15, 695a:12–695b:25, 695c:6-13, 736:17-24. PVHD's continued losses and stagnant revenues in the last two years—under management of Gianello and HFS, with CEO Anaya acting as Quality Director with a different title—has proven that Klune was correct. It is also undisputed that Klune is perfectly capable of rehabilitating a financially distressed hospital, as he did in 2009-2010.

No contrary evidence was offered by PVHD. Hudson confirmed that there was no performance evaluation, no review of personnel files, and no discussion regarding performance. See PA792:5-10, 800:19–801:16. Neither plaintiff was asked to consider a pay cut. PA791:18–792:4.

**VI. The Supposedly After-Acquired Evidence Proved Nothing** – With respect to the Stark Law Violation regarding medical office building leases, Klune testified the doctors had moved into the medical building without signed leases before he was hired. PA697-99. Not a single defense witness had any personal knowledge to refute this. Defendant relied on the self-report letter dated January 30, 2012 (Ex. 107), written by Patterson and signed by Carney. See PA750. PVHD's lawyer, Jackson, stated on cross that his blaming Klune "was erroneous." PA751. Ms. Roberts' attempted "rehabilitation" of Jackson merely proved once again that at least two doctors had moved in weeks or months before Klune was hired on April 28, 2009. Ex. 107, p. 4; PA702. Despite zero evidence that Klune *caused*[7] the Stark violation, Sartin, Hudson and Burton each delivered the rehearsed party line stating they would have wanted to terminate both Klune and Rutherford had they known. PVHD certainly did know, given its General Counsel reported it to CMS in January of 2012 in a letter signed by its Board President, while Burton was a Board member. Hudson was on the Board when these physicians were allowed to move in without leases. While not denying involvement or knowledge, she took no responsibility but blamed

---

[7] PVHD claimed Klune's alleged delay in forcing Patterson and Carney to self-report increased the amount of the settlement, but the Court struck the testimony for lack of foundation. PA813-15.

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

1   Rutherford, instead, who was not hired until March of 2010. PA804; see PA737.

2       The alleged HIPAA violation fared no better. First, there is zero evidence that Rutherford

3   possessed or maintained any HIPAA protected information at any time. As to Klune, PVHD claims

4   its only knowledge of any facts comes from Klune's declarations. See PA793, PA744-46. Neither

5   of the two declarations Klune submitted states that he knew there was unredacted private patient

6   information among the several thousand pages of documents that were stored electronically on a

7   hard drive. See Dkt. 89-4, 140-3. At trial, Klune testified, "it was not known to me that there was

8   any HIPAA or private patient information on any hard drive that I had in my possession." PA715:

9   15-17. This testimony was uncontradicted. Moreover, the Board approved the disclosure. Legally,

10  Klune cannot be fired for disclosing information. Labor Code § 1102.5(b). HIPAA specifically

11  allows use and disclosure of private patient information for "health oversight activities" which

12  includes "fraud and abuse detection and compliance programs," related "legal services" and self-

13  reporting to oversight agencies—everything that occurred here. See 45 C.F.R. §§ 164.501,

14  164.502, 164.506(c)(1) and (c)(4)(ii), and 164.512(d)(1).

15      HIPAA also specifically allows a "workforce member" acting as whistleblower to provide private

16  health information directly to an oversight agency or to an attorney. 45 C.F.R. § 164.502(j)(1). But

17  for Klune's termination he would have continued to be a "workforcer member" and his actions

18  could not even arguably violate HIPAA.[8] *Id.* An employer cannot create the "misconduct" by

19  terminating the employee. See *McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 362-363

20  (1995); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir. 1996).

21  **VII. Evidence of Post-Termination Events Was Proven Irrelevant** – After plaintiffs were

22  terminated, PVHD first rented an interim CEO from HFS at $30,000/mo. for five months. PA752,

---

23

24

25  [8] Even after Klune was terminated, there was no "breach" under HIPAA unless the disclosure
    creates "a significant risk of financial, reputational, or other harm to the individual." 45 C.F.R. §

26  402(1)(i). The only information before the Court is that, after his termination, Klune did not
    personally access any information on the hard drive or share it with anyone other than providing a

27  copy of the hard drive to his counsel. See Dkt. 140-3. There was no "breach." PVHD simply chose

28  not to even try to demonstrate to regulators that no breach had occurred. PA747.

12

1  760. That person, Larry Blitz, did not testify. The $1,800/day interim CFO, Gianello, testified that

2  his firm has billed $950,000 for consulting services over a two year period, of which $282,000 was

3  for Blitz' services as CEO and Gianello's services as CFO, combined. See PA753, 756-57, 761.

4  The replacement C-suite cost more than $500,000 per year. See PA755-59. This does not include

5  the additional cost of an assistant CFO, a position that was created after Rutherford was fired

6  because Gianello only works three days a week on average. PA762-64, 766. Hudson testified that

7  she does not know whether firing Klune resulted in any cost savings. PA802. When the $477,000

8  in severance plus interest and attorney's fees due to Klune are included, the choice to fire

9  plaintiffs certainly did not result in any direct savings.

10  Gianello claimed to have found about $5 million in "new money" and also to have decreased

11  operating costs by another $5.9 million, for a total swing of more than $10 million. PA765. Despite

12  this, PVHD has only slightly more than half as much money in the bank now as it did in February

13  of 2013 ($1.7 mill. now compared to $3.1 mill. then). PA766. Gianello also admitted PVHD's

14  revenues have been essentially flat, with no appreciable change during his tenure. PA754.

15  Ms. Anaya became CEO in July of 2013, about six months after Klune was terminated. PA767,

16  772-73. She has no idea *when* the issues she allegedly encountered actually arose—before or

17  after Klune was fired—and knows nothing about the challenges Klune faced and overcame when

18  he first became CEO at the hospital. See PA 776-77, 780. Ms. Anaya had no answer to a simple

19  question: given that she was able to correct in her first three months as CEO the alleged problems

20  about which she testified, why didn't the $30,000/month interim CEO, Blitz, fix these problems in

21  the five months he was at the helm? PA774-75.

22  Ms. Anaya testified about a "survey" in March of 2013. She had no percipient knowledge, but

23  relied on a citation issued by the DHS (Ex. 486). See PA768-69. She testified the primary reason

24  for that survey, "the big one that brought the State in the door," was an inappropriate patient

25  discharge that occurred in February of 2013, after Klune was fired. PA770; see PA781. The

26  document upon which she relied (Ex. 486) reveals that the inappropriate discharge involved a

27  botched surgery where Dr. Sahlolbei punctured the patient's left ureter. Ex. 486, pp. 17-20

28  ("Summary Statement of Deficiencies" column). Under Dr. Sahlolbei's care, the patient became

13

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

1  septic and had an infection positive for MRSA, at the site of Dr. Sahlolbei's surgical incision. *Id.*
2  While the charge nurse was not present and without her knowledge or input, Dr. Sahlolbei
3  personally discharged the patient, placed him in a cab, and sent him to another facility 108 miles
4  away. *Id.* Ms. Anaya testified that the additional surveys in May and December of 2013 were
5  "based on that initial [March] survey," the one Sahlolbei caused. [9] PA771. It is truly absurd and
6  certainly disingenuous to blame Klune and Rutherford for these surveys.[10]

7  **VIII. Plaintiffs Are Entitled to Substantial Damages** – Both 31 U.S.C. § 3730(h) and Cal. Govt.
8  Code § 12653 provide that relief for violations of the statutes shall include two times the amount of
9  back pay, interest on the back pay, and compensation for any special damages. (Cal. Labor Code
10  § 1102.5 does not provide detail on specific damages recoverable, but case law makes it
11  abundantly clear that they damages are intended to make the plaintiff whole and include front pay
12  and back pay.)

13  a. <u>Klune's Economic Damages</u>: It is undisputed that, at the time of his termination on January
14  22, 2013, Klune was earning $477,000 plus benefits. It is undisputed that Klune became
15  reemployed on April 1, 2015. Plaintiffs' economist, Brian Brinig, calculated loss of back pay
16  through April 30, 2015, at $1,173,366. Ex. 479. Brinig used Klune's actual pre-termination and
17  post-termination earnings. Accordingly, unless the Court determines that Klune failed to mitigate

---

[9] Sahlolbei is identified as the "Chief of Staff, who was providing surgical services to patients" in PVHD's response to the citation ("Provider's Plan of Correction" column) on page 5 of Exhibit 486. Additional information identifying Sahlolbei as "MD 1" is in the "Summary Statement of Deficiencies" column on pages 12 and 13 (Item No. 3). In each section, there is a reference to Dr. Sahlolbei not having privileges to practice medicine at the hospital. Incredibly, Ms. Anaya admitted Sahlobei was the Chief of Staff, but claimed she did not know—and made no effort to determine—the identity of the surgeon who did these horrible things. PA782-83. Instead, Anaya blamed the nurses and the case manager. See PA770.

[10] Additional findings were that the Board failed to assure the Chief of Staff had privileges to practice medicine at the hospital and that the Board failed to assure that the medical staff was accountable to the Board for the quality of care provided to patients, among other issues with Dr. Sahlolbei and the Board. Ex. 486, see, e.g., p. 5 (A046) and p. 8 (A049). In March of 2013, at the time of this survey, Sartin, Hudson and Burton had controlled the Board for several months.

14

STUTZ ARTIANO SHINOFF & HOLTZ
A PROFESSIONAL CORPORATION

his damages (an issue upon which defendant bears the burden of proof), or that he engaged in job misconduct which would have resulted in his termination (of which there is no evidence), Klune's back pay, when doubled, totals $2,346,732.

Klune detailed his reasonable efforts to obtain subsequent employment. The testimony of PVHD's vocational expert, Roger Thrush, should be disregarded because Klune had no burden to *document* his search. There was no evidence that Klune failed to use reasonable efforts to find employment. PVHD's economist, Kennedy, made no real analysis of loss of back or front pay. Instead, relying exclusively on the report of Thrush, Kennedy claimed that Klune's per-termination earning capacity was <u>less</u> than what he was actually earning. Kennedy therefore made no "present value" calculations. Even if the Court were to credit Thrush and Kennedy's theories, substituting statistics for Mr. Klune's actual pre-termination earnings in calculating economic loss is unsupportable. As noted in the case of *Oberson v. United States*, 311 F.Supp.2d 917 (Dist. Mont. 2004), "[s]tatistics are used in place of actual knowledge, as a way to extrapolate from what we know to what we would to know. In the case of [plaintiff's] earning capacity, there is no need for statistical projections because we have uncontroverted evidence of his actual earnings." Brinig presented the only admissible calculation of total future loss, which is $2,632,493 based upon Klune's actual pre-termination earnings.

b. <u>Rutherford's Economic Damages</u>: The comments above relating to the testimony of Kennedy and Thrush are equally applicable to Rutherford. The only reliable evidence of Rutherford's past loss values it at $355,693, which, when doubled, totals $711,386. See Ex. 478. Depending upon which work life expectancy figure is used, Mr. Rutherford's total future loss is between $576,162 and $912,828. *Id.*

Thrush conceded that Rutherford found employment in an appropriate period of time, thus, there is no issue as to mitigation. There was also absolutely no evidence that Rutherford engaged in any misconduct that would allow the reduction of his back pay or future loss of earnings.

c. <u>Non-economic Damages</u>: The Court elicited testimony from both Klune and Rutherford regarding emotional distress. The Court has ample evidence and ample experience upon which to base its award of emotional distress damages in light of community standards.

15

1   Dated: May 18, 2015                          STUTZ ARTIANO SHINOFF & HOLTZ
2                                                A Professional Corporation
3                                                By:   */s/ Ljubisa Kostic*
4                                                      Ray J. Artiano
                                                       Ljubisa Kostic
5                                                Attorneys for Plaintiffs, DENNIS RUTHERFORD,
6                                                PETER KLUNE and TARA BARTH

STUTZ ARTIANO SHINOFF & HOLTZ
*A PROFESSIONAL CORPORATION*