# Exhibit A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

| | |
|---|---|
| DENNIS RUTHERFORD, ET AL., | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) CV13-01247-JAK |
| | ) |
| PALO VERDE HEALTH CARE DISTRICT, | ) |
| ET AL., | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |
| | ) |
| - AND CONSOLIDATED CASES - | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF DAY TWO OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, APRIL 22, 2015, **MORNING SESSION**

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-H
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

TESTIMONY OF PETER KLUNE
April 22, 2015

144

```
1    BY MR. KOSTIC:

2    Q    WHAT WERE YOU ANXIOUS ABOUT, MR. KLUNE?

3    A    FINDING A NEW JOB AND BY REPUTATION.

4    Q    WHY WERE YOU CONCERNED ABOUT YOUR REPUTATION?

5    A    I FELT IT WAS PREVENTING ME FROM -- I FELT RECENT

6    EVENTS WERE IMPACTING MY REPUTATION TO THE POINT IT WAS

7    PREVENTING ME FROM FINDING NEW EMPLOYMENT.

8    Q    YOU MENTIONED THE DEPRESSION.  WHAT KIND OF

9    DEPRESSIVE THOUGHTS WERE YOU HAVING?

10              MS. ROBERTS:  OBJECTION.  LEADING.  ASSUMES

11   FACTS.

12              THE COURT:  SUSTAINED.

13   BY MR. KOSTIC:

14   Q    MR. KLUNE, DID YOU FEEL YOU HAD SOME DEPRESSION?

15   A    YES.

16   Q    WHY DID YOU THINK THAT?

17              MS. ROBERTS:  SPECULATION.  UNINTELLIGIBLE.

18              THE COURT:  JUST A MINUTE.

19              MS. ROBERTS:  AND IMPROPER OPINION FROM A LAY

20   WITNESS.

21              THE COURT:  MR. KLUNE, YOU SAID EARLIER YOU

22   HAD MOMENTS OF DEPRESSION AND ANXIETY.

23              WHAT DID YOU MEAN BY A "MOMENT OF

24   DEPRESSION"?

25              THE WITNESS:  I DON'T THINK I'M A CONSISTENTLY
```

TESTIMONY OF PETER KLUNE
April 22, 2015

145

1   DEPRESSED INDIVIDUAL, YOUR HONOR.  BUT CERTAINLY I HAD

2   SLEEPLESS NIGHTS AND MOMENTS WHERE I WAS CONCERNED

3   ABOUT MY ABILITY TO EARN A LIVING AND SUPPORT MYSELF.

4          THE COURT:  AND WHEN YOU SAID "ANXIETY," WERE

5   YOU REFERRING TO SOMETHING DIFFERENT THAN WHAT YOU JUST

6   TOLD ME?

7          THE WITNESS:  I THINK WHAT I WOULD RESPOND TO

8   YOU THERE, YOUR HONOR, AND SAY, I'M ANXIOUS IN LARGE

9   PART BECAUSE I FEEL LIKE A BAD GUY.  THAT I'VE BEEN

10  PAINTED AS THE BAD GUY AS OPPOSED TO WHAT I WAS HOPING

11  AND TRYING TO DO, WAS OBEY THE LAW AND DO THE RIGHT

12  THING.

13         THE COURT:  ALL RIGHT.  DURING WHAT TIME

14  PERIOD DID YOU EXPERIENCE SLEEPLESS NIGHTS?

15         THE WITNESS:  FROM THE TIME I GOT TERMINATED

16  UNTIL I -- WELL, STILL LAST NIGHT.

17         THE COURT:  OKAY.  AND DURING WHAT TIME PERIOD

18  HAVE YOU FELT ANXIETY?

19         THE WITNESS:  THE WHOLE TIME.

20         THE COURT:  AND HAS YOUR STARTING NEW WORK

21  AFFECTED -- HAS THE FACT THAT YOU HAVE A NEW POSITION,

22  WHICH YOU HAVE STARTED, AFFECTED YOUR SLEEPLESS NIGHTS?

23         THE WITNESS:  ABSOLUTELY.

24         THE COURT:  IN A POSITIVE WAY?

25            DO YOU HAVE FEWER SLEEPLESS NIGHTS NOW

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3      COUNTY OF LOS ANGELES          )
                                       )
4      STATE OF CALIFORNIA            )

5

6                  I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

7      COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

       COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

8      CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

9      STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

10     TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

11     HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

12     TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13     REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

14     STATES.

15     DATE:  APRIL 23, 2015

16

17

18                      /S/ ALEXANDER T. JOKO
                        _____
19                      ALEXANDER T. JOKO, CSR NO. 12272
                        FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

APP0088                    EXHIBIT A

1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4     THE HONORABLE JOHN A. KRONSTADT, JUDGE PRESIDING

5

6    DENNIS RUTHERFORD, et al.,        )
                                       )
7                    Plaintiffs,       )
                                       )
8                                      )
            vs.                        )   No. EDCV 13-1247 JAK-SP
9                                      )
     PALO VERDE HEALTH CARE DISTRICT, et )
10   al.,                              )
                                       )
11                   Defendants.       )
     _____)

12

13

14

15        REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS

16

17               Los Angeles, California

18          Wednesday, April 22, 2015, 1:16 P.M.

19   Day 2 of Court Trial, Afternoon Session, Page 1 through 123

20

21                        PAT CUNEO CSR 1600, CRR-CM
                          Official Reporter
22                        Roybal Federal Building
                          Room 181-E
23                        255 East Temple Street
                          Los Angeles, California 90012
24                        213-894-1782
                          patcuneo1600@gmail.com
25                        www.patcuneo.com

APP0089                              EXHIBIT A

TESTIMONY OF PETER KLUNE
April 22, 2015, Afternoon Session

```
 1              MS. ROBERTS:  From the Palo Verde official board

 2     minutes that are kept on its website and in its records.

 3     They were also produced in response to discovery.

 4              THE COURT:  Well, here's what I'm -- I'm going to

 5     admit Exhibit 90 as a copy -- it would be representative of

 6     the public record and/or business record of the board

 7     minutes.

 8              As to whether any specific statement within these

 9     27 pages is itself hearsay within hearsay, I'll have to hear

10     about it later if that's an issue.  It depends on what each

11     side is going to seek to draw from these minutes.

12     BY MS. ROBERTS:

13     Q.    Mr. Klune, was there anything urgent about having the

14     outgoing board vote on your proposed second amendment to the

15     contract?

16     A.    Yes.

17              MR. KOSTIC:  Objection.  Vague and ambiguous,

18     overbroad.

19     BY MS. ROBERTS:

20     Q.    And what was that urgency?

21              THE COURT:  Excuse me.

22              Did you understand the question?

23              THE WITNESS:  Yes.

24              THE COURT:  Overruled.  Next question, please.

25              MS. ROBERTS:  I'm sorry.  I didn't hear his
```

TESTIMONY OF PETER KLUNE
April 22, 2015, Afternoon Session

104

```
 1   answer.
 2             THE COURT:  The answer was "yes."
 3   BY MS. ROBERTS:
 4   Q.   And what was the urgency?
 5   A.   It was known to the board and to management that the
 6   incoming board members had a specific agenda with respect to
 7   the two RFPs.
 8   Q.   So you wanted to deliberately have this decided before
 9   the two new board members who were elected in November were
10   sworn into office?
11   A.   The board -- would you repeat the question, please.
12             THE COURT:  Read the question, please.
13                       (Record read.)
14             THE WITNESS:  I didn't request to do anything with
15   my contract.  This agenda was put together by the existing
16   board and they did have a desire to put in place certain
17   safeguards that the issues of illegal activity weren't going
18   to be swept under the rug by the new board.
19             MS. ROBERTS:  I'll move to strike as
20   nonresponsive.
21             THE COURT:  Motion is granted.
22             When you said "your contract," to what were you
23   referring?
24             THE WITNESS:  The board put --
25             THE COURT:  No, I'm just asking what's the
```

*Day 2 of Court Trial, April 22, 2015, Afternoon Session*

TESTIMONY OF PETER KLUNE
April 22, 2015, Afternoon Session

```
 1   contract to which you're referring.
 2           THE WITNESS:  There's an amendment item on this
 3   agenda for the CEO that changed some language in the CEO
 4   contract.  Or they sought to do that.
 5           THE COURT:  Okay.  Next question, please.
 6   BY MS. ROBERTS:
 7   Q.   Mr. Klune, did you speak out against this contract
 8   being amended just before the outgoing board two days before
 9   the newly elected board members were sworn in?
10   A.   Not at all.
11   Q.   All right.  That was your desire as well; correct?
12           THE COURT:  I don't understand the question.
13   BY MS. ROBERTS:
14   Q.   It was your desire as well to have the contract voted
15   on by the outgoing board?
16           THE COURT:  Which contract?
17           MS. ROBERTS:  The amendments to his contract that
18   were discussed at the December 5 meeting.
19           THE COURT:  Restate the question, please.
20   BY MS. ROBERTS:
21   Q.   Certainly.
22           It was your desire, Mr. Klune, to have the second
23   amendment to your contract voted on by the outgoing board as
24   opposed to waiting for the newly elected board members to be
25   sworn in two days later; correct?
```

TESTIMONY OF PETER KLUNE
April 22, 2015, Afternoon Session

```
 1              MR. KOSTIC:  Asked and answered.

 2              THE COURT:  Overruled.  You may answer.

 3              THE WITNESS:  I agreed to the outgoing board's

 4   request.

 5   BY MS. ROBERTS:

 6   Q.   Did you take into account at any of these meetings when

 7   the public was speaking out what their concerns and comments

 8   were?

 9   A.   Certainly.

10   Q.   Because, in fact, the District belongs to the people of

11   Blythe; correct?

12   A.   Absolutely.

13              MR. KOSTIC:  Calls for a legal conclusion, Your

14   Honor.

15              THE COURT:  Sustained.

16   BY MS. ROBERTS:

17   Q.   All right.  Now, Mr. Klune, you left for a vacation

18   after the new board members were sworn in and you came back

19   the first week of January; correct?

20   A.   Correct.

21   Q.   Is that the reason why there were no financial reports

22   in the month of December 2012?

23   A.   No.

24   Q.   Were financial reports given in the month of December

25   2012?
```

*Day 2 of Court Trial, April 22, 2015, Afternoon Session*

123

CERTIFICATE

I, PAT CUNEO, CSR 1600, hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date: April 23, 2015

/s/ PAT CUNEO

PAT CUNEO, OFFICIAL REPORTER
CSR NO. 1600

*Day 2 of Court Trial, April 22, 2015, Afternoon Session*

APP0094                                        EXHIBIT A

1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    WESTERN DIVISION

4    THE HONORABLE JOHN A. KRONSTADT, JUDGE PRESIDING

5

6    DENNIS RUTHERFORD, et al.,          )
                                         )
7                        Plaintiffs,     )
                                         )
8                                        )
             vs.                         )   No. EDCV 13-1247 JAK-SP
9                                        )
     PALO VERDE HEALTH CARE DISTRICT, et )
10   al.,                                )
                                         )
11                       Defendants.     )
     _____)

12

13

14        REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS

15

16              Los Angeles, California

17        Thursday, April 23, 2015, 12:31 P.M.

18        Day 3 of Court Trial, Page 1 through 163

19

20

21                           PAT CUNEO CSR 1600, CRR-CM
                             Official Reporter
22                           Roybal Federal Building
                             Room 181-E
23                           255 East Temple Street
                             Los Angeles, California 90012
24                           213-894-1782
                             patcuneo1600@gmail.com
25                           www.patcuneo.com

*Day 3 of Court Trial, April 23, 2015*

TESTIMONY OF PETER KLUNE
April 23, 2015

12

```
 1    to advise on their patients' preferences and that, in fact,

 2    was the original intent in 2010 when I signed some of these

 3    documents that have just been put in evidence.

 4    BY MS. ROBERTS:

 5    Q.   All right.  And, likewise, if the physicians local to

 6    Blythe had preferences regarding which company was used to

 7    transport patients, that those preferences should not be

 8    honored?  Actually, let me withdraw that question.

 9              Likewise, Mr. Klune, if the physicians local to

10    Blythe preferred a particular transport company, that was

11    not something that you would consider to be unlawful;

12    correct?

13    A.   Not in a situation where all other things were equal,

14    meaning the patient was not being harmed or disadvantaged by

15    that mode of transport.

16    Q.   In other words, Mr. Klune, it's not unlawful for

17    physicians to have certain preferences regarding who treats

18    their patients or how their patients are transported when

19    necessary; correct?

20              MR. KOSTIC:  Overbroad, vague and ambiguous, calls

21    for a legal conclusion.

22              THE COURT:  As framed, it's calling for a legal

23    statement.

24    BY MS. ROBERTS:

25    Q.   All right.  Mr. Klune, you did not meet with
```

*Day 3 of Court Trial, April 23, 2015*

EXHIBIT A

TESTIMONY OF PETER KLUNE
April 23, 2015

13

1   Trina Sartin or Sandy Hudson in the weeks after they were

2   elected to the board in November of 2012; correct?

3   A.   That is correct.

4   Q.   And you don't specifically have recollections -- strike

5   that.

6          You don't have any specific recollection of

7   conversations that you had with Sandra Hudson in 2012 or

8   2013; correct?

9          MR. KOSTIC:   Overbroad.

10          THE COURT:   Overruled.   You may answer.

11          THE WITNESS:   I don't recall what conversations I

12   may have had with Trina Sartin or Sandy Hudson in 2012.

13   BY MS. ROBERTS:

14   Q.   All right.   And the same would be true in the year

15   2013; correct?

16   A.   No.   2013 is pretty clear.

17   Q.   Okay.   Well, when I asked you at your deposition -- let

18   me just read from his deposition, Your Honor.

19          THE COURT:   Just a moment, please.

20          What page and lines?

21          MS. ROBERTS:   Beginning with page 332, line 23, to

22   333, line 10.

23          *(Pause in the proceedings.)*

24          THE COURT:   All right.   You may read that.

25          MS. ROBERTS:   *(Reading:)*

TESTIMONY OF PETER KLUNE
April 23, 2015

14

```
 1            "QUESTION:  When was the last time you had a
 2    communication with Sandra Hudson?
 3            "ANSWER:  I don't recall.
 4            "QUESTION:  What year was it?
 5            "ANSWER:  It was more than a year ago.
 6            "QUESTION:  Did you have any direct communications
 7    with Sandra Hudson in the year 2013?
 8            "ANSWER:  I'm sure I did.
 9            "QUESTION:  When was that?
10            "ANSWER:  I was the CEO of the hospital in January
11    of 2013 and Ms. Hudson was a board member at that point.  I
12    am sure we had some exchanges which specifics I do not
13    recall."
14                      (End of reading deposition.)
15    BY MS. ROBERTS:
16    Q.    Now, Mr. Klune, you do not recall any specific
17    communications you had with Trina Sartin in the year 2013;
18    correct?
19    A.    Correct.
20    Q.    All right.  And you do not recall any specific
21    communications that you had with Sam Burton in the year
22    2013; correct?
23    A.    Not offhand, no.
24    Q.    All right.  And you also do not recall any specific
25    conversations that you had with Sam Burton in the year 2012;
```

*Day 3 of Court Trial, April 23, 2015*

EXHIBIT A

TESTIMONY OF PETER KLUNE
April 23, 2015

15

```
 1   correct?
 2   A.    Not offhand, no.
 3   Q.    Now, did you learn -- well, actually, let me just back
 4   up for a second here.
 5            The finances, when you started at Palo Verde
 6   Hospital, you described them as being in very bad shape.  Is
 7   that a fair characterization of your view of the finances at
 8   that time?
 9   A.    Yes, it is.
10   Q.    All right.  And yesterday you testified that when you
11   started as the CEO in 2009 you began eliminating staffing
12   positions in order to cut costs.
13            Do you recall that testimony?
14   A.    I do.
15   Q.    Do you recall what positions were eliminated?
16   A.    I do not.
17   Q.    All right.  And you eliminated staffing positions in
18   2009, according to your testimony, to reduce payroll and
19   benefit expenses; correct?
20   A.    This would be accurate.
21   Q.    Do you recall how many positions you eliminated when
22   you began at Palo Verde Hospital?
23   A.    I do not.
24   Q.    And you also said that there were wage freezes; is that
25   correct?
```

*Day 3 of Court Trial, April 23, 2015*

TESTIMONY OF PETER KLUNE
April 23, 2015

21

1           "QUESTION:  And the financial report was

2     concerning but even more concerning was the actual financial

3     state of the hospital as of January 16, 2013; correct?

4           "ANSWER:  The financial condition of the hospital

5     was very concerning."

6                 (End of reading deposition.)

7     Q.   Now, Mr. Klune, you did not address the board at all

8     after the financial report was presented; correct?

9                 THE COURT:  On what date?

10                MS. ROBERTS:  I'm sorry, Your Honor.

11    Q.   Mr. Klune, you did not address the board after

12    Mr. Rutherford presented the financials on January 16, 2013;

13    correct?

14    A.   From looking at the agenda, it does not appear so.  I

15    don't have a specific recollection one way or the other.

16    Q.   Okay.  Now, yesterday you testified that you, in your

17    comments to the board at the January 16, 2013 meeting, that

18    you spoke about the financials.

19                Do you recall that testimony?

20    A.   I do in general terms, yes.

21    Q.   And you did not actually address the board about the

22    fact that the cash at the hospital had declined more than

23    $6 million in the two years prior to that meeting, did you,

24    Mr. Klune?

25                MR. KOSTIC:  Argumentative, overbroad.

*Day 3 of Court Trial, April 23, 2015*

TESTIMONY OF PETER KLUNE
April 23, 2015

22

```
 1              THE COURT:  Just a minute.

 2                   (Pause in the proceedings.)

 3              THE COURT:  Overruled.  You may answer.

 4              THE WITNESS:  I probably didn't.  It wouldn't have

 5    been within the scope of my report.

 6    BY MS. ROBERTS:

 7    Q.   At that meeting, did you offer to the board to take a

 8    reduction in your pay?

 9    A.   No, I did not.

10    Q.   At that meeting did you provide the board with a

11    schedule of steps to take in the immediate future to save

12    the hospital from closure?

13              MR. KOSTIC:  Argumentative, assumes facts.

14              THE COURT:  Just a minute.

15                   (Pause in the proceedings.)

16              THE COURT:  There's no foundation.

17    BY MS. ROBERTS:

18    Q.   Mr. Klune, did you offer the board at the January 16,

19    2013 meeting any list or schedule of steps to be taken to

20    address the financial problems that were very concerning to

21    you?

22    A.   One, yes.

23    Q.   And what was that step?

24    A.   To meet with the administrative staff in a meeting to

25    develop that business plan.
```

*Day 3 of Court Trial, April 23, 2015*

# TESTIMONY OF PETER KLUNE
April 23, 2015

```
 1   being paid to Mr. Klune?

 2            MR. KOSTIC:  Overbroad.

 3            THE COURT:  Overruled.  You may answer.

 4            Do you understand the question?

 5            THE WITNESS:  Did I agree with what he was being

 6   paid?  Is that the question?

 7            THE COURT:  Correct.  Was there anytime -- read

 8   the question, please.

 9                 (The record was read.)

10            THE COURT:  Do you understand the question?  You

11   may answer.

12            THE WITNESS:  (No audible response.)

13            THE COURT:  Is that a "yes."  You do understand

14   it?

15            THE WITNESS:  I understand it.  I'm sorry.

16            Yes.  At that time when he was being negotiated on

17   his salary, that's why the amounts came out the way they did

18   because I didn't agree.

19   BY MS. ROBERTS:

20   Q.   You didn't agree with Mr. Klune making $450,000 or

21   more; correct?

22   A.   Correct.

23   Q.   All right.  Now, one of the issues that was addressed

24   regarding what to do with Mr. Klune was related to his

25   compensation; correct?
```

*Day 3 of Court Trial, April 23, 2015*

1                          CERTIFICATE

2

3        I, PAT CUNEO, CSR 1600, hereby certify that

4  pursuant to Section 753, Title 28, United States Code, the

5  foregoing is a true and correct transcript of the

6  stenographically reported proceedings held in the

7  above-entitled matter and that the transcript page format is

8  in conformance with the regulations of the Judicial

9  Conference of the United States.

10

11  Date:  April 24, 2015

12

13

14

15

16                           /s/ PAT CUNEO

17                           PAT CUNEO, OFFICIAL REPORTER

18                           CSR NO. 1600

19

20

21

22

23

24

25

*Day 3 of Court Trial, April 23, 2015*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -


DENNIS RUTHERFORD, ET AL.,          )
                                    )
                  PLAINTIFF,        )
                                    )
VS.                                 )  CV13-01247-JAK
                                    )
PALO VERDE HEALTH CARE DISTRICT,    )
ET AL.,                             )
                                    )
                  DEFENDANT.        )
_____)
                                    )
- AND CONSOLIDATED CASES -          )
_____)



REPORTER'S TRANSCRIPT OF DAY FOUR OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

FRIDAY, APRIL 24, 2015






_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-H
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

TESTIMONY OF PETER KLUNE
April 24, 2015

22

1    STANDPOINT THAT WE WERE CONSIDERING WAGE FREEZES FOR

2    THE WHOLE HOSPITAL.  I WOULD HAVE PUT MYSELF IN THAT

3    SAME BUCKET WITH THAT KIND OF A --

4          THE COURT:  I SEE.

5          SO IN YOUR THINKING, WAS -- YOUR THINKING

6    ABOUT THE POSSIBILITY OF A WAGE FREEZE WITH RESPECT TO

7    YOUR OWN COMPENSATION, DID YOU -- WAS YOUR -- WHAT WAS

8    YOUR THINKING AS TO HOW A WAGE FREEZE WOULD AFFECT YOUR

9    COMPENSATION?

10         THE WITNESS:  IT WOULD AFFECT MY COMPENSATION

11   THE WAY IT WOULD AFFECT EVERY OTHER EMPLOYEE'S

12   COMPENSATION.

13         THE COURT:  OKAY.  NOW, THERE WAS -- AS I

14   MENTIONED EARLIER, THERE WAS -- THERE'S BEEN EVIDENCE

15   PRESENTED CONCERNING A PROJECTION AS TO THE CASH

16   AVAILABLE TO PALO VERDE BY THE END OF THE SECOND

17   QUARTER OF 2013.  AND I BELIEVE THAT ESTIMATE WAS LESS

18   THAN $700,000 IN CASH.

19         DOES THAT CONFORM TO YOUR RECOLLECTION?

20         THE WITNESS:  I BELIEVE THAT'S CORRECT.

21         THE COURT:  WHEN YOU WERE DOING YOUR THINKING

22   THAT YOU TOLD ME ABOUT, DID YOU -- DID YOU TAKE THAT

23   INTO -- DID YOU TAKE THAT CASH FLOW -- EXCUSE ME.

24         IN DOING YOUR THINKING ABOUT YOUR OWN

25   COMPENSATION, DID YOU TAKE INTO ACCOUNT THAT

TESTIMONY OF PETER KLUNE
April 24, 2015

23

1    PROJECTION?

2            THE WITNESS:  ABSOLUTELY.

3            THE COURT:  I SEE.

4            IN WHAT WAY DID YOU -- IF YOU DID, DID

5    YOU ANALYZE WHETHER, WITH THAT CASH PROJECTION, PALO

6    VERDE COULD CONTINUE TO COMPENSATE YOU EACH MONTH AT

7    YOUR -- AT YOUR THEN-CURRENT SALARY?

8            THE WITNESS:  IF I MAY, YOUR HONOR?  THAT CASH

9    PROJECTION WAS ASSUMING WE DID NOTHING, THAT WE SAT IN

10   OUR CHAIRS, THAT WE DID ABSOLUTELY NOTHING AS CEO, CFO,

11   OTHER ADMINISTRATOR.  WE WERE PREPARED TO DO MANY

12   THINGS.  AND SO THAT WAS NOT A PROGNOSTICATION OF WHERE

13   WE WOULD BE.  THAT WAS A WAKE-UP CALL TO THE NEW BOARD

14   TO SAY, WE NEEDED YOUR SUPPORT TO GET THINGS DONE.

15           MS. ROBERTS:  MOTION TO STRIKE AS

16   NONRESPONSIVE, YOUR HONOR.

17           THE COURT:  MOTION DENIED.  JUST A MINUTE.

18           I'M NOT ASKING YOU TO SPECULATE.  I'M

19   ASKING THE THINGS YOU THOUGHT ABOUT IN LATE 2012, EARLY

20   2013.

21           IN WHAT YOU JUST STATED ABOUT BEING

22   PREPARED TO DO VARIOUS THINGS THAT COULD ADDRESS THE

23   FINANCIAL POSITION OF PALO VERDE, I JUST WANT TO MAKE

24   SURE I'M CLEAR ON THIS.  YOU'VE TOLD ME THAT ONE OF THE

25   THINGS THAT YOU THOUGHT ABOUT WAS WHETHER YOU YOURSELF

TESTIMONY OF PETER KLUNE
April 24, 2015

24

```
 1    WOULD TAKE SOME FREEZE THAT WOULD CORRESPOND TO A

 2    FREEZE IN COMPENSATION THAT MIGHT APPLY TO SOME OTHERS

 3    EMPLOYED; IS THAT CORRECT?

 4              THE WITNESS:  YES.

 5              THE COURT:  OTHER THAN BY WAGE FREEZE, DID YOU

 6    HAVE THAT QUANTIFIED?

 7                   DOES "WAGE FREEZE" MEAN -- WHEN YOU SAY

 8    "WAGE FREEZE," DID THAT MEAN ANYTHING DIFFERENT THAN

 9    YOUR COMPENSATION WOULD BE FROZEN AT ITS THEN-CURRENT

10    LEVEL?

11              THE WITNESS:  THAT'S CORRECT.

12              THE COURT:  I SEE.

13              OKAY.  THANK YOU FOR YOUR TESTIMONY,

14    MR. KLUNE.  YOU MAY STEP DOWN.

15              THE WITNESS:  THANK YOU, YOUR HONOR.

16              THE COURT:  WOULD YOU CALL THE NEXT WITNESS,

17    PLEASE.

18              MR. KOSTIC:  YES, YOUR HONOR.

19                   THE PLAINTIFFS WOULD CALL DENNIS

20    RUTHERFORD.

21              THE COURT:  MR. RUTHERFORD, WOULD YOU COME

22    FORWARD, PLEASE.

23              THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE

24    TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

25    PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE
```

TESTIMONY OF PETER KLUNE
April 24, 2015

86

1    NEVADA, IN LAS VEGAS.  THERE WAS A HOSPITAL IN NORTHERN

2    CALIFORNIA.  BESIDE THAT, I DON'T REMEMBER.

3    Q    DID YOU HAVE ANY IN-PERSON INTERVIEWS OTHER THAN AT

4    GILBERT HOSPITAL?

5    A    NO.  JUST BAKERSFIELD HEART HOSPITAL.

6    Q    DID YOU RECEIVE ANY OFFERS PRIOR TO THE OFFER FROM

7    GILBERT HOSPITAL?

8    A    NO, I DIDN'T.

9    Q    DID YOUR TERMINATION FROM PALO VERDE HOSPITAL --

10   AFTER YOUR TERMINATION FROM PALO VERDE HOSPITAL, DID

11   YOU EXPERIENCE ANY EMOTIONAL DIFFICULTY?

12   A    YES.

13   Q    CAN YOU DESCRIBE THE EMOTIONAL DIFFICULTY YOU

14   EXPERIENCED?

15   A    SURE.  I WENT THROUGH ANXIETY AND BASICALLY MY

16   ANGER INCREASED.  UNFORTUNATELY, I TOOK IT OUT ON MY

17   WIFE.  SINCE THEN IN GENERAL, CANDIDLY, THE ENJOYMENT

18   OF MY PROFESSION IS NOT WHAT IT USED TO BE.

19   Q    ABOUT WHAT WERE YOU ANXIOUS?

20   A    ABOUT TRYING TO DO THE RIGHT THING AND HAVING IT

21   APPEAR TO TURN AROUND ON ME.

22   Q    IN WHAT MANNER DID YOUR ANGER INCREASE?

23   A    WELL, I JUST HAD A SHORTER TEMPER, BASICALLY LESS

24   TOLERANT, MORE AGITATED AFTER THE EVENTS.

25   Q    WHY DO YOU FEEL THAT YOU ENJOY YOUR PROFESSION LESS

TESTIMONY OF PETER KLUNE
April 24, 2015

```
1    A    NO.

2    Q    AND AT CHILDREN'S HOSPITAL, THERE HAS NEVER BEEN A

3    TIME WHERE YOU HAD BEEN -- RECEIVED $105,000 IN PAY

4    INCREASES IN A 15-MONTH PERIOD OF TIME; CORRECT?

5    A    AGAIN, I --

6              MR. KOSTIC:  ARGUMENTATIVE, YOUR HONOR.

7              THE COURT:  OVERRULED.

8                   YOU MAY ANSWER.

9              THE WITNESS:  NO, THERE WASN'T.

10   BY MS. ROBERTS:

11   Q    NOW, DURING -- LET ME START OVER.

12              IN MARCH OF 2012, YOU ALSO RECEIVED ANOTHER

13   PAY INCREASE OF APPROXIMATELY $9500, A BIWEEKLY RATE.

14   SO ABOUT A $18,000 A MONTH PAY INCREASE; CORRECT?

15   A    YES.

16   Q    ALL RIGHT.  SO ACTUALLY IN THE FIRST 15 MONTHS THAT

17   YOU WERE AT PALO VERDE HOSPITAL, YOUR BASE SALARY WENT

18   FROM 150- TO 224-.  YOU RECEIVED $35,000 IN DEFERRED

19   COMPENSATION.  AND APPROXIMATELY ONE YEAR LATER, YOU

20   RECEIVED AN $18,000 RAISE; CORRECT?

21   A    YES.

22   Q    ALL RIGHT.  NOW, IT'S YOUR CLAIM, MR. RUTHERFORD,

23   THAT YOU PLANNED TO STAY AT PALO VERDE HOSPITAL UNTIL

24   YOU RETIRED; CORRECT?

25   A    YES, IF ANOTHER OPPORTUNITY DID NOT ARISE THAT WAS
```

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES      )
                               )

4    STATE OF CALIFORNIA       )

5

6                I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

7    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

8    COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

9    CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

10   STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

11   TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

12   HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

13   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

14   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

15   STATES.

16   DATE:  APRIL 24, 2015

17

18                    /S/ ALEXANDER T. JOKO

19                    _____
                    ALEXANDER T. JOKO, CSR NO. 12272
                    FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

```
DENNIS RUTHERFORD, ET AL.,          )
                                    )
                PLAINTIFF,          )
                                    )
VS.                                 )  CV13-01247-JAK
                                    )
PALO VERDE HEALTHCARE DISTRICT,     )
ET AL.,                             )
                                    )
                DEFENDANT.          )
_____)
                                    )
- AND CONSOLIDATED CASES -          )
_____)
```

REPORTER'S TRANSCRIPT OF DAY FIVE OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, APRIL 28, 2015

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-H
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

APP00111                                    EXHIBIT A

TESTIMONY OF BLAISE JACKSON
April 28, 2015

7

1    Q    AND WHEN YOU SERVE AS DISTRICT COUNSEL, DO YOU AND

2    MR. SCOTT SHARE THE DUTY AND RESPONSIBILITIES?

3    A    WE HAVE TO.  WE'RE A JUST A THREE-PERSON LAW FIRM.

4    SO THERE'S AN AWFUL LOT OF INTERACTION BETWEEN US.

5    Q    DO YOU CURRENTLY DO WORK FOR PALO VERDE HEALTHCARE

6    DISTRICT?

7    A    WE DO.

8    Q    AND IN WHAT CAPACITY?

9    A    WE HAVE SERVED AS THE GENERAL OR DISTRICT COUNSEL

10   FOR PALO VERDE HEALTHCARE DISTRICT SINCE, I BELIEVE,

11   THE LATTER PART OF DECEMBER 2012 UP TO THE PRESENT.

12   THIS IS ACTUALLY OUR SECOND TENURE AS GENERAL COUNSEL

13   FOR PALO VERDE.  WE WERE THERE ONCE BEFORE FROM 2003

14   TO, ROUGHLY, MAY OF 2008.

15   Q    AND WHY DID YOU STOP BEING DISTRICT COUNSEL FOR

16   PALO VERDE HEALTHCARE DISTRICT IN 2008?

17            MR. KOSTIC:  RELEVANCE.  LACKS FOUNDATION.

18            THE COURT:  TO WHAT IS THIS RELEVANT?

19            MS. ROBERTS:  TO THE CHANGEOVER IN DISTRICT

20   COUNSEL.  THAT IS NOT UNCOMMON WITH HEALTHCARE

21   DISTRICTS.

22            THE COURT:  BRIEFLY, YOU MAY ANSWER.

23            THE WITNESS:  YES.  THE BOARD AND THE

24   ADMINISTRATION WANTED TO GO IN A DIFFERENT DIRECTION.

25   AND WE STEPPED ASIDE AND ALLOWED THAT TO HAPPEN.  AND I

EXHIBIT A

TESTIMONY OF BLAISE JACKSON
April 28, 2015

8

1    BELIEVE AT THAT TIME IS WHEN THEY HIRED MR. PATTERSON

2    AND BEST, BEST AND KRIEGER.

3    BY MS. ROBERTS:

4    Q    OPERATIONALLY, ARE PUBLIC HEALTHCARE DISTRICTS LIKE

5    PALO VERDE HEALTHCARE DISTRICT DIFFERENT THAN IN THE

6    PRIVATE HOSPITALS?

7            MR. KOSTIC:  LACKS FOUNDATION.  VAGUE.

8    RELEVANCE.  LEADING.

9            THE COURT:  OVERRULED.

10           THE WITNESS:  YES.  ESSENTIALLY, THIS IS TRUE

11   IN ANY PUBLIC AGENCY SETTING.  YOU ARE HAVING TO WORK

12   WITHIN THE CONFINES OF THE OPEN MEETING LAWS THAT

13   APPLY.  WE CALL THEM THE "BROWN ACT" IN CALIFORNIA.

14           THE COURT:  THAT'S FINE.  STOP THERE.

15               NEXT QUESTION, PLEASE.

16   BY MS. ROBERTS:

17   Q    HAVE THERE BEEN -- DO YOU KNOW HOW MANY CEO'S PALO

18   VERDE HEALTHCARE DISTRICT HAS HAD IN THE LAST 10 YEARS?

19   A    I BELIEVE THE NUMBER IS SEVEN.

20   Q    AND HOW DO YOU KNOW THAT?

21   A    WELL, WE WERE THERE FROM 2003 TO 2008.  SO WE WERE

22   ACQUAINTED WITH THE INDIVIDUALS WHO HELD THE JOB DURING

23   THAT TIME FRAME.  AND BECAUSE OF OUR CURRENT TENURE

24   AND, AMONG OTHER THINGS, THIS CASE, WE'RE AWARE OF WHO

25   WAS IN THAT ROLE DURING THE TIME THAT WE WEREN'T

TESTIMONY OF RICHARD GIANELLO
April 28, 2015

54

```
1              IT'S A BUSINESS RECORD.  TO THE EXTENT
2    THERE ARE, WITHIN IT, STATEMENTS THAT ARE HEARSAY, I'LL
3    ADDRESS THOSE IF THEY'RE DISPLAYED.  BUT THE INTERNAL
4    HEARSAY -- IF THERE'S INTERNAL HEARSAY WHOSE ADMISSION
5    YOU SEEK, YOU NEED TO IDENTIFY IT AND THE EXCEPTION
6    THAT WOULD APPLY.  OTHERWISE, IT WILL -- UNTIL THAT
7    OCCURS, IT'S DEEMED NOT ADMITTED FOR THAT PURPOSE.
8              MS. ROBERTS:  THANK YOU, YOUR HONOR.
9              (EXHIBIT 417 RECEIVED IN EVIDENCE)
10   BY MS. ROBERTS:
11   Q    MR. GIANELLO, WERE YOU PERSONALLY INVOLVED IN
12   ASSESSING THE FINANCES OF PALO VERDE HOSPITAL IN THAT
13   TIME PERIOD OF FEBRUARY TO MAY 2013?
14   A    I WAS.
15   Q    AND WHAT WERE THE CONDITIONS OF THE -- WHAT WAS THE
16   CONDITION OF THE FINANCES WHEN YOU ARRIVED AT PALO
17   VERDE HOSPITAL?
18             MR. KOSTIC:  LACKS FOUNDATION.  HEARSAY.
19   SPECULATION.
20             THE COURT:  OVERRULED.
21             THE WITNESS:  BASICALLY THE HOSPITAL WAS IN
22   DIRE FINANCIAL STRAITS.  THEY HAD PROJECTED THEY WOULD
23   RUN OUT OF CASH BY JUNE OF 2013.  THEY WERE LOSING, I
24   BELIEVE, APPROXIMATELY LITTLE OVER $4 MILLION A YEAR AT
25   THAT POINT IN TIME.
```

TESTIMONY OF RICHARD GIANELLO
April 28, 2015

55

BY MS. ROBERTS:

1

2    Q    AND DID THE FINANCIAL CONDITION OF THE HOSPITAL, IN

3    YOUR OPINION, REQUIRE IMMEDIATE STEPS IN ORDER TO KEEP

4    THE HOSPITAL OPEN?

5    A    ABSOLUTELY.

6    Q    AND DID YOU MAKE RECOMMENDATIONS FOR STEPS TO BE

7    TAKEN TO TRY TO KEEP THE HOSPITAL OPEN?

8    A    WE DID.

9    Q    AND DID YOU SEE, IN YOUR ASSESSMENT, ANY INDICATION

10   OF WHETHER ANY OF THE STEPS YOU RECOMMENDED HAD BEEN

11   TAKEN OR BEGUN BEFORE YOU CAME IN AND BEGAN YOUR

12   ASSESSMENT?

13            MR. KOSTIC:  LACKS FOUNDATION.  SPECULATION.

14   HEARSAY.  BEST EVIDENCE RULE.

15            THE COURT:  JUST A MINUTE.

16            I'M NOT -- I DON'T UNDERSTAND THE

17   QUESTION.  RESTATE THE QUESTION.

18   BY MS. ROBERTS:

19   Q    THE RECOMMENDATIONS THAT YOU MADE TO PALO VERDE

20   HOSPITAL WERE TO TAKE CERTAIN STEPS; IS THAT CORRECT?

21   A    YES.

22   Q    DID YOU SEE, IN YOUR OPERATIONAL ASSESSMENT,

23   WHETHER ANY OF THOSE STEPS HAD BEGUN BEFORE YOU CAME TO

24   PALO VERDE HOSPITAL?

25            MR. KOSTIC:  HEARSAY.  LACKS FOUNDATION.

TESTIMONY OF SANDRA ANAYA
April 28, 2015

128

1    A    YES.

2    Q    WHAT WAS PALO VERDE HOSPITAL LIKE WHEN YOU STARTED

3    THERE IN JULY OF 2013?

4           MR. KOSTIC:  OVERBROAD.

5           THE COURT:  SUSTAINED.

6    BY MS. ROBERTS:

7    Q    WHEN YOU BEGAN AT PALO VERDE HOSPITAL, WHAT WAS THE

8    FIRST THING THAT YOU -- OR ISSUE OR TASK THAT YOU

9    ADDRESSED AT PALO VERDE HOSPITAL?

10   A    THE WEEK THAT I WAS HIRED, WHICH I WAS HIRED

11   TUESDAY -- OR I STARTED WORK ON TUESDAY, THE 13TH, I

12   BELIEVE.  DURING THAT WEEK, I RECEIVED A LETTER FROM

13   CMS THAT THE HOSPITAL WAS IN JEOPARDY OF LOSING DEEMED

14   STATUS.

15           MR. KOSTIC:  MOVE TO STRIKE.  HEARSAY.  BEST

16   EVIDENCE RULE.

17           THE COURT:  WELL -- ALL RIGHT.  I'LL SUSTAIN

18   THE OBJECTION WITH RESPECT TO THE CONTENT OF THE

19   LETTER.

20   BY MS. ROBERTS:

21   Q    WHAT DID YOU DO IN RESPONSE TO RECEIVING THE LETTER

22   FROM CMS REGARDING THE DEEMED STATUS?

23   A    I REVIEWED ALL OF THE 2567 CITATIONS THAT HAD BEEN

24   ISSUED.  AND I IMMEDIATELY STARTED TO WORK WITH THE

25   EMPLOYEES AND THE MANAGERS TO DETERMINE WHETHER THE

TESTIMONY OF SANDRA ANAYA
April 28, 2015

129

1    ACTION HAD BEEN CARRIED OUT THAT HAD BEEN RESPONDED TO

2    ON THOSE PLANS.

3    Q    WAS ONE OF THE SURVEYS THAT YOU REVIEWED, THE

4    SURVEY OF MARCH 13, 2013?

5    A    I'M SORRY?

6    Q    WAS ONE OF THE 2567 SURVEYS THAT YOU REVIEWED, THE

7    ONE THAT WAS ISSUED IN MARCH OF 2013?

8    A    YES.

9    Q    LET ME ASK YOU TO TURN TO EXHIBIT 486 IN THE

10   DEFENSE BINDER BEHIND YOU.  MS. ANAYA, IT'S BINDER --

11   DEFENSE BINDER 3 OF 6.

12   A    IT SAYS "3 OF 5."

13             THE COURT:  THAT'S CORRECT.  IT'S "5."

14   BY MS. ROBERTS:

15   Q    IF YOU COULD TURN TO EXHIBIT 486.

16   A    YES, I HAVE IT.

17   Q    AND IS THAT THE MARCH 2013 SURVEY FROM MEDI-CAL

18   THAT YOU REFERENCED AS ONE OF THE 2567'S THAT YOU HAD

19   REVIEWED?

20   A    YES.  IT'S FROM DHS.

21   Q    ALL RIGHT.  AND IS THAT DOCUMENT APPROXIMATELY 132

22   PAGES IN LENGTH?

23   A    YES, IT IS.

24             MS. ROBERTS:  YOUR HONOR, I WOULD MOVE TO

25   ADMIT EXHIBIT 486.

TESTIMONY OF SANDRA ANAYA
April 28, 2015

130

1      THE COURT:   ANY OBJECTION?

2      MR. KOSTIC:   HEARSAY AND RELEVANCE.

3      THE COURT:   OVERRULED.   IT'S ADMITTED.

4      (EXHIBIT 486 RECEIVED IN EVIDENCE)

5      THE COURT:   SAME LIMITATION.   TO THE EXTENT

6  THERE'S HEARSAY WITHIN HEARSAY AND YOU WISH TO HAVE

7  IT -- THAT ADMITTED, YOU'LL NEED TO ADDRESS THAT.

8  BY MS. ROBERTS:

9  Q    WHEN YOU REVIEWED EXHIBIT 486, MS. ANAYA, DID YOU

10  BEGIN TO TAKE ANY STEPS TO RESPOND TO THE AREAS THAT

11  HAD BEEN CITED IN EXHIBIT 486?

12  A    YES.   WE PRIMARILY FOCUSED ON MAKING SURE THAT THIS

13  PLAN OF CORRECTION HAD BEEN IMPLEMENTED.   WENT BACK.   I

14  LOOKED AT POLICIES.   PRIMARILY THE DISCHARGE PLANNING

15  ONE WAS A HUGE ONE ON THIS SURVEY.   LOOKED AT

16  INTERACTIONS AND COMMUNICATIONS BETWEEN CASE MANAGEMENT

17  AND NURSING BECAUSE AN AREA OF FOCUS HAD BEEN INTER --

18  A LACK OF COMMUNICATION ABOUT THE DISCHARGE PLAN.

19      SO WE STARTED TO PUT IN MONITORING INDICATORS,

20  POLICY UPDATES, AND GO BACK AND MAKE SURE THAT EVERY

21  SINGLE THING HAD BEEN ADDRESSED.

22  Q    ALL RIGHT.   WHO WAS IN CHARGE -- LET ME ASK YOU

23  THIS:

24      DO YOU KNOW WHETHER YOUR PREDECESSOR, LARRY

25  BLITZ, WHO WAS THE INTERIM CEO, WHETHER HE HAD BEGUN TO

TESTIMONY OF SANDRA ANAYA
April 28, 2015

131

```
1    RESPOND TO THE SURVEY THAT IS MARKED AS EXHIBIT 486?

2    A    I DON'T REALLY.

3    Q    YOU DON'T KNOW ONE WAY OR THE OTHER?

4    A    IN THE MARCH SURVEY -- LET ME SEE.  IT'S NOT

5    SIGNED.

6              SO IN THE MARCH SURVEY, HFS CONSULTANTS HAD

7    HAPPENED TO BE THERE TO DO THE ASSESSMENT OF THE

8    ORGANIZATION.  IT'S MY UNDERSTANDING THAT HFS

9    CONSULTANTS MET WITH SURVEYORS AND HELPED DEVELOP A

10   CORRECTIVE ACTION PLAN.

11   Q    MS. ANAYA, WERE ALL OF THE ISSUES IN EXHIBIT 486

12   RESPONDED TO THROUGH CORRECTIVE ACTION BY PALO VERDE

13   HOSPITAL?

14   A    YES.

15   Q    WHEN YOU BEGAN AT PALO VERDE HOSPITAL, DID YOU DO

16   AN ASSESSMENT OF ANY LIFE SAFETY ISSUES?

17   A    YES, I DID.  THERE WERE SEVERAL PLANT OPERATION

18   ISSUES, ONE OF -- COUPLE OF WHICH WERE VERY DANGEROUS

19   FOR EMPLOYEES AND PATIENTS.  THERE WERE NO EXIT

20   ILLUMINATION SIGNS, WHICH IS REQUIRED FOR THE FIRE

21   SAFETY.  SO IN THE EVENT OF A FIRE, THERE WOULD BE NO

22   GUIDANCE OUT OF THE BUILDING.

23              MR. KOSTIC:  MOVE TO STRIKE AFTER "YES," YOUR

24   HONOR.  CALLS FOR A NARRATIVE, APPARENTLY.

25              THE COURT:  OVERRULED.  DENY THE MOTION.
```

TESTIMONY OF SANDRA ANAYA
April 28, 2015

132

BY MS. ROBERTS:

1    Q    WERE THERE ANY OTHER LIFE SAFETY ISSUES THAT YOU

2    NOTICED OTHER THAN THE EXIT SIGNS WERE NOT ILLUMINATED?

3    A    YES.   SPRINKLERS HAD NOT BEEN HOOKED UP IN CERTAIN

4    PARTS OF THE BUILDING.

5    Q    FIRE SPRINKLERS?

6    A    YES, FIRE SPRINKLERS.

7    Q    AND DID YOU RESPOND TO THE PROBLEMS WITH THE FIRE

8    SPRINKLERS NOT BEING SET UP AND HAVING NO LIGHTED EXIT

9    SIGNS?

10   A    YES.   WE HAD TO HOOK UP THE SPRINKLERS.   AND WE GOT

11   THE ILLUMINATION LIGHTS.   IN FACT, THEY WERE IN A

12   STORAGE AREA SOMEPLACE IN THE CITY.

13   Q    OKAY.   WERE THERE EVALUATION OF LIFE SAFETY PLAN --

14   DID YOU HAVE TO DO ANY EVALUATION OF LIFE SAFETY PLANS?

15   A    WE DID EVALUATION OF ALL THE ANNUAL PLANS THAT IS

16   REQUIRED BY CMS.   WE ALSO UPDATED THE ENTIRE DISASTER

17   MANUAL, WHICH HAD NOT BEEN REVIEWED FOR A PERIOD OF

18   TIME, THAT GOES ALONG WITH LIFE SAFETY.

19   Q    LET'S TALK ABOUT THE PHYSICAL CONDITION OF THE

20   HOSPITAL, MS. ANAYA.

21            CAN YOU DESCRIBE WHETHER OR NOT YOU MADE

22   ANY -- OBSERVED ANY PROBLEMS WITH THE PHYSICAL

23   CONDITION OF THE INSIDE OF THE HOSPITAL WHEN YOU

24   ARRIVED?

TESTIMONY OF SANDRA ANAYA
April 28, 2015

133

```
 1                MR. KOSTIC:   OVERBROAD.   LACKS FOUNDATION.

 2                THE COURT:   AT THIS POINT, IT'S A "YES" OR

 3       "NO."

 4                THE WITNESS:   YES.

 5       BY MS. ROBERTS:

 6       Q     CAN YOU DESCRIBE ANY PROBLEMS OR ISSUES THAT YOU

 7       NOTICED WHEN YOU BEGAN AT PALO VERDE HOSPITAL?

 8                MR. KOSTIC:   COMPOUND AND OVERBROAD.

 9                THE COURT:   WELL, OVERRULED.   BUT I MAY STOP

10       YOU.

11                GO AHEAD.

12                THE WITNESS:   THE HOSPITAL PRIMARILY WAS IN

13       DISREPAIR, ESPECIALLY THE EMERGENCY ROOM.   SOME OF THE

14       FORMICA COUNTERS WERE WARPED WITH WATER.   THE LOBBY

15       FURNITURE WAS BROKEN AND DINGY.

16                THE COURT:   STOP THERE.

17       BY MS. ROBERTS:

18       Q     WAS THERE ANY PROBLEMS NOTED IN THE SURVEYS OR IN

19       YOUR ASSESSMENTS REGARDING LINENS OR SCRUBS THAT WERE

20       BEING USED IN THE HOSPITAL?

21       A     YES.

22       Q     AND WHAT WAS NOTED?

23       A     THAT THE LINEN WAS STAINED AND HAD HOLES IN IT.

24       THERE WERE INSUFFICIENT SCRUBS IN THE O.R., WHICH IS

25       THEIR REQUIRED GARB WHEN THEY WORK IN THE O.R.
```

TESTIMONY OF SANDRA ANAYA
April 28, 2015

134

1    Q    WERE YOU CITED FOR HOLES IN THE WALL IN THE

2    HOSPITAL?

3    A    WE WERE CITED -- I CAN'T RECALL THAT.

4    Q    DO YOU RECALL FINDING HOLES IN THE WALLS IN THE

5    HOSPITAL?

6    A    YES.

7    Q    AND WHERE WERE THOSE?

8    A    THROUGHOUT THE COMMON AREAS AND SOME OF THE PATIENT

9    ROOMS.

10   Q    WERE THERE ISSUES REGARDING -- THAT YOU OBSERVED

11   REGARDING THE QUALITY PROGRAM THAT WAS IN EFFECT BEFORE

12   YOU BEGAN?

13   A    BEFORE I BEGAN?

14   Q    YEAH.  DID YOU NOTICE PROBLEMS WITH THE QUALITY

15   PROGRAM THAT WAS IN EFFECT AT THE TIME YOU STARTED?

16   A    YES.

17   Q    AND WHAT DID YOU NOTICE IN THAT REGARD?

18   A    THERE WAS A LACK OF INFORMATION FLOW.  SOME

19   DEPARTMENT MANAGERS WERE NOT ATTENDING QUALITY COUNSEL.

20   SOME OF THE DEPARTMENTS DID NOT HAVE MONITORING

21   INDICATORS.  THERE WAS A LACK OF TRENDING OF

22   INFORMATION THAT WAS CRITICAL TO THE HOSPITAL, LIKE

23   TRENDING OF ADVERSE EVENTS OR MEDICATION ERRORS OR

24   OCCURRENCES THAT HAPPENED SO THAT YOU CAN PRIORITIZE

25   IMPROVEMENT, WHICH IS REQUIRED.

TESTIMONY OF SANDRA ANAYA
April 28, 2015

135

1   Q    WERE YOU CITED FOR A FAILURE TO HAVE TRACKING AND

2   TRENDING?

3   A    IN SEVERAL AREAS.

4   Q    WHAT DID YOU DO TO ADDRESS THAT?  WHAT TYPE OF

5   CORRECTION ACTION?

6   A    I WENT BACK ON ABOUT NINE MONTHS OF MEDICATION

7   ERROR REPORTS.  I WENT BACK ON NINE MONTHS OF RISK

8   MANAGEMENT REPORTS.  I TRENDED THEM OUT, AND I USED

9   THEM AS AN INITIAL PHASE OF PRIORITIZING, WHAT WE WERE

10  GOING TO DO FOR IMPROVEMENT.

11  Q    AND, MS. ANAYA, DID YOU -- WHEN THE SURVEYORS CAME

12  IN FROM THE STATE OF CALIFORNIA AND ISSUED THE

13  CITATIONS, HOW FAR BACK IN TIME DID THEY GO FROM WHEN

14  THEY ARRIVED IN MARCH OF 2013?

15  A    HISTORICALLY, THEY GO BACK SIX TO EIGHT MONTHS.

16          MR. KOSTIC:  LACKS FOUNDATION.

17          THE COURT:  SUSTAINED.

18  BY MS. ROBERTS:

19  Q    MS. ANAYA, WERE YOU ABLE TO TELL, FROM LOOKING AT

20  EXHIBIT 486, HOW FAR BACK THE INVESTIGATION OF THE

21  SURVEYORS WENT?

22          MR. KOSTIC:  HEARSAY.  BEST EVIDENCE RULE.

23          THE COURT:  IT'S HEARSAY.

24  BY MS. ROBERTS:

25  Q    DID YOU MAKE CHANGES TO THE QUALITY DEPARTMENT,

TESTIMONY OF SANDRA ANAYA
April 28, 2015

136

1   MS. ANAYA?

2   A    I REVAMPED THE ENTIRE PROGRAM TO IMPROVE THE FLOW

3   AND MAKE SURE THAT WE MET ALL THE REQUIREMENTS IN CMS.

4   Q    WHO WAS THE DIRECTOR OF QUALITY SINCE YOU BEGAN?

5   A    THERE WAS AN INTERIM PERSON WHO WAS -- HER NAME WAS

6   "KIM DUNCAN."

7   Q    WHO IS CURRENTLY THE DIRECTOR OF QUALITY?

8   A    I AM.

9   Q    HOW LONG HAVE YOU HELD THAT ROLE?

10  A    PROBABLY OVER A YEAR.  PROBABLY SINCE NOVEMBER 2013

11  OR OCTOBER, AROUND THERE.

12  Q    ALL RIGHT.  WERE THERE CLINICAL POLICIES THAT YOU

13  DISCOVERED THAT WERE PROBLEMATIC WHEN YOU ARRIVED AT

14  PALO VERDE?

15  A    MOST OF THE POLICIES HAD NOT BEEN UPDATED.  AND

16  THERE WERE SEVERAL MISSING FOR MEDICATION MANAGEMENT

17  AND CRITICAL MEDICATIONS.

18  Q    WERE YOU CITED BY THE STATE FOR PROBLEMS WITH THE

19  MEDICATION PROTOCOLS AND MANAGEMENT?

20           MR. KOSTIC:  HEARSAY.

21           THE WITNESS:  YES.

22           THE COURT:  SUSTAINED.

23  BY MS. ROBERTS:

24  Q    DID YOU HAVE TO COME UP WITH A CORRECTIVE ACTION

25  PLAN FOR MEDICATION PROTOCOL DEFICIENCIES?

TESTIMONY OF SANDRA ANAYA
April 28, 2015

137

1   A    YES.

2   Q    AND WHAT DID YOU DO IN THAT REGARD?

3   A    WE IMPLEMENTED SEVERAL POLICIES ON CRITICAL

4   MEDICATIONS.  WE EDUCATED NURSES.  THERE HAD BEEN SOME

5   STANDARDS THAT WERE RECOMMENDED BY CMS IN 2011 AND 2012

6   THAT HAD NOT BEEN IMPLEMENTED.  SO WE WROTE POLICIES ON

7   THOSE.

8   Q    DID YOU HAVE TO TAKE ANY STEPS WITH RESPECT TO

9   TECHNICIANS WORKING IN THE OPERATING ROOM WHO WERE

10  EXCEEDING THEIR CERTIFICATION OR LICENSURE?

11  A    ONE OF THE FINDINGS ON THIS CITATION WAS THAT.

12         MR. KOSTIC:  MOTION TO STRIKE.  HEARSAY.

13         THE COURT:  PLEASE DON'T INTERRUPT THE

14  WITNESS.

15              **(RECORD READ)**

16         THE COURT:  CAN YOU RESPOND TO THAT QUESTION

17  WITHOUT REFERRING TO A DOCUMENT, PLEASE?

18         THE WITNESS:  WITHOUT REFERRING, YOUR HONOR?

19         THE COURT:  CORRECT.

20         THE WITNESS:  IT HAD ALREADY BEEN DONE.  O.R.

21  TECHNICIANS WERE EDUCATED BY HFS PERSONNEL.

22  BY MS. ROBERTS:

23  Q    OKAY.  AND WHO --

24         MR. KOSTIC:  MOVE TO STRIKE.  LACKS

25  FOUNDATION.  HEARSAY.

TESTIMONY OF SANDRA ANAYA
April 28, 2015

138

```
1         THE COURT:  OVERRULED.

2    BY MS. ROBERTS:

3    Q    WHOSE RESPONSIBILITY IS IT AT THE HOSPITAL FOR

4    MAKING SURE THAT THE OPERATING ROOM TECHS DO NOT EXCEED

5    WHATEVER THEIR LICENSURE OR CERTIFICATION IS?

6    A    THE CIRCULATING RN WHO IS IN THE ROOM AT THE TIME

7    THE SURGERY IS BEING PERFORMED, IF IT WAS IDENTIFIED,

8    SHOULD HAVE THEN LET THE DIRECTOR KNOW.  AND IF THE

9    DIRECTOR HAD A PROBLEM WITH RESOLUTION ON THAT LINE,

10   SHOULD HAVE CONTACTED THE CNO.  IT SHOULD MOVE UPWARD.

11   Q    MS. ANAYA, WERE THERE CORRECTIVE ACTION PLANS THAT

12   YOU CAME UP WITH THAT RELATED TO PROPER NURSE

13   SUPERVISION OF PATIENT CARE?

14   A    YES.

15   Q    AND WHAT DID THAT INVOLVE?

16   A    THAT INVOLVED DEFINING AND UPDATING WHAT'S CALLED

17   AN "ACUITY CLASSIFICATION SYSTEM."  BECAUSE THE

18   REQUIREMENT BY TITLE 22 IS THAT, WHEN AN ASSIGNMENT IS

19   MADE ON THE NURSING UNIT, THAT YOU MATCH UP THE NURSE'S

20   CAPABILITY WITH THE PATIENT'S NEEDS BASED ON CONDITION

21   AND DIAGNOSIS.  THE HOSPITAL HAD BEEN CITED FOR NOT

22   IMPLEMENTING THAT.  AND WE MADE SURE THAT THAT WAS

23   IMPLEMENTED AND THAT WE MONITORED IT DAILY.

24   Q    DO YOU KNOW WHAT TRIGGERED THE MARCH 2013 SURVEY,

25   MS. ANAYA?
```

TESTIMONY OF SANDRA ANAYA
April 28, 2015

139

1    A    EIGHT COMPLAINTS, APPARENTLY.

2    Q    AND WHAT DID THOSE COMPLAINTS RELATE TO, IF YOU

3    KNOW?

4    A    I KNOW THAT ONE OF THE COMPLAINTS WAS THAT A

5    PATIENT HAD BEEN INAPPROPRIATELY DISCHARGED SOMETIME

6    AROUND FEBRUARY OF 2013.  AND THAT WAS THE PRIMARY ONE.

7    I WOULD HAVE TO GO THROUGH AND READ ALL OF THESE.  BUT

8    THAT WAS THE BIG ONE THAT BROUGHT THE STATE IN THE

9    DOOR.

10            MR. KOSTIC:  MOVE TO STRIKE AS TO ALL BUT THE

11   ONE THAT THE WITNESS WAS ABLE TO DESCRIBE.  THE OTHER

12   ONES -- HEARSAY.

13            THE COURT:  THAT'S ALL THE ANSWER THAT WAS

14   PROVIDED.  THE ONLY ANSWER PROVIDED WAS THAT.

15   BY MS. ROBERTS:

16   Q    MS. ANAYA, WHO WAS IN CHARGE OF ENSURING FOR THE

17   PROPER DISCHARGE OF THAT PATIENT?

18   A    NURSING IS PRIMARILY RESPONSIBLE.  IT'S WITHIN OUR

19   SCOPE OF PRACTICE AS NURSES.  HOWEVER, IT'S USUALLY A

20   COMBINED PROCESS BETWEEN THE CASE MANAGER, THE RN AND

21   THE PHYSICIAN.

22   Q    AND DID YOU TAKE CORRECTIVE ACTION REGARDING THE

23   DISCHARGE PROCESS?

24   A    YES.

25   Q    AND WHAT DID DO YOU IN THAT REGARD?

TESTIMONY OF SANDRA ANAYA
April 28, 2015

140

1    A    WE MADE SURE THAT, PRIOR TO ANY DISCHARGE, THE CASE

2    MANAGER WAS NOTIFIED.  WE IMPLEMENTED A PROCESS FOR

3    SCREENING PATIENT'S DISCHARGE NEEDS AT THE TIME OF

4    ADMISSION.  WE ALSO MADE SURE THAT THE PLAN OF CARE

5    RELATED TO DISCHARGE WAS UPDATED BEFORE THE PATIENT

6    LEFT WHEN A DISCHARGE ORDER WAS OBTAINED.  AND I

7    STARTED A MORNING HUDDLE IN MY OFFICE EVERYDAY TO GO

8    OVER EVERY PATIENT THAT WAS ADMITTED, THE

9    APPROPRIATENESS OF ADMISSION, THE PROPOSED DISCHARGE

10   PLAN, THE ANTICIPATED LENGTH OF STAY.

11   Q    MS. ANAYA, WAS THE HOSPITAL CITED FOR OTHER

12   PROBLEMS THAT WE HAVEN'T COVERED?

13   A    YES, MANY.

14          MR. KOSTIC:  MOVE TO STRIKE AFTER "YES."

15   OVERBROAD.  HEARSAY.

16          THE COURT:  OVERRULED.  MOTION DENIED.

17   BY MS. ROBERTS:

18   Q    WAS THERE -- WAS THERE A PART OF THE CLINICAL

19   OPERATIONS OF THE HOSPITAL THAT WAS NOT INVOLVED IN

20   SOME ASPECT OF THE CITATION FROM MARCH OF 2013?

21   A    NOT REALLY.

22   Q    WERE THERE PROBLEMS WITH THE DIETARY PROCESSES AT

23   PALO VERDE HOSPITAL ACCORDING TO THE SURVEY?

24   A    YES.

25   Q    AND WHAT DID --

TESTIMONY OF SANDRA ANAYA
April 28, 2015

141

```
 1              MR. KOSTIC:  HEARSAY.  MOVE TO STRIKE.

 2              THE COURT:  DENIED.

 3                   IS THERE SOME REASON TO GO OVER ALL THIS

 4    IF IT'S IN THE DOCUMENT?

 5    BY MS. ROBERTS:

 6    Q    MS. ANAYA, HOW LONG DID IT TAKE FOR YOU TO BRING

 7    THE HOSPITAL INTO COMPLIANCE?

 8    A    WE WORKED FROM JULY TO ABOUT OCTOBER NON-STOP.  I'D

 9    SAY SEVEN DAYS A WEEK.  I PERSONALLY WORKED ABOUT 18

10    HOURS A DAY.  AND IT'S STILL AN ONGOING PROCESS.

11              WE HAD REVISITS FROM THE DEPARTMENT OF HEALTH

12    BASED ON THAT INITIAL SURVEY.  THEY CAME IN AND DID A

13    FULL VALIDATION SURVEY IN MAY.  THERE WERE NEW

14    FINDINGS.  WE WORKED ON THAT.  WE ALSO HAD A AN

15    UNANNOUNCED SURVEY IN DECEMBER.  IT WAS A PATIENT

16    LICENSING SURVEY -- EXCUSE ME, PATIENT SAFETY AND

17    LICENSING SURVEY.  EVERY HOSPITAL IN RIVERSIDE COUNTY

18    HAD UNDERGONE THAT SURVEY.

19              THE COURT:  STOP THERE, PLEASE.

20    BY MS. ROBERTS:

21    Q    MS. ANAYA, DID YOU, AT SOME POINT IN TIME, RESTORE

22    THE DEEMED STATUS OF THE HOSPITAL?

23    A    YES.

24    Q    IS THE --

25              MR. KOSTIC:  LACKS FOUNDATION AS TO "RESTORE."
```

TESTIMONY OF SANDRA HUDSON
April 28, 2015

186

1    Q    AND DID ANYONE VOTE AGAINST THAT?

2    A    MR. BURTON.

3    Q    WAS HE THE ONLY ONE WHO VOTED AGAINST THAT?

4    A    HE WAS.

5    Q    ALL RIGHT.  AFTER YOU WERE SWORN IN ON DECEMBER --

6    WERE YOU SWORN IN ON DECEMBER 7?

7    A    I WAS.

8    Q    AND MS. SARTIN AS WELL?

9    A    YES.

10   Q    WERE YOU DESIROUS, AFTER YOU WERE SWORN IN, ABOUT

11   SETTING A MEETING OF THE BOARD?

12   A    YES.  I ASKED THAT A MEETING BE SET FOR JANUARY THE

13   11TH BECAUSE I WANTED THE PUBLIC TO BE HEARD.  AND WE

14   ALSO HAD A BROWN ACT VIOLATION COMPLAINT IN THAT TIME.

15            MR. ARTIANO:  OBJECTION.  MOVE TO STRIKE AFTER

16   THE WORD "YES."  IT'S NONRESPONSIVE.

17            THE COURT:  MOTION GRANTED.

18   BY MS. ROBERTS:

19   Q    DID YOU SET A MEETING FOR DECEMBER 11, 2012?

20   A    YES.

21   Q    AND WHY DID YOU WANT TO SET A MEETING FOR THAT DATE

22   OR THAT SOON AFTER YOU WERE SWORN IN?

23   A    THE PUBLIC HAD BEEN OUTRAGED, AND PETER AND THE OLD

24   BOARD HAD BEEN NONRESPONSIVE TO THEM.  WE -- I FELT

25   LIKE THEY NEEDED TO BE HEARD.

TESTIMONY OF SANDRA HUDSON
April 28, 2015

187

1      THE COURT:   PLEASE REFER TO THE INDIVIDUALS BY

2   LAST NAME.

3            YOU'RE REFERRING TO "MR. KLUNE"; IS THAT

4   CORRECT?

5         THE WITNESS:   YES, I AM.   THANK YOU.

6   BY MS. ROBERTS:

7   Q     SO YOU WANTED THE PUBLIC TO HAVE AN OPPORTUNITY TO

8   BE HEARD?

9   A     ABSOLUTELY.

10  Q    WERE THERE ANY OTHER REASONS WHY YOU WANTED TO SET

11  A MEETING SHORTLY AFTER YOU WERE SWORN IN?

12  A    YES.   I WANTED TO HAVE AN OPEN DISCUSSION

13  CONCERNING MR. PATTERSON'S BEHAVIOR.   I DIDN'T REALLY

14  FEEL LIKE IT WAS APPROPRIATE, AND I HAD SOME QUESTIONS.

15  Q     WAS THERE ANY OTHER REASON WHY YOU WANTED TO HAVE A

16  MEETING SO SOON AFTER YOU WERE ELECTED?

17  A    NOT THAT I RECALL SPECIFICALLY.

18  Q    DO YOU RECALL WHETHER, AT THE DECEMBER 5 MEETING,

19  THERE WERE ANY BROWN ACT COMPLAINTS RAISED?

20  A    THERE WAS ONE RAISED, AND WE RECEIVED A LETTER OF

21  COMPLAINT PRIOR TO THE DECEMBER -- THE MEETING ON THE

22  11TH OF JANUARY.

23           MR. ARTIANO:   YOUR HONOR, AGAIN, IT'S

24  NONRESPONSIVE TO THE QUESTION AFTER "THERE WAS."

25           THE COURT:   THE MOTION IS GRANTED AFTER "THERE

APP00131                                    EXHIBIT A

TESTIMONY OF SANDRA HUDSON
April 28, 2015

188

1   WAS ONE RAISED."

2   BY MS. ROBERTS:

3   Q    DID YOU ACTUALLY RECEIVE A WRITTEN COMPLAINT OF A

4   BROWN ACT VIOLATION SOMETIME AFTER THE DECEMBER 5

5   MEETING?

6   A    THAT'S CORRECT.

7   Q    WAS THAT ON THE AGENDA FOR DECEMBER 11?

8   A    IT WAS.

9   Q    WAS THERE ANYTHING ELSE ON THE AGENDA FOR DECEMBER

10  11 THAT YOU RECALL?

11  A    DISCUSSING LEGAL COUNSEL, I BELIEVE.

12           MS. ROBERTS:  CAN WE PUT UP EXHIBIT 93,

13  PLEASE?

14  BY MS. ROBERTS:

15  Q    MS. HUDSON, WOULD YOU LOOK AT EXHIBIT 93 AND TELL

16  ME IF YOU RECOGNIZE THAT DOCUMENT?

17  A    I DO.

18  Q    AND WHAT IS THAT DOCUMENT?

19  A    IT IS THE AGENDA FROM A SPECIAL MEETING, DECEMBER

20  11TH, 2012.

21  Q    LET'S GO DOWN TO ITEM NUMBER 12.

22           DOES THAT ITEM REFRESH YOUR RECOLLECTION AS

23  TO -- DOES THIS DOCUMENT REFRESH YOUR RECOLLECTION THAT

24  THIS ITEM WAS ALSO ON THE AGENDA FOR DECEMBER 11, 2012?

25  A    YES.

TESTIMONY OF SANDRA HUDSON
April 28, 2015

194

```
 1              THE COURT:  WHEN YOU GET TO A CONVENIENT
 2     BREAKING POINT, PLEASE LET ME KNOW.
 3              MS. ROBERTS:  OKAY.
 4                MAY I ALSO MOVE EXHIBIT 95 INTO EVIDENCE,
 5     YOUR HONOR?
 6              THE COURT:  ANY OBJECTION?
 7              MR. ARTIANO:  I THOUGHT THAT WAS JUST ADMITTED
 8     INTO EVIDENCE, 94 AND 95.
 9                I HAVE NO OBJECTION.
10              THE COURT:  THE PRIOR MOTION WAS FOR 93 AND
11     94.
12                SO NO OBJECTION TO 93, 94 AND 95; IS THAT
13     CORRECT, MR. ARTIANO?
14              MR. ARTIANO:  THAT'S CORRECT.
15              THE COURT:  THEY'RE ALL ADMITTED.
16              (EXHIBIT 95 RECEIVED IN EVIDENCE)
17              MS. ROBERTS:  WHY DON'T I JUST FINISH UP WITH
18     THIS MEETING.  I HAVE A FEW MORE QUESTIONS.
19              THE COURT:  THANK YOU.
20     BY MS. ROBERTS:
21     Q     DID YOU FIRE MR. PATTERSON AT THIS MEETING?
22     A     NO.
23     Q     DID MR. PATTERSON STEP DOWN FROM THE ROLE OF
24     DISTRICT COUNSEL?
25     A     HE DID.
```

TESTIMONY OF SANDRA HUDSON
April 28, 2015

195

1    Q    AND AT THAT POINT IN TIME, WAS A MOTION MADE TO

2    RETAIN NEW INTERIM DISTRICT COUNSEL?

3    A    YES, THERE WAS.

4    Q    AND WHO WAS IT THAT WAS RECOMMENDED OR WHAT FIRM

5    WAS RECOMMENDED TO BE INTERIM DISTRICT COUNSEL?

6    A    IT'S LAW FIRM OF JEFF SCOTT.

7    Q    OKAY.  IS THAT KNOWN AS "SCOTT AND JACKSON"?

8    A    THAT'S CORRECT.

9    Q    AND DID YOU KNOW JEFF SCOTT BEFORE THAT DECEMBER 14

10   MEETING?

11   A    I DID NOT.

12   Q    HAD YOU EVER SPOKEN TO HIM?

13   A    I HAD NOT.

14   Q    AND WAS THERE ANY OBJECTION TO SCOTT AND JACKSON

15   BEING RETAINED AS INTERIM DISTRICT COUNSEL AT THAT

16   MEETING?

17           MR. ARTIANO:  OBJECTION, YOUR HONOR.  VAGUE

18   AND AMBIGUOUS.  OBJECTION --

19           THE COURT:  I UNDERSTAND.

20           MS. ROBERTS:  I'LL RESTATE IT, YOUR HONOR.

21           THE COURT:  YES.  GO AHEAD.  RESTATE THE

22   QUESTION, PLEASE.

23   BY MS. ROBERTS:

24   Q    DID ANYBODY SPEAK OUT AGAINST JEFF SCOTT AND

25   JACKSON BEING RETAINED AS DISTRICT COUNSEL AT THAT

TESTIMONY OF SANDRA HUDSON
April 28, 2015

196

1    MEETING?

2    A      YES.   THERE WERE TWO OTHER MEMBERS WHO DID.   AND

3    DR. SAHLOLBEI DID.

4    Q      SPOKE OUT AGAINST SCOTT AND JACKSON?

5    A      YES.   THEY WERE NOT IN FAVOR.

6    Q      AND SO THE BOARD -- DID THE BOARD VOTE TO RETAIN

7    SCOTT AND JACKSON AS INTERIM COUNSEL?

8    A      THEY DID.

9    Q      AT THAT MEETING OR ANYTIME THEREAFTER, DID THE

10   BOARD VOTE TO TERMINATE ANY OF THE ATTORNEYS FOR PALO

11   VERDE HOSPITAL?

12   A      I HAVE NEVER VOTED TO, AND I DON'T BELIEVE THEY

13   HAVE.

14   Q      DID ANY OF THE ATTORNEYS FOR PALO VERDE THAT WERE

15   RETAINED IN DECEMBER OF 2012 CONTINUE TO DO WORK FOR

16   PALO VERDE AFTER THAT TIME?

17   A      YES.

18   Q      AND DO YOU RECALL WHO THOSE LAWYERS WERE?

19   A      BEST, BEST AND KRIEGER WAS STILL ON STAFF.   I THINK

20   THE SLOVAK BARON FIRM WAS STILL DOING WORK FOR THE

21   HOSPITAL AT THAT POINT.   I DON'T --

22   Q      DO YOU REMEMBER CARLO COPPLE CONTINUING TO DO WORK

23   FOR THE DISTRICT?

24   A      I REMEMBER HIM BEING THERE FOR THE TRO'S.   SO, YES,

25   HE WAS, OR HIS REPRESENTATIVE WAS THERE.

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES          )
                               )
STATE OF CALIFORNIA            )


              I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

STATES.

DATE:  APRIL 28, 2015


                    /S/ ALEXANDER T. JOKO
                    _____
                    ALEXANDER T. JOKO, CSR NO. 12272
                    FEDERAL OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE JOHN A. KRONSTADT

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

DENNIS RUTHERFORD, ET AL.,           )
                                     )
                    PLAINTIFF,       )
                                     )
VS.                                  )  CV13-01247-JAK
                                     )
PALO VERDE HEALTHCARE DISTRICT,      )
ET AL.,                              )
                                     )
                    DEFENDANT.       )
_____)
                                     )
- AND CONSOLIDATED CASES -           )
_____)


REPORTER'S TRANSCRIPT OF DAY SIX OF TRIAL PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, APRIL 29, 2015, **MORNING SESSION**


_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
255 EAST TEMPLE STREET, ROOM 181-H
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

TESTIMONY OF SANDRA HUDSON
April 29, 2015

4

1      MR. ARTIANO:  ACTUALLY, I DON'T THINK WHAT THE

2  WITNESS JUST SAID IS ACCURATE.

3      THE COURT:  THEN I'LL STRIKE AFTER "YES, IT

4  WAS."

5      YOU CAN ASK THE NEXT QUESTION.

6  BY MS. ROBERTS:

7  Q   WHAT DID -- THE COMPENSATION OVERVIEW THAT WAS

8  PRESENTED BY MR. RUTHERFORD ON JANUARY 16, 2013, WHAT

9  DID IT SHOW REGARDING MR. KLUNE'S COMPENSATION, AS YOU

10  RECALL?

11  A   AS I RECALL, IT SHOWED HIS CURRENT SALARY AT THAT

12  TIME TO BE 477-, PLUS BENEFITS.

13  Q   ALL RIGHT.  AND WAS THAT OF CONCERN TO YOU?

14  A   YES.  IT WAS PRACTICALLY DOUBLED WHERE PETER HAD

15  STARTED -- WHERE MR. KLUNE HAD STARTED.

16  Q   WERE PEOPLE SPEAKING OUT AT THAT MEETING ON JANUARY

17  16, 2013?

18  A   YES.  WE HAD A PACKED HOUSE THAT DAY.

19  Q   NOW, WHEN WAS -- I'M SORRY, LET ME GO BACK TO

20  JANUARY 16.

21      DID MR. RUTHERFORD OR MR. KLUNE PRESENT ANY

22  INFORMATION TO THE BOARD ON JANUARY 16, 2013 REGARDING

23  ANY STEPS THAT HAD BEEN TAKEN PRIOR TO THAT DATE TO

24  MINIMIZE THE FINANCIAL PROBLEMS AT THE HOSPITAL?

25  A   THEY DID NOT.

TESTIMONY OF SANDRA HUDSON
April 29, 2015

5

1   Q   DID THEY IDENTIFY FOR THE BOARD AND THE PUBLIC ON

2   JANUARY 16, 2013, ANY SPECIFIC STRATEGY OR STEPS THAT

3   THE HOSPITAL SHOULD TAKE GOING FORWARD?

4   A   THE ONLY THING THAT WAS SUGGESTED AT THAT MEETING

5   BY MR. KLUNE WAS HAVING A BOARD RETREAT.

6   Q   I'M SORRY, I DIDN'T HEAR YOU.

7   A   THE ONLY THING THAT WAS SUGGESTED BY MR. KLUNE AT

8   THE 16TH MEETING WAS TO HAVE A BOARD RETREAT.

9   Q   AND WAS THAT SOMETHING THAT YOU FELT WOULD BE

10  PRODUCTIVE?

11  A   I DIDN'T THINK IT WOULD BE LEGAL, FOR ONE THING, TO

12  HAVE ALL OF THE BOARD SOMEPLACE PRIVATE, HAVING A

13  MEETING, DISCUSSING FINANCES.

14          MR. ARTIANO:  MOVE TO STRIKE, YOUR HONOR.

15          THE COURT:  MOTION GRANTED.

16  BY MS. ROBERTS:

17  Q   DID YOU THINK THAT THE BOARD COULD MEET SEPARATELY

18  WITH MR. KLUNE?

19          MR. ARTIANO:  OBJECTION.  THAT CALLS FOR A

20  LEGAL CONCLUSION.

21          THE COURT:  SUSTAINED.

22  BY MS. ROBERTS:

23  Q   MS. HUDSON, IN YOUR EXPERIENCE AS A BOARD MEMBER,

24  HAD YOU -- HAD THE BOARD EVER MET PRIVATELY OUTSIDE OF

25  A REGULARLY- OR SPECIALLY-SCHEDULED BOARD MEETING WITH

TESTIMONY OF SANDRA HUDSON
April 29, 2015

6

1    EXECUTIVE MANAGEMENT?

2    A    NO.

3    Q    ALL RIGHT.  WHAT WAS YOUR REACTION TO THE NEWS THAT

4    THE HOSPITAL WOULD BE DOWN TO $650,000 IN A MATTER OF

5    MONTHS?

6    A    I WAS SHOCKED.  IT WAS RATHER BREATHTAKING.

7    Q    WAS IT UPSETTING?

8    A    IT WAS PAST UPSETTING.  IT WAS FRIGHTENING.

9    Q    WHEN WAS THE NEXT BOARD MEETING AFTER JANUARY 16,

10   2013?

11   A    IT WAS A BOARD MEETING ON JANUARY 22ND.

12   Q    AND ON -- WAS THE JANUARY 22 BOARD MEETING THE

13   MEETING WHERE YOU ALL VOTED ON THE RESOLUTIONS THAT HAD

14   BEEN PASSED A COUPLE MONTHS PRIOR?

15   A    THAT'S CORRECT.

16   Q    AND DID YOU VOTE TO RESCIND THOSE RESOLUTIONS?

17   A    I DID.

18   Q    AND WHY DID YOU DO THAT?

19   A    BECAUSE ON --

20         MR. ARTIANO:  OBJECTION.  NARRATIVE, YOUR

21   HONOR.

22         THE COURT:  OVERRULED.

23         YOU MAY RESPOND.  I MAY INTERRUPT YOU.

24         GO AHEAD, PLEASE.

25         THE WITNESS:  WHEN THE TRO HAD BEEN ISSUED,

TESTIMONY OF SANDRA HUDSON
April 29, 2015

7

1  THERE ALSO HAD BEEN AN INJUNCTION ISSUED TO PREVENT THE

2  BOARD AND MR. KLUNE FROM GOING FORWARD WITH THOSE

3  RESOLUTIONS.  AND I FELT LIKE THEY HAD BEEN DONE

4  INAPPROPRIATELY AND ILLEGALLY.

5  BY MS. ROBERTS:

6  Q    DID YOU HAVE ANY OTHER CONCERNS ABOUT THOSE

7  RESOLUTIONS AS THEY WERE PASSED?

8  A    WELL, I, AS A COMMUNITY MEMBER AND A BOARD MEMBER,

9  DID NOT WANT MR. KLUNE OR ANYONE ELSE MAKING MY

10  DECISIONS ON WHO IS GOING TO BE MY SURGEON OR WHO I

11  WANT TO PROVIDE TRANSPORTATION FOR ME OUT OF THE

12  HOSPITAL.

13       THE COURT:  YOU NEED TO SLOW DOWN PLEASE,

14  MS. HUDSON.  THANK YOU.

15  BY MS. ROBERTS:

16  Q    AT THE BOARD MEETING ON JANUARY 22, 2013, WAS THERE

17  AN AGENDA ITEM THAT RELATED TO REVIEWING THE

18  PERFORMANCE REVIEW OF MR. KLUNE AND/OR MR. RUTHERFORD?

19  A    YES.

20  Q    WAS THERE ANY DISCUSSION AT THAT BOARD MEETING OR

21  ANY ACTION AT THE JANUARY 22 BOARD MEETING REGARDING A

22  PERFORMANCE REVIEW OF MR. RUTHERFORD?

23  A    THERE WAS.

24       I'M SORRY, MR. RUTHERFORD?  ABSOLUTELY NOT.

25  Q    DID YOU HAVE ANY INPUT AS TO PUTTING THE

TESTIMONY OF SANDRA HUDSON
April 29, 2015

9

```
1           MR. ARTIANO:  OBJECTION.  OVERBROAD.

2           MS. ROBERTS:  I'LL ASK IT A DIFFERENT WAY.

3    BY MS. ROBERTS:

4    Q     WAS THERE ANYTHING THAT MR. RUTHERFORD PRESENTED IN

5    HIS FINANCIAL REPORT ON JANUARY 22, 2013 THAT CAUSED

6    YOU ANY FURTHER CONCERN?

7    A     THERE WAS.

8    Q     AND WHAT WAS THAT?

9    A     HE SHOWED THAT WE HAD LOST ANOTHER MILLION-THREE, I

10   BELIEVE.

11   Q     IN WHAT TIME PERIOD?

12   A     FROM DECEMBER UNTIL THAT POINT.

13   Q     ALL RIGHT.  AND DID MR. RUTHERFORD PRESENT ANY

14   PROJECTIONS FOR THE REST OF THE YEAR?

15   A     HE DID.  AND IT SHOWED A DOWNWARD SLIDE GOING DOWN

16   TO $650,000 BY JUNE.

17   Q     DID MR. RUTHERFORD OR MR. KLUNE, AT THE JANUARY 22,

18   2013 MEETING, PRESENT ANY INFORMATION ABOUT STEPS THAT

19   HAD BEEN TAKEN TO MINIMIZE THE FINANCIAL PROBLEMS TO

20   THAT DATE?

21   A     NONE.

22   Q     DID THEY PRESENT ANY STRATEGY OR PLAN OF ACTION TO

23   THE BOARD ON THE JANUARY 22 MEETING?

24   A     THEY DID NOT.

25   Q     DID THEY IDENTIFY ANY STEPS OR RECOMMENDATIONS THAT
```

TESTIMONY OF SANDRA HUDSON
April 29, 2015

10

```
1    SHOULD BE IMPLEMENTED TO PREVENT THE HOSPITAL FROM

2    CLOSING?

3    A    THEY DID NOT.

4    Q    ALL RIGHT.  DID YOU VOTE AT THE JANUARY 22, 2013

5    MEETING REGARDING MR. KLUNE?

6    A    I DID.

7    Q    AND WHAT DID YOU VOTE, IN FAVOR OF OR AGAINST?

8    A    I VOTED IN FAVOR OF TERMINATING MR. KLUNE.

9    Q    AND WAS THAT VOTE CAST IN CLOSED SESSION?

10   A    IT WAS.

11   Q    AND WAS COUNSEL PRESENT IN THAT CLOSED SESSION

12   MEETING?

13   A    YES.  MR. SCOTT WAS PRESENT.

14   Q    WAS HE ADVISING THE BOARD?

15   A    HE WAS.

16   Q    WHY DID YOU VOTE TO TERMINATE MR. KLUNE ON JANUARY

17   22, 2013?

18   A    THERE WERE A NUMBER OF REASONS.  I DIDN'T THINK

19   PETER'S SALARY WAS SUSTAINABLE.

20            THE COURT:  PLEASE REFER TO "MR. KLUNE" AS

21   "MR. KLUNE."

22            THE WITNESS:  I'M SORRY.

23            I DID NOT FEEL LIKE MR. KLUNE'S SALARY

24   WAS SUSTAINABLE.  HE HAD NOT PRESENTED A PLAN OF ANY

25   KIND.  WE WERE GOING DOWNHILL QUICKLY.  AND I LOST
```

TESTIMONY OF SANDRA HUDSON
April 29, 2015

11

1    CONFIDENCE IN MR. KLUNE.

2    BY MS. ROBERTS:

3    Q    ALL RIGHT.  WERE THERE ANY OTHER REASONS WHY YOU

4    VOTED TO TERMINATE MR. KLUNE OTHER THAN THE REASONS

5    THAT YOU JUST GAVE?

6    A    NOT THAT I CAN RECALL.

7    Q    DID YOU TERMINATE MR. KLUNE BECAUSE PALO VERDE

8    HOSPITAL WAS SUING DR. SAHLOLBEI?

9    A    ABSOLUTELY NOT.

10   Q    DID YOU TERMINATE MR. KLUNE FOR ANY OTHER REASON

11   THAT YOU CAN THINK OF OTHER THAN THOSE THAT YOU JUST

12   STATED?

13   A    NO.

14   Q    ALL RIGHT.  WAS -- THE TERMINATION OF MR. KLUNE,

15   WAS THAT AN EASY DECISION FOR YOU TO MAKE?

16        MR. ARTIANO:  OBJECTION.  RELEVANCE.

17        THE COURT:  SUSTAINED.

18   BY MS. ROBERTS:

19   Q    AFTER -- BY THE WAY, DID THE MOTION TO TERMINATE

20   MR. KLUNE PASS?

21   A    IT DID.

22   Q    AFTER MR. KLUNE'S CONTRACT WAS TERMINATED, DID

23   SOMEBODY COME IN OR WAS SOMEBODY PROMOTED TO BECOME

24   INTERIM CEO?

25   A    YES, MR. RUTHERFORD.

APP00144                                    EXHIBIT A

TESTIMONY OF SANDRA HUDSON
April 29, 2015

12

1    Q    ALL RIGHT.  AND HOW LONG WAS MR. RUTHERFORD THE

2    INTERIM CEO?

3    A    ROUGHLY, 30 DAYS.

4    Q    AND WHY JUST 30 DAYS?

5    A    WELL, IN THOSE 30 DAYS, DISTRICT COUNSEL INFORMED

6    US THAT HIS CONTRACT WAS SET TO EXPIRE AT THE END OF

7    FEBRUARY.

8    Q    WHEN DID YOU FIND OUT THAT MR. RUTHERFORD'S

9    CONTRACT WAS SET TO EXPIRE?

10   A    SOMETIME EARLY MID-FEBRUARY.

11   Q    DID YOU KNOW THAT AT THE TIME THAT YOU ASKED

12   MR. RUTHERFORD TO CONSIDER BEING THE INTERIM CEO?

13   A    I DID NOT.

14   Q    AND DID THE BOARD MEET TO DISCUSS MR. RUTHERFORD'S

15   CONTRACT AT SOME POINT IN TIME?

16   A    THEY DID.

17   Q    AND WAS THAT AT THE FEBRUARY 19, 2013 MEETING?

18   A    THAT SOUNDS RIGHT, YES.

19   Q    AND WAS THAT IN CLOSED SESSION?

20   A    YES.

21   Q    WAS COUNSEL PRESENT?

22   A    HE WAS.

23   Q    ALL RIGHT.  AND WAS A MOTION PASSED IN CLOSED

24   SESSION REGARDING MR. RUTHERFORD'S CONTRACT ON FEBRUARY

25   19, 2013?

TESTIMONY OF SANDRA HUDSON
April 29, 2015

13

1    A    IT WAS.

2    Q    AND WHAT WAS THE RESULT OF THAT MOTION?

3    A    THE BOARD CHOSE NOT TO RENEW HIS CONTRACT.

4    Q    AND DID YOU VOTE IN FAVOR OF THAT, MS. HUDSON?

5    A    I DID.

6    Q    WHAT WAS THE REASON WHY YOU VOTED IN FAVOR OF NOT

7    RENEWING MR. RUTHERFORD'S CONTRACT?

8    A    THEY WERE QUITE SIMILAR TO MR. KLUNE'S REASONS.

9    BUT MR. RUTHERFORD IN PARTICULAR HAD NOT RAISED ANY

10   KIND OF A FLAG.  HE HAD USED "HUNKY-DORY" OR

11   "OKIE-DOKIE."  HE WOULD USE THOSE TERMS TO DESCRIBE

12   BEING -- GOING WELL AT PALO VERDE HOSPITAL.  AND THAT

13   WASN'T TRUE.

14   Q    ARE YOU TALKING ABOUT COMMENTS MADE BY

15   MR. RUTHERFORD BEFORE THE JANUARY 16, 2013 MEETING?

16   A    YES.

17   Q    AND HOW DO YOU KNOW HE USED THOSE KINDS OF WORDS?

18   A    I HEARD HIM.

19   Q    WOULD THAT HAVE BEEN IN NOVEMBER IN PRIOR MEETINGS?

20   A    IT WOULD HAVE BEEN NOVEMBER IN PRIOR MEETINGS.

21   Q    ALL RIGHT.  NOW, WITH RESPECT TO MR. RUTHERFORD,

22   DURING THE TIME THAT HE WAS THE INTERIM CEO, DID HE

23   OFFER ANY STRATEGY OR PLAN TO YOU OR THE BOARD

24   REGARDING HOW TO SAVE THE HOSPITAL FROM CLOSURE?

25   A    HE ONLY OFFERED ONE THAT I RECALL.

TESTIMONY OF SANDRA HUDSON
April 29, 2015

14

1    Q    AND WHAT WAS THAT?

2    A    BANKRUPTCY.

3    Q    MS. SARTIN (SIC), DID MR. RUTHERFORD, AT ANY POINT

4    IN TIME WHEN HE WAS THE INTERIM CEO, DISCUSS WITH YOU

5    ANY STEPS THAT THE HOSPITAL SHOULD TAKE ON AN URGENT

6    BASIS?

7    A    NO.

8    Q    DID HE PROVIDE ANY PLAN OR STRATEGY FOR SAVING THE

9    HOSPITAL?

10   A    NOT AT ANY TIME.

11   Q    WHEN YOU MADE YOUR DECISION REGARDING TERMINATING

12   MR. KLUNE'S CONTRACT AND NOT RENEWING MR. RUTHERFORD'S

13   CONTRACT, DID THE INPUT OF THE PUBLIC HAVE ANY BEARING

14   ON YOUR DECISION?

15   A    I THINK THE INPUT OF THE PUBLIC ALWAYS HAS A

16   BEARING.  BUT AT THE END OF THE DAY, THE DECISION WAS

17   MY DECISION.

18   Q    DID YOU ASK MR. RUTHERFORD OR MR. KLUNE TO TAKE A

19   REDUCTION IN PAY BEFORE YOU VOTED TO END THEIR

20   EMPLOYMENT AT PALO VERDE?

21   A    NO.

22   Q    WHY NOT?

23   A    IT WAS A LITTLE TOO LATE FOR ALL THAT.

24   Q    WHAT DO YOU MEAN?

25   A    WE WERE FACING CLOSURE.  WE DIDN'T HAVE THE LUXURY

TESTIMONY OF SANDRA HUDSON
April 29, 2015

19

1     WHILE MR. KLUNE AND MR. RUTHERFORD WERE AT THE

2     HOSPITAL?

3     A    YES.

4     Q    OKAY.  NOW, AT ANY POINT IN TIME AFTER MR. KLUNE

5     AND MR. RUTHERFORD WERE GONE, DID YOU HEAR OR LEARN OF

6     PETER KLUNE TAKING PRIVATE PATIENT INFORMATION FROM THE

7     HOSPITAL?

8     A    I DID.

9     Q    AND HOW DID YOU LEARN ABOUT THAT?

10    A    I READ IT IN THE COURT DOCUMENTS.

11    Q    THE DECLARATION OF MR. KLUNE, IS THAT WHAT YOU ARE

12    REFERRING TO?

13    A    THAT'S WHAT I'M REFERRING TO.

14    Q    DID YOU ALSO REVIEW SAMPLE DOCUMENTS, PRIVATE

15    PATIENT DOCUMENTS THAT WERE FILED WITH THE COURT?

16    A    I DID.

17    Q    AND WERE THOSE IN REDACTED FORM?

18    A    THEY WERE.

19    Q    OKAY.  AND WHEN DID YOU FIRST DISCOVER OR LEARN

20    ABOUT MR. KLUNE TAKING THIS INFORMATION?

21    A    I BELIEVE IT WAS DURING THE HOLIDAYS, 2013, RIGHT

22    AFTER CHRISTMAS.

23    Q    DID PALO VERDE HOSPITAL HAVE A POLICY AGAINST ITS

24    EMPLOYEES TAKING PRIVATE PATIENT INFORMATION?

25    A    ABSOLUTELY.

TESTIMONY OF SANDRA HUDSON
April 29, 2015

20

```
 1            MR. ARTIANO:  OBJECTION, YOUR HONOR.  THIS IS
 2    CUMULATIVE.  LACKS FOUNDATION.
 3            THE COURT:  WE HAVE THE EXHIBIT WITH THE
 4    SIGNED DOCUMENTS SIGNED BY THE PLAINTIFF; CORRECT?
 5            MS. ROBERTS:  WE DO, YOUR HONOR.
 6            THE COURT:  SO IS THERE SOMETHING NEW?
 7            MS. ROBERTS:  YES.
 8    BY MS. ROBERTS:
 9    Q    MS. HUDSON, HAD MR. KLUNE STILL BEEN THE CEO AT
10    PALO VERDE HOSPITAL WHEN YOU LEARNED ABOUT THIS IN
11    DECEMBER OF 2013, WOULD YOU HAVE WANTED TO TAKE ANY
12    ACTION AGAINST HIM?
13            MR. ARTIANO:  OBJECTION, YOUR HONOR.  THAT
14    CALLS FOR SPECULATION.
15            THE COURT:  WELL, THERE'S -- I'VE RULED ON THE
16    ISSUE AS TO AFTER-ACQUIRED INFORMATION.  AND I THINK IT
17    GOES TO THE AFTER-ACQUIRED INFORMATION AND THE STANDARD
18    THAT WOULD APPLY.
19            MR. ARTIANO:  I UNDERSTAND.
20              BUT I THINK THAT IT WOULD BE IMPROPER FOR
21    THIS WITNESS TO NOW OPINE AS TO WHAT SHE WOULD HAVE
22    DONE FROM THAT TIME.
23            THE COURT:  I UNDERSTAND.
24              OVERRULED.
25              YOU MAY ANSWER.
```

TESTIMONY OF SANDRA HUDSON
April 29, 2015

21

```
 1              EXCUSE ME, IT'S ADMITTED FOR THE LIMITED
 2     PURPOSE THAT I STATED.
 3              READ THE QUESTION, PLEASE.
 4              (RECORD READ)
 5              THE WITNESS:  YES.
 6     BY MS. ROBERTS:
 7     Q    AND WHAT ACTION WOULD YOU HAVE TAKEN AGAINST
 8     MR. KLUNE?
 9              MR. ARTIANO:  SAME OBJECTION, YOUR HONOR.
10              THE COURT:  SAME RULING.
11              THE WITNESS:  I WOULD HAVE WANTED TO CONVENE
12     THE BOARD AND ASK FOR HIS TERMINATION.
13     BY MS. ROBERTS:
14     Q    WHY?
15     A    BECAUSE OUR PATIENTS, LIKE PATIENTS ANY PLACE GOING
16     TO A HOSPITAL, HAVE AN EXPECTATION OF PRIVACY.  THEY
17     DON'T EXPECT FOR THE CEO TO BE TAKING THEIR PRIVATE
18     INFORMATION, THEIR MEDICAL RECORDS WITH HIM TO GIVE TO
19     A THIRD PARTY.
20     Q    AT SOME POINT IN TIME, DID YOU DISCOVER OR WERE YOU
21     ADVISED OF SOME STARK VIOLATIONS THAT HAD BEEN REPORTED
22     BY MR. KLUNE?
23     A    YES.
24     Q    AND WHEN DID YOU LEARN ABOUT THAT?
25     A    I BELIEVE IT WAS IN FEBRUARY OF 2014.
```

TESTIMONY OF SANDRA HUDSON
April 29, 2015

22

1    Q    AND WERE YOU PROVIDED WITH A COPY OF A SELF-REPORT

2    LETTER THAT MR. PATTERSON HAD WRITTEN TO CMS?

3    A    YES.

4    Q    AND DID YOU READ THAT LETTER?

5    A    I DID.

6    Q    AND, ULTIMATELY, AS A BOARD MEMBER, DID YOU HAVE TO

7    VOTE ON WHETHER OR NOT TO ENTER INTO A SETTLEMENT WITH

8    CMS FOR THE PAYMENT OF A FINE?

9    A    YES.

10   Q    AND WHAT WAS THE AMOUNT OF THE FINE?

11             MR. ARTIANO:  OBJECTION, YOUR HONOR.  BEST

12   EVIDENCE RULE.

13             THE COURT:  SUSTAINED.

14   BY MS. ROBERTS:

15   Q    MS. HUDSON, DID YOU VOTE TO APPROVE THE SETTLEMENT?

16   A    I DID.

17   Q    AND DO YOU HAVE ANY ROLE IN ISSUING CHECKS FOR THE

18   PAYMENT OF A FINE TO CMS?

19   A    I ONLY HAVE THE ROLE OF SIGNING THOSE CHECKS

20   OCCASIONALLY.

21   Q    AND WHAT WAS -- WHAT IS THE AMOUNT THAT HAS TO BE

22   REPAID?

23             MR. ARTIANO:  SAME OBJECTION, YOUR HONOR.

24             THE COURT:  ISN'T THIS IN ONE OF THE EXHIBITS?

25             MS. ROBERTS:  I'M NOT SURE, YOUR HONOR.

TESTIMONY OF SANDRA HUDSON
April 29, 2015

23

```
 1            THE COURT:  I THINK IT IS.  AND THERE'S BEEN

 2   TESTIMONY ABOUT ITS AMOUNT.  YOU'RE ASKING WHAT THE

 3   CHECK SAYS, WHICH IS HEARSAY.

 4   BY MS. ROBERTS:

 5   Q   MS. HUDSON, IF -- WHAT YOU READ ABOUT IN THAT

 6   SELF-REPORT, WHO WAS THE CEO AND CFO WHEN THESE LEASES

 7   WERE NOT SIGNED?

 8            MR. ARTIANO:  OBJECTION.  LACK OF FOUNDATION.

 9   ALSO RELIES UPON HEARSAY.

10            THE COURT:  SUSTAINED AS FRAMED.

11   BY MS. ROBERTS:

12   Q   MS. HUDSON, WHAT WERE THE YEARS THAT THE LEASES

13   WERE NOT SIGNED ACCORDING TO MR. -- THE SELF-REPORT

14   THAT WAS PROVIDED TO CMS?

15            MR. ARTIANO:  OBJECTION, YOUR HONOR.

16            THE COURT:  IT'S HEARSAY.

17            MS. ROBERTS:  YOUR HONOR, THE REPORT IS IN

18   EVIDENCE.

19            THE COURT:  THAT'S WHERE YOU CAN ARGUE BASED

20   ON THE EVIDENCE.  WE DON'T NEED HEARSAY.

21   BY MS. ROBERTS:

22   Q   MS. HUDSON, HAD MR. KLUNE AND MR. RUTHERFORD STILL

23   BEEN EMPLOYED AT PALO VERDE HOSPITAL IN FEBRUARY OF

24   2014, WHEN YOU LEARNED ABOUT THE STARK VIOLATION, WOULD

25   YOU HAVE WANTED TO TAKE ANY ACTION WITH RESPECT TO
```

TESTIMONY OF SANDRA HUDSON
April 29, 2015

24

```
 1    THOSE GENTLEMEN?

 2    A     YES.

 3              THE COURT:  SAME RULING BEFORE AS TO THE

 4    LIMITED PURPOSE.

 5    BY MS. ROBERTS:

 6    Q     AND WHAT ACTION WOULD YOU HAVE TAKEN?

 7    A     I WOULD HAVE WANTED TO CONVENE THE BOARD AND ASK

 8    FOR THEIR TERMINATION.

 9    Q     WHY?

10    A     BECAUSE OF THE STARK VIOLATION, WE NOW HAVE A

11    PERMANENT BLACK MARK ON OUR RECORD.  AND, TWO, WE FACE

12    CLOSURE.

13              MS. ROBERTS:  I DON'T HAVE ANYTHING FURTHER,

14    YOUR HONOR.

15              THE COURT:  CROSS-EXAMINATION?

16              MR. ARTIANO:  YES, YOUR HONOR.

17                        CROSS-EXAMINATION

18    BY MR. ARTIANO:

19    Q     GOOD MORNING, MS. HUDSON.

20    A     GOOD MORNING, SIR.

21    Q     MS. HUDSON, YOU SERVED ON THE BOARD FOR PALO VERDE

22    HOSPITAL DURING 2009 AND 2010; CORRECT?

23    A     YES.

24    Q     OKAY.  WERE YOU INVOLVED IN THE HIRING OF

25    MR. KLUNE?
```

TESTIMONY OF SANDRA HUDSON
April 29, 2015

76

```
 1              THE WITNESS:  I'M GOING TO STATE ONCE AGAIN,

 2    THAT WASN'T MY RESPONSIBILITY.  THAT WAS MR. KLUNE'S

 3    AND MR. RUTHERFORD'S.

 4    BY MR. ARTIANO:

 5    Q    SO YOU DID NOTHING; CORRECT?

 6    A    I OBSERVED.

 7    Q    OKAY.  DID YOU LOOK AT HIS PERSONNEL FILE BEFORE

 8    YOU MADE THE DECISION TO TERMINATE MR. KLUNE?

 9    A    NO.  I ALREADY KNEW THAT PETER WAS A GOOD SPEAKER.

10    I KNEW HE WORKED WELL WITH OTHERS.  I KNEW THOSE

11    THINGS, SIR.

12    Q    AFTER THE JANUARY 16TH BOARD MEETING, DID YOU SPEAK

13    WITH MR. KLUNE?

14    A    I DID NOT SPEAK WITH MR. KLUNE.  MR. KLUNE HAS NOT

15    SPOKEN TO ME THE ENTIRE TIME I'VE BEEN ON THE BOARD THE

16    SECOND TERM.

17    Q    IS IT CORRECT THAT YOU TRIED TO SET UP A MEETING

18    THROUGH JEFF SCOTT WITH MR. KLUNE ON A FRIDAY, WHICH

19    WOULD HAVE BEEN JANUARY 19TH?

20    A    I COULDN'T VERIFY THE DATE.  BUT I DO KNOW THAT

21    TRINA SARTIN AND JEFF SCOTT ATTEMPTED TO SET UP A

22    MEETING ON A FRIDAY WITH PETER KLUNE.

23    Q    AND HE WASN'T AVAILABLE?

24    A    THAT'S MY UNDERSTANDING.

25    Q    WHAT DID YOU DO TO TRY TO CONTACT MR. KLUNE BETWEEN
```

TESTIMONY OF SANDRA HUDSON
April 29, 2015

77

1    THE 17TH AND THE 22ND OTHER THAN HAVING MR. SCOTT TRY

2    TO SET UP A MEETING?

3    A     I FELT LIKE HAVING MR. SCOTT SET UP THE MEETING WAS

4    SUFFICIENT.

5    Q     WHAT DID YOU DO TO TRY TO SPEAK WITH MR. KLUNE

6    ABOUT CONCERNS THAT YOU HAD?

7    A     I CONTACTED MY DISTRICT COUNSEL AND ASKED HIM TO

8    SET UP A MEETING.

9    Q     DID YOU DO ANYTHING OTHER THAN THAT?

10   A     I THINK THAT WAS SUFFICIENT, SIR.

11   Q     MY QUESTION IS, DID YOU DO ANYTHING OTHER THAN

12   THAT?

13   A     NO.

14   Q     WERE YOU IN BLYTHE AT THE TIME?

15   A     I DON'T SPECIFICALLY RECALL WHERE I WAS THAT DAY.

16          THE COURT:  EXCUSE ME, MR. ARTIANO, WHEN YOU

17   HAVE BEEN REFERRING TO A "FRIDAY," WHAT'S THE DATE AND

18   MONTH, PLEASE?

19          MR. ARTIANO:  THE FRIDAY WAS JANUARY 19TH.

20          THE COURT:  THANK YOU.

21             2013; CORRECT?

22          MR. ARTIANO:  YES.

23          THE COURT:  THANK YOU.

24   BY MR. ARTIANO:

25   Q     WOULD IT HAVE BEEN DIFFICULT FOR YOU TO CALL

# TESTIMONY OF SANDRA HUDSON
## April 29, 2015

87

1    Q    ALL RIGHT.  AND DID PETER KLUNE DO ANYTHING TO

2    CONTACT YOU BETWEEN THE DATE YOU WERE ELECTED TO THE

3    BOARD AND THE DATE OF HIS TERMINATION TO MEET OR SPEAK

4    WITH YOU ABOUT ANYTHING?

5    A    NOT AT ANY TIME.

6    Q    NOW, IN THE MINUTES FROM -- ONE SECOND.

7         MS. ROBERTS:  ACTUALLY, I DON'T -- ONE LAST

8    QUESTION.

9    BY MS. ROBERTS:

10   Q    HAVE ANY SURGEONS BEEN BROUGHT TO THE HOSPITAL

11   SINCE PETER KLUNE WAS GONE?  ANY NEW SURGEONS?

12   A    WE HAVE A NEW UROLOGIST THERE.

13   Q    AND HAS THERE BEEN AN INCREASE IN THE NUMBER OF

14   SURGERIES BEING DONE AT THE HOSPITAL BY THE

15   OPHTHALMOLOGIST?

16   A    I BELIEVE SO.  I'M NOT POSITIVE.

17   Q    OKAY.

18        MS. ROBERTS:  I DON'T HAVE ANYTHING FURTHER.

19        THE COURT:  MS. HUDSON, AGAIN, TO THE EXTENT

20   THAT YOU WISH TO INVOKE YOUR 5TH AMENDMENT RIGHTS OR IF

21   COUNSEL WISHES TO ADVISE YOU TO DO SO, LET ME KNOW.

22        WHAT, IF ANYTHING, DO YOU KNOW -- EXCUSE

23   ME.

24        WERE YOU AWARE THAT EITHER MR. RUTHERFORD

25   OR MR. KLUNE HAD BROUGHT MATTERS TO THE ATTENTION OF

TESTIMONY OF SANDRA HUDSON
April 29, 2015

88

```
 1    FEDERAL AND STATE AUTHORITIES WITH RESPECT TO

 2    ACTIVITIES AT THE HOSPITAL?

 3              THE WITNESS:  NO, SIR.

 4         THE COURT:  YOU -- SINCE YOU HAVE BECOME A

 5    BOARD MEMBER, YOU'RE NOT AWARE OF THAT?

 6         MS. ROBERTS:  THAT MAY INVADE THE

 7    ATTORNEY/CLIENT PRIVILEGE AS FAR AS THIS LITIGATION IS

 8    CONCERNED.

 9         THE COURT:  WELL, NOT THIS LITIGATION.  I'M

10    ASKING WHAT -- I WANT -- WHAT I'M ASKING ABOUT IS THIS:

11              WERE YOU AWARE THAT EITHER MR. KLUNE OR

12    MR. RUTHERFORD EVER BROUGHT ANY MATTER TO THE ATTENTION

13    OF THE DISTRICT ATTORNEY?

14              THE WITNESS:  NOT UNTIL I WENT TO MR. KLUNE'S

15    DEPOSITION.

16              THE COURT:  AND WHEN WAS THAT?

17              THE WITNESS:  SIX OR EIGHT MONTHS AGO.

18              THE COURT:  WERE YOU EVER AWARE PRIOR TO THAT

19    THAT THAT EITHER MR. RUTHERFORD OR MR. KLUNE HAD MET

20    WITH ANY FEDERAL AUTHORITIES?

21              THE WITNESS:  NO, SIR.

22         THE COURT:  DID YOU HAVE -- WHEN YOU RAN FOR

23    THE BOARD IN 2012, DID YOU CREATE ANY CAMPAIGN

24    MATERIALS?

25              THE WITNESS:  I DID.
```

TESTIMONY OF ROGER THRUSH
April 29, 2015

131

1    Q    AND HAVE YOU DONE THIS TYPE OF CONSULTING WORK

2    SPECIFICALLY IN THE HEALTHCARE INDUSTRY?

3    A    YES.  SUCH AS IN THIS CASE, YES.

4    Q    WHAT IS IT ABOUT YOUR EDUCATION, TRAINING AND

5    EXPERIENCE THAT ALLOWS YOU TO ANALYZE THE EMPLOYABILITY

6    AND EARNING CAPACITY OF INDIVIDUALS WHOM YOU EVALUATE?

7    A    WELL, MY EDUCATION AND EXPERIENCE HAS, OVER THE

8    LAST 35 YEARS, OFFERED ME THE OPPORTUNITY TO UNDERSTAND

9    THE LABOR MARKET, TO BE ABLE TO IDENTIFY QUALIFICATIONS

10   OF INDIVIDUALS AND THEN TO COMPARE THOSE QUALIFICATIONS

11   TO POSITIONS AVAILABLE IN THE LABOR MARKET TO DETERMINE

12   THEIR EMPLOYABILITY.  AND WITH THAT UNDERSTANDING, THEN

13   I CAN RESEARCH THE LABOR MARKET, BE IT LOCAL, STATE,

14   NATIONAL, TO DETERMINE WITH SOMEONE OF THAT -- WITH

15   THOSE QUALIFICATIONS, WHAT WOULD THEY BE EXPECTED TO

16   EARN IN THE LABOR MARKET, WHICH WOULD BE CONSIDERED

17   LABOR CAPACITY.

18   Q    WHAT ARE YOUR RESOURCES FOR ANALYZING THE LABOR

19   MARKET?  AND I WANT TO DIRECT YOUR ATTENTION

20   SPECIFICALLY -- DR. THRUSH, DID YOU ANALYZE THE LABOR

21   MARKET FOR YOUR ROLE AS AN EXPERT WITNESS IN THIS CASE?

22   A    YES.

23   Q    AND WHAT RESOURCES DID YOU REFER TO IN DOING THAT

24   RESEARCH?

25   A    PRIMARILY, I RELIED UPON THE PUBLISHED DATA BY A

EXHIBIT A

TESTIMONY OF ROGER THRUSH
April 29, 2015

132

1   CALIFORNIA GOVERNMENT AGENCY CALLED "PUBLIC PAY," AND

2   ALSO AN INDUSTRY AGENCY CALLED "GUIDESTAR," WHICH

3   PUBLISHES WAGE DATA FOR SPECIFIC OCCUPATIONS OF

4   EXECUTIVES IN HEALTHCARE.

5   Q    AND WERE EITHER OF THOSE SOURCES, DID THEY PROVIDE

6   INFORMATION ABOUT HOSPITALS COMPARABLE TO PALO VERDE

7   HOSPITAL?

8   A    IN THE PUBLIC PAY DATABASE, I IDENTIFIED HOSPITALS

9   THAT HAD SIMILAR NUMBER OF BEDS AND EMPLOYEES AND THAT

10  WERE ALSO CONSIDERED RURAL HOSPITALS AND

11  SINGLE-FACILITY HOSPITALS.

12  Q    AND WERE THOSE HOSPITALS THAT WERE LOCATED IN THE

13  STATE OF CALIFORNIA?

14  A    YES.

15  Q    OKAY.  JUST, GENERALLY, DR. THRUSH, WHAT IS YOUR

16  ROLE AS AN EXPERT WITNESS IN THIS MATTER ON BEHALF OF

17  PALO VERDE HEALTHCARE DISTRICT?

18  A    MY UNDERSTANDING IS THAT I WAS TO PERFORM AN

19  EMPLOYABILITY AND AN EARNING CAPACITY STUDY FOR

20  MR. KLUNE AND MR. RUTHERFORD.

21  Q    AND WHAT DO YOU MEAN BY THE "EMPLOYABILITY"?

22  A    AS I SAID EARLIER, REVIEWING THEIR QUALIFICATIONS

23  AND COMPARING THOSE TO AVAILABLE POSITIONS WITHIN THE

24  LABOR MARKET, WHICH WOULD DETERMINE EMPLOYABILITY.  AND

25  THEN WITH THOSE QUALIFICATIONS, COMPARING THOSE WITH

TESTIMONY OF ROGER THRUSH
April 29, 2015

133

1    WAGES PAID INDIVIDUALS IN THE LABOR MARKET FOR THOSE

2    POSITIONS.

3    Q    IN ADDITION TO DOING RESEARCH, DID YOU REVIEW ANY

4    DOCUMENTS WITH RESPECT TO YOUR ROLE AS AN EXPERT IN

5    THIS CASE?

6    A    I DID.

7         MS. ROBERTS:  YOUR HONOR, I WOULD LIKE TO

8    REFER TO EXHIBIT 644.

9    BY MS. ROBERTS:

10   Q    DO YOU SEE EXHIBIT 644?

11   A    YES.

12   Q    AND DOES THAT APPEAR TO BE A COPY OF YOUR REPORT

13   THAT RELATED TO MR. KLUNE AND MR. RUTHERFORD?

14   A    THIS IS A REPORT REFERENCING MR. RUTHERFORD.

15   Q    OKAY.  AND IF WE GO TO PAGE 11 OF EXHIBIT 644, WHAT

16   IS THAT PART OF EXHIBIT 644?

17   A    THAT WOULD BE MY REPORT REGARDING MR. KLUNE.

18   Q    OKAY.  AND IN YOUR REPORTS, THE PART THAT RELATES

19   TO MR. RUTHERFORD AND MR. KLUNE, IS THERE A SECTION

20   THAT IDENTIFIES THE INFORMATION OR DOCUMENTATION THAT

21   YOU REVIEWED?

22   A    YES, IF YOU GO TO EXHIBIT A AND EXHIBIT B TO MY

23   REPORTS.

24   Q    THAT WOULD BE -- WITH RESPECT TO MR. RUTHERFORD,

25   THAT WOULD BE -- LET ME ASK YOU THIS --

TESTIMONY OF ROGER THRUSH
April 29, 2015

138

1    Q     DID YOU FORMULATE AN OPINION REGARDING MR. KLUNE'S

2    CAPACITY TO GENERATE INCOME?

3    A     YES.

4    Q     AND WHAT DID YOU CONCLUDE IN THAT REGARD?

5    A     AS A CHIEF FINANCIAL OFFICER, HIS EARNING CAPACITY

6    WOULD BE $210,000.

7          AND AS A CHIEF EXECUTIVE OFFICER, HIS EARNING

8    CAPACITY WOULD RANGE BETWEEN 200- TO $300,000.

9    Q     AND WHAT WAS THE BASIS FOR THOSE CONCLUSIONS THAT

10   MR. KLUNE COULD EARN 2- TO $300,000 ANNUALLY AS A CEO?

11   A     IT WAS BASED ON MY UNDERSTANDING OF HIS BACKGROUND,

12   THREE-AND-A-HALF YEARS AS A CEO FOR A SMALL RURAL

13   HOSPITAL, AND THE RESEARCH I DID, WHICH IS IDENTIFIED

14   IN EXHIBITS A AND B TO MY REPORT, WHICH PROVIDED ME THE

15   EARNINGS THAT ARE TYPICALLY PAID CEO'S AT SIMILAR

16   FACILITIES OR SIMILAR EMPLOYERS.

17         AND SO BASED ON THAT INFORMATION, I WAS ABLE

18   TO CONCLUDE THAT HIS EARNINGS WOULD RANGE BETWEEN 2- TO

19   300,000.

20         ALSO, HE WAS ENGAGED IN DISCUSSIONS WITH A

21   HOSPITAL MENDOCINO, WHICH HAD ON THE TABLE OF 215,000

22   AS A POSSIBLE SALARY.

23         AND THEN IT'S MY UNDERSTANDING IN HIS CURRENT

24   POSITION, HE WAS OFFERED 200,000.  SO THOSE SEEM TO

25   SUPPORT THE PRIOR OPINION THAT I HAD MADE IN JANUARY.

TESTIMONY OF ROGER THRUSH
April 29, 2015

139

1    Q    IF I COULD ASK YOU TO TURN TO EXHIBIT 644, PAGE 17.

2         IS THIS THE EXHIBIT TO YOUR REPORT THAT YOU --

3    THIS IS THE RESULTS OF YOUR ANALYSIS OF MR. KLUNE'S

4    EARNING CAPACITY?

5    A    THIS IS EXHIBIT A WHERE I IDENTIFIED NOT ONLY PALO

6    VERDE, BUT IN REGARDS TO THE CEO, EIGHT ADDITIONAL

7    HOSPITALS, HOSPITAL DISTRICTS WHICH I IDENTIFIED

8    EARNINGS PAID TO THEIR CEO FOR 2009, 2010, 2011 AND

9    2012.

10        AND SO BY LOOKING AT THOSE, IF WE GO TO THE

11   NEXT PAGE, I SUMMARIZED THAT DATA IN WHICH I SHOWED,

12   FOR EACH YEAR, THE RANGE THAT WAS PAID BY THE EIGHT

13   HOSPITALS FOR THE CEO, AND COMPARED THAT TO WHAT PALO

14   VERDE HAD REPRESENTED, IN THE SAME PUBLIC PAY

15   DOCUMENTATION MR. KLUNE WAS PAID TO MAKE A COMPARISON.

16   Q    ALL RIGHT.  AND WAS THERE ANY HOSPITAL -- RURAL

17   HOSPITAL THAT YOU CAME ACROSS IN YOUR RESEARCH THAT WAS

18   COMPENSATING THEIR CEO'S IN EXCESS OF $300,000 AT ANY

19   YEAR?

20   A    BASED ON THIS STUDY, NO.

21   Q    DID YOU DO A STUDY -- DID YOU LOOK AT COMPENSATION

22   JUST BEYOND THE RURAL HEALTHCARE DISTRICTS IN

23   CALIFORNIA?

24   A    NO.

25   Q    AND WHY NOT?

TESTIMONY OF ROGER THRUSH
April 29, 2015

140

1   A    I MADE THE ASSUMPTION THAT HE WOULD BE SEEKING WORK

2   WITHIN CALIFORNIA.

3   Q    OKAY.  AND DID YOU FIND THE COMPENSATION THAT

4   MR. KLUNE WAS MAKING AT PALO VERDE HOSPITAL TO BE

5   SIGNIFICANTLY MORE THAN WHAT ANY OTHER RURAL HOSPITAL

6   PAID IN THE YEARS OF 2010, '11, AND '12?

7           MR. KOSTIC:  OBJECTION.  LEADING.  RELEVANCE.

8   LACK OF FOUNDATION.

9           THE COURT:  AN EXPERT CAN BE LED.  JUST A

10  MINUTE.

11             OVERRULED.

12             YOU MAY ANSWER.

13          THE WITNESS:  IF YOU LOOK AT THE SUMMARY ON

14  PAGE 2 OF EXHIBIT A, I DID JUST WHAT YOU ASKED.  I

15  COMPARED THE RANGE FOR EACH YEAR WITH THE WAGES

16  MR. KLUNE HAD BEEN PAID FOR THAT SAME YEAR.  SO YOU

17  COULD SEE FOR 2010, THE EARNINGS WERE GREATER THAN THE

18  RANGE.  2011, THE EARNINGS WERE GREATER THAN THE RANGE.

19  2012, THE EARNINGS WERE GREATER THAN THE RANGE.

20  BY MS. ROBERTS:

21  Q    DID YOU FORMULATE ANY OPINIONS OR ANALYZE WHETHER

22  OR NOT MR. KLUNE'S EFFORTS TO MITIGATE HIS DAMAGES TO

23  FIND OTHER WORK AS PART OF YOUR ANALYSIS?

24  A    YES.

25  Q    AND WERE YOU PROVIDED WITH DOCUMENTS THAT HAD BEEN

TESTIMONY OF ROGER THRUSH
April 29, 2015

142

1    Q    WHAT PERCENTAGE OF THE FIRST 22 MONTHS THAT

2    MR. KLUNE WAS OUT OF WORK AFTER LEAVING PALO VERDE

3    HOSPITAL, WHAT PERCENTAGE OF THE DAYS DO YOU HAVE

4    INFORMATION FROM MR. KLUNE THAT HE DID SOMETHING

5    AFFIRMATIVE TO PURSUE NEW EMPLOYMENT?

6    A    APPROXIMATELY 20 PERCENT OF THE TIME.

7    Q    AND DO YOU CONSIDER THAT, IN YOUR OPINION AS A

8    VOCATIONAL REHABILITATION CONSULTANT, TO BE A

9    REASONABLE EFFORT TO FIND NEW EMPLOYMENT?

10   A    NO.

11   Q    AND WHY IS THAT?

12   A    WELL, AS I STATED IN MY REPORT, JOB SEARCH IS A

13   FULL-TIME ACTIVITY.  AND IT SHOULD BE PURSUED ON A, IF

14   NOT A DAILY, DEFINITELY A WEEKLY BASIS.

15           AS YOU CAN SEE BY THE CALENDAR, THE VISUAL

16   AID, THERE'S MANY WEEKS WHERE THERE'S NO ACTIVITY

17   IDENTIFIED.  I MEAN, SOME MONTHS THERE'S ONE DAY OR

18   NOTHING IDENTIFIED.  SO I WOULD NOT CONSIDER THIS LEVEL

19   OF ACTIVITY WHAT WE CALL A "DILIGENT JOB SEARCH."

20   Q    AND IN YOUR OPINION, HAD MR. KLUNE BEEN MORE

21   PROACTIVE IN HIS JOB SEARCH, WOULD THAT HAVE HELPED HIM

22   FIND WORK SOONER?

23   A    I THINK IT'S MORE PROBABLE THAN NOT HE WOULD HAVE

24   FOUND WORK SOONER THAN THE TWO-YEAR TIME MARK.

25   Q    WERE YOU AWARE OF MR. KLUNE BEING IN COMMUNICATIONS

TESTIMONY OF ROGER THRUSH
April 29, 2015

146

1    Q    IS THAT WHAT MR. RUTHERFORD IS CURRENTLY -- HOW HE

2    IS CURRENTLY EMPLOYED?

3    A    YES.

4    Q    AND WHAT DID YOU DETERMINE ABOUT MR. RUTHERFORD'S

5    ABILITY TO GENERATE INCOME?

6    A    I DID THE SAME TYPE OF ANALYSIS THAT WE TALKED

7    ABOUT A MOMENT AGO.  AND TO MY REPORT, EXHIBITS A AND B

8    ARE REPRESENTATIONS OF THE DATA IN WHICH I OBTAINED.

9    EXHIBIT A REPRESENTS DATA FROM THE PUBLIC RESOURCE.

10   AND EXHIBIT B IS THE DATA FROM A COMPENSATION STUDY.

11   Q    AND WHAT DID YOU DETERMINE WOULD BE THE AVERAGE

12   RANGE OF MR. RUTHERFORD'S EARNING CAPACITY AT A SMALL

13   RURAL CLINIC?

14   A    IF WE LOOK AT PAGE 2 OF EXHIBIT A, WE CAN SEE, FOR

15   THE YEARS 2010, 2011, 2012, THE RANGES PAID BY THE NINE

16   HOSPITAL DISTRICTS IN WHICH DATA WAS OBTAINED.

17   Q    MR. RUTHERFORD TESTIFIED AT TRIAL THAT HE IS MAKING

18   APPROXIMATELY 225- -- MORE THAN $225,000 A YEAR.

19              IS THAT ON THE UPPER END OF WHAT YOU PROJECTED

20   HE COULD EARN?

21   A    YES.

22   Q    NOW, WITH RESPECT TO MR. RUTHERFORD'S MITIGATION

23   EFFORTS -- I'D LIKE TO HAVE EXHIBIT 601 PUT ON THE

24   SCREEN.

25              MS. ROBERTS:  I HAVE TO APOLOGIZE TO THE

TESTIMONY OF ROGER THRUSH
April 29, 2015

148

```
1    Q    ARE YOU REFERRING TO WHAT'S BLOWN UP ON THE BOARD

2    THERE, MAY 2013?

3    A    YES.

4    Q    WHERE IT SAYS "INTERIM CFO POSITION OFFERED"?

5    A    YES.

6    Q    ALL RIGHT.  THE EXHIBIT 667, WHICH IS THE SECOND --

7    SECOND PAGE OF EXHIBIT 667, IS THIS DOCUMENT, THE WHITE

8    DAYS ON THIS CALENDAR, REFLECT -- REFLECTS WHAT?

9    A    THE DAYS ON WHICH -- THE JOB SEARCH DOCUMENTATION I

10   REVIEWED REPRESENTS DAYS IN WHICH MR. RUTHERFORD

11   PERFORMED JOB SEARCH ACTIVITY.

12   Q    AND DID YOU CONSIDER THAT TO BE REASONABLE?

13   A    WELL, THE WHITE DAYS REPRESENT LESS THAN 20 PERCENT

14   OF THE TIME OF THE TIME AVAILABLE.  AND SO I WOULD

15   STATE THAT IT WOULD NOT BE CONSIDERED A DILIGENT

16   EFFORT.

17              MS. ROBERTS:  THANK YOU.

18              I DON'T HAVE ANYTHING FURTHER.

19         THE COURT:  CROSS-EXAMINATION?

20                   CROSS-EXAMINATION

21   BY MR. KOSTIC:

22   Q    DR. THRUSH, ON YOUR CHARTS THERE, IF PETER KLUNE

23   MADE A PHONE CALL ONE DAY, WHAT KIND OF DOCUMENTATION

24   WOULD YOU EXPECT FOR HIM TO PRODUCE TO YOU SO YOU COULD

25   PUT IT ON YOUR CHART?
```

TESTIMONY OF ROGER THRUSH
April 29, 2015

165

```
 1              MY QUESTION TO YOU --

 2         MR. KOSTIC:  MOVE TO STRIKE THE TESTIMONY.

 3           THE COURT:  OVERRULED.  IT'S THE BASIS FOR THE

 4    OPINION.

 5              NEXT QUESTION -- STATE THE QUESTION,

 6    PLEASE.

 7    BY MS. ROBERTS:

 8    Q    IF MR. RUTHERFORD WAS EARNING $224,000 IN 2011 AND

 9    $244,000 IN 2012, WHERE DOES THAT FALL IN THE RANGE OF

10    YOUR -- THE EARNINGS -- MARKET EARNINGS ANALYSIS THAT

11    YOU DID, DR. THRUSH?

12    A    IT WOULD BE ABOVE THE RANGE IDENTIFIED.

13    Q    OKAY.  NOW, LET ME ASK YOU TO LOOK AT EXHIBIT 109.

14    WE'RE GOING TO PUT IT ON THE SCREEN, PAGE 31.  AND THIS

15    INFORMATION -- IS THIS AN OVERVIEW OF MR. KLUNE'S

16    COMPENSATION, INCLUDING WHAT HE WAS EARNING IN 2012,

17    $477,000?

18              DO YOU SEE THAT?

19         MR. KOSTIC:  HEARSAY.  BEYOND THE SCOPE OF

20    CROSS.  I DIDN'T GO INTO MR. KLUNE'S RANGE.

21           THE COURT:  OVERRULED.

22              IT'S THE BASIS FOR -- EXPERTS MAY RELY ON

23    HEARSAY.  THE ISSUE IS, WHAT'S THE OPINION?

24    BY MS. ROBERTS:

25    Q    DR. THRUSH, WHAT WAS -- MR. KLUNE'S COMPENSATION IN
```

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES          )
                               )
STATE OF CALIFORNIA            )


         I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

STATES.

DATE:  APRIL 30, 2015


         /S/ ALEXANDER T. JOKO
         _____
         ALEXANDER T. JOKO, CSR NO. 12272
         FEDERAL OFFICIAL COURT REPORTER

EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3           HONORABLE JOHN A. KRONSTADT, U.S. DISTRICT JUDGE

 4

 5   DENNIS RUTHERFORD, ET AL.,        )
                                       )
 6                    PLAINTIFF,       )
                                       )
 7             vs.                     ) No. CV13-01247-JAK
                                       )
 8   PALO VERDE HEALTHCARE DISTRICT,   )
     ET AL.,                           )
 9                                     )
                      DEFENDANT.       )
10   _____)
                                       )
11    AND RELATED COUNTERCLAIM.        )
     _____)
12

13

14           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

15                  LOS ANGELES, CALIFORNIA

16                 WEDNESDAY, APRIL 29, 2015

17                      1:26 P.M.

18              DAY 6, AFTERNOON SESSION

19

20   _____

21              CHIA MEI JUI, CSR 3287, CRR
              FEDERAL OFFICIAL COURT REPORTER
22            255 EAST TEMPLE STREET, ROOM 181-C
               LOS ANGELES, CALIFORNIA 90012
23                  cmjui.csr@gmail.com

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

TESTIMONY OF BRIAN BRINIG
April 29, 2015, Afternoon Session

49

```
 1              THE WITNESS:  The date of valuation change, which

 2    is nominal.  There is an addition of the Schedule 1A that we

 3    just talked through.  And with great apology, Your Honor,

 4    there is a typo on Schedule 1 in the middle where it says

 5    "Total Future Loss" in the middle of the page.  That should

 6    read "Total Past Loss."  I apologize.

 7              Other than that, the -- my report, my two reports

 8    would concisely explain all of the assumptions in each of

 9    these.

10              THE COURT:  Thank you, Mr. Brinig.

11              Do you have any questions for Mr. Brinig?

12              MS. ROBERTS:  Yes, Your Honor.

13              THE COURT:  Here is what I am going to do.  You

14    conduct your examination first, and then I will make a final

15    determination.

16                        CROSS-EXAMINATION

17    BY MS. ROBERTS:

18    Q     Mr. Brinig, all of your opinions assume that the

19    contracts that Mr. Klune, Mr. Rutherford had with Palo Verde

20    Hospital would automatically renew year after year through

21    their work life expectancy; correct?

22    A     Effectively, yes.

23    Q     All right.  And, in fact, at your deposition when you

24    were asked that question, you indicated that your opinions

25    and your calculations assume that Mr. Rutherford's contract
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT A

TESTIMONY OF BRIAN BRINIG
April 29, 2015, Afternoon Session

50

1   and Mr. Klune's contract would renew automatically year

2   after year; correct?

3   A      Yes.

4              MR. KOSTIC:  Hearsay as to the deposition -- I'm

5   sorry.  Mr. Artiano's witness.  I apologize.

6              THE COURT:  Sustained.

7              MS. ROBERTS:  May I read from his deposition,

8   Your Honor?

9              THE COURT:  You may.

10             MS. ROBERTS:  Page -- beginning page 75.

11             THE COURT:  Do I have this?

12             MS. ROBERTS:  Lines 10 to 21.

13             THE COURT:  We don't have his transcript.  Any

14   objection to that being read?

15             MR. ARTIANO:  Not at all other than the fact that

16   it's consistent with his testimony.

17             THE COURT:  Go ahead.  You may read it.

18             MS. ROBERTS:  (Reading:)  If we can go to page 3

19   of your report in Klune, please.

20             ANSWER:  Yes.

21             THE COURT:  Wait a second.

22             MS. ROBERTS:  Page 75, 10 to 21.

23             QUESTION:  Under the time period portion, you

24             will note that there is an assumption that

25             Mr. Klune will continue his work life

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

64

```
 1              Do you recall in this time period of late
 2   November, December, January whether members of the public
 3   were attending the meetings?
 4   A     Yes.
 5   Q     Was it more than usual?
 6   A     Yes, it was.  It was pretty chaotic.
 7   Q     Were people upset about some of the steps that were
 8   being -- strike that.
 9              Did people voice concerns at those meetings?
10   A     Yes.
11              MR. ARTIANO:  Objection, Your Honor.
12              THE COURT:  Well, overruled as to that question.
13   BY MS. ROBERTS:
14   Q     Did Mr. Rutherford present the financials to the board
15   on January 16, 2013?
16   A     Yes.
17   Q     And do you recall anything specific that was of concern
18   to you in his presentation?
19   A     Yes.  He had stated that -- we had lost a significant
20   amount of money and that by June we'd have to close the
21   doors of the hospital, basically.
22   Q     Did he present the financials both in a copy of the --
23   paper copy of the financial report as well as a PowerPoint
24   presentation?
25   A     Yes.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT A

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

65

1    Q     And were you surprised by that news, Mr. Burton?

2    A     Absolutely.

3    Q     Why?

4    A     I thought that we were okay.  And then all of a sudden

5    we get this financial report saying that we're going to have

6    to close the doors.

7    Q     Did Mr. Rutherford in 2012 ever say anything to the

8    board like presenting the financials and saying things like

9    "Things are hunky-dory" or anything like that?

10   A     Well, he would, basically, give general statements, and

11   he would say, you know, "Down a little, up a little, but

12   we're going to be okay," you know, nothing significant,

13   just -- nothing significant that would make it seem like

14   there was an urgency or we would be closing our doors soon,

15   just general statements.

16   Q     When Mr. Rutherford presented the financials on

17   January 16, 2013, did he address the board with any urgent

18   plan or strategy for addressing the financial problems?

19   A     No.

20          MR. ARTIANO:  Objection.  Your Honor.  It's vague

21   and ambiguous as to "urgent plan."

22          THE COURT:  Overruled.

23   BY MS. ROBERTS:

24   Q     Did Mr. Rutherford or Mr. Klune at the

25   January 16, 2013, meeting propose any cost cutting measures

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT A

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

66

1    or any other measures that could help the hospital with the

2    financial problems?

3    A    No.

4    Q    In 2012, did Mr. Rutherford or Mr. Klune at any time

5    advise the board that they should -- that the hospital

6    should take any cost cutting measures?

7    A    No.

8    Q    Was any plan of action or strategy stated or identified

9    by Mr. Klune or Mr. Rutherford on January 16, 2013?

10   A    No, not that I recall.

11   Q    Do you recall meeting as a board approximately one week

12   after the January 16 meeting?

13   A    Yes.

14   Q    And did Mr. Klune or Mr. Rutherford attempt to have any

15   communication with you between the January 16 meeting and

16   the January 22nd meeting?

17   A    Not that I recall.

18   Q    At the January 22nd meeting, was there a financial

19   report given?

20   A    Yes.

21   Q    And who presented the financial report?

22   A    I believe Mr. Rutherford.

23   Q    And do you recall anything that was of concern to you

24   in the January 22 financial report?

25   A    Yes.  We had -- we kept losing money.  There was more

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT A

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

67

1   money that was still -- the income of the hospital was still

2   on a decline, a steady decline, even though, like, a week

3   later.

4   Q    All right.  And did Mr. Klune or Mr. Rutherford at the

5   January 22 meeting provide the board with any plan of action

6   or strategy for helping the hospital remain financially

7   viable?

8   A    No.

9   Q    Did Mr. Klune or Mr. Rutherford tell the board that

10  they would provide a plan some date in the future regarding

11  how to save the hospital?

12  A    Not that I recall.

13  Q    Do you recall, Mr. Burton, if at the January 22, 2013,

14  meeting there were -- the exclusive contract resolutions

15  were on the agenda for consideration again?

16  A    I'd have to look at the Minutes, but --

17  Q    All right.  Do you recall at some point in time,

18  Mr. Burton, voting to rescind those two exclusive contract

19  resolutions that you had voted against in November of 2012?

20  A    Yes.

21  Q    Did you do that sometime in January of 2013?

22  A    Yes, I believe so.

23  Q    All right.  And why did you vote to rescind those

24  resolutions for the exclusive contracts?

25  A    Well, several reasons.  I -- one, we had -- to my

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

69

```
1    A    Yes.

2    Q    And was it to terminate Mr. Klune's contract?

3    A    Yes.

4    Q    How did you vote with respect to that motion to

5    terminate Mr. Klune's contract?

6    A    I voted in favor to terminate Mr. Klune's contract.

7    Q    And why did you do that, Mr. Burton?

8    A    After the report of the hospital is going to close, we

9    didn't have a plan, just -- I felt like we had to do

10   something to save the hospital, and we couldn't afford to

11   keep paying Mr. Klune that salary.

12   Q    Why did it matter to you whether or not the hospital

13   remained opened, Mr. Burton?

14   A    Well, I was born there.  And I have -- my grandmother

15   worked there for several years, family members.  And the

16   hospital has a special place, you know, for people that are

17   from the community like myself.  And it's very important --

18   it's all we have to take care of and care for people in that

19   community.

20   Q    Was there any other reason why you voted to terminate

21   Mr. Klune's contract, other than your concerns about the

22   finances, the lack of a plan or strategy, and your concern

23   that the hospital could not afford his salary?

24   A    No.  That's the only reason I could think of.

25   Q    Was it an easy decision for you to make to terminate
```

1    Mr. Klune?

2                MR. ARTIANO:  Objection.

3                THE WITNESS:  No.

4                MR. ARTIANO:  Relevance, Your Honor.

5                THE COURT:  Sustained.

6                MS. ROBERTS:  All right.

7    Q    Immediately after Mr. Klune's contract was terminated,

8    who became the interim CEO after that?

9    A    Mr. Rutherford.

10   Q    Okay.  And how long was Mr. Rutherford the interim CEO?

11   A    Three weeks, maybe a month.

12   Q    And why just for three weeks or a month?

13   A    After that we -- after we had terminated Mr. Klune's

14   contract, we had another meeting, and we didn't renew

15   Mr. Rutherford's contract.

16   Q    So sometime after Mr. Klune's contract was terminated,

17   you learned that Mr. Rutherford's contract was set to

18   expire?

19   A    Yes.

20   Q    And, by the way, in the month or so that Mr. Rutherford

21   was the interim or acting CEO, did he provide you or the

22   board with any plan of action or strategy?

23   A    Not at all, not to my knowledge.

24   Q    Did he present the board with any steps to take

25   immediately to prevent the hospital from closing?

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

71

1   A     No, ma'am.

2   Q     Did Mr. Rutherford ever tell you or the board that the

3   hospital would not close, notwithstanding the finances?

4   A     No.

5   Q     All right.  You indicated that you voted to not offer

6   Mr. Rutherford a new contract; is that correct?

7   A     That's correct.

8   Q     And did you personally vote against a new contract for

9   Mr. Rutherford?

10  A     Yes, I voted not to renew his contract.

11  Q     And why did you vote that way?

12  A     The same reason.  It was -- it wasn't as much as

13  Mr. Klune, but it was pretty steep, and there was no plan,

14  and we couldn't afford to pay him either with the hospital

15  doors closing in June.

16  Q     Did this news of the problems with the finances of the

17  hospital come as a surprise to you, Mr. Burton?

18  A     Yes.

19             MR. ARTIANO:  Asked and answered.

20             THE COURT:  Sustained.

21             THE WITNESS:  Excuse me.  Sir, might I get some

22  water?

23             THE COURT:  There should be water right there.

24  Help yourself.  Thank you.

25

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

72

```
1   BY MS. ROBERTS:

2   Q    Mr. Burton, did you invite Mr. Klune or Mr. Rutherford

3   to speak to the board about the board's concerns anytime

4   before you voted to end their employment at Palo Verde?

5   A    No.  But they could have said whatever they wanted to

6   say during every meeting.

7   Q    Did you conduct a formal performance evaluation of

8   Mr. Klune and Mr. Rutherford before you cast your vote

9   regarding their employment at Palo Verde?

10  A    No, ma'am.

11  Q    Why not?

12  A    We didn't have time.  It was just -- we had to -- I

13  felt like I had to do something towards keeping the doors

14  open or try to save the hospital.

15  Q    After Mr. Klune and Mr. Rutherford were gone,

16  Mr. Burton, did you -- did the hospital retain the services

17  of HFS to assist it with its finances?

18  A    Yes.

19  Q    And did you come to learn, as a board member, that the

20  finances were worse than you had suspected?

21  A    Yes.

22  Q    Did you also learn that there were problems with some

23  of the compliance issues at the hospital?

24  A    Yes.

25  Q    Now, did you -- in December of 2013, were you advised
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APP00179                                    EXHIBIT A

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

73

1    of -- that Mr. Klune had taken some private patient records

2    and information from Palo Verde Hospital?

3    A    Yes.

4              MR. ARTIANO:   Objection.   Your Honor, this is --

5              THE COURT:   Why isn't this cumulative?

6              MS. ROBERTS:   On the after-acquired evidence, I

7    need to lay the foundation, Your Honor.

8              THE COURT:   But there has been testimony about

9    this.   Is this something new here?

10             MS. ROBERTS:   Yes.

11   Q    Mr. Burton, if Mr. Klune was still working at

12   Palo Verde Hospital when you found out about the taking of

13   the private patient information, would you have wanted to

14   take any action against him?

15   A    Yes.

16             MR. ARTIANO:   Objection, Your Honor.   Lack of

17   foundation.   Calls for speculation.

18             THE COURT:   Same ruling as before.   Admitted for a

19   limited purpose in evaluating the post-termination evidence.

20             The answer is yes; correct?

21             Would you read the answer, please.

22        (The record was read.)

23             THE COURT:   Thank you.

24   BY MS. ROBERTS:

25   Q    Mr. Burton, what action would you have taken with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT A

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

74

1   respect to Mr. Klune?

2           THE COURT:   Same ruling.

3           THE WITNESS:   I would have voted to terminate him.

4   BY MS. ROBERTS:

5   Q    Why?

6   A    Because of the action that we found out that happened

7   in the violation that put the hospital in jeopardy.

8   Q    I am going to ask you the same question with respect to

9   the Stark issue that came up involving the physician leases.

10          Do you recall when you learned about that,

11  Mr. Burton?

12  A    I think the -- we were informed by the CEO, Ms. Anaya.

13  Q    When was that?

14  A    Probably around February 2013.

15  Q    All right.  Did you have to vote as a board member,

16  cast a vote regarding some issue related to the Stark

17  violation?

18  A    I believe I did.

19  Q    Okay.  And did that relate to paying a fine?

20  A    Yes.

21  Q    Do you recall the amount of the fine that you voted to

22  approve?

23          MR. ARTIANO:  Objection, Your Honor.  Hearsay.

24          THE COURT:  Sustained.

25

TESTIMONY OF SAMUEL BURTON
April 29, 2015, Afternoon Session

75

```
1   BY MS. ROBERTS:

2   Q    If Mr. Klune and Mr. Rutherford had remained employed

3   at Palo Verde in February of 2014, Mr. Burton, would you

4   have wanted to take action against them based on what you

5   learned about the violations associated with the lease

6   agreements?

7   A    Yes.

8   Q    And what action?

9   A    I would have wanted them terminated.

10  Q    Why is that?

11  A    Again, it put the hospital in jeopardy, and they have

12  violated people's rights.

13  Q    Mr. Burton, at any point in time before Mr. Klune and

14  Mr. Rutherford left Palo Verde Hospital, did you have any

15  information whatsoever that they were investigating illegal

16  conduct and reporting it to the district attorney, the U.S.

17  Attorney, the OIG, anything like that?

18  A    No, not at all.

19  Q    Were you aware of a lawsuit that had been filed by the

20  district against Dr. Sahlolbei?

21  A    Yes, I was aware of that.

22  Q    But you didn't have any information about any

23  investigations and reporting to law enforcement; correct?

24  A    No, not that I recall.

25  Q    All right.  Was the fact that a lawsuit had been filed
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APP00182                                        EXHIBIT A

TESTIMONY OF TRINA SARTIN
April 29, 2015, Afternoon Session

```
 1   received that day.
 2   Q    And what did that report indicate as far as the future
 3   of the hospital?
 4   A    Mr. Rutherford presented a PowerPoint to the board.
 5   And in that PowerPoint, basically, there was a decline of
 6   finances and the hospital would, by June of 2013, would have
 7   reached $650,000, which means the hospital would, basically,
 8   not be able to operate and it would have to close.
 9   Q    At a subsequent meeting, did you vote -- did you get a
10   subsequent bad financial report a week later?
11   A    Yes.
12   Q    Did you, at that subsequent meeting vote, in closed
13   session to terminate Mr. Klune?
14   A    Yes.
15   Q    Why did you vote to terminate Mr. Klune?
16            THE COURT:  Are we talking about a closed session?
17            MS. ROBERTS:  Yes.
18            THE COURT:  Haven't you asserted that it's
19   privileged?
20            MS. ROBERTS:  It is privileged, but the fact that
21   she voted is public.
22   Q    Why did you vote to terminate Mr. Klune?
23   A    Do I answer?
24            THE COURT:  You may answer.
25            THE WITNESS:  Because there had been another
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

EXHIBIT A

1   financial report that was given to the board January 22nd,

2   and we lost another 1.3 or $1.5 million less than a week

3   later.  The hospital was in a critical financial crisis.

4                MR. ARTIANO:  Belated objection, Your Honor.  One

5   of the problems --

6                THE COURT:  Just state your motion.  What is your

7   motion?  Just state the ground.

8                MR. ARTIANO:  The problem is that they have

9   asserted an attorney-client privilege for all closed

10  sessions and throughout discovery in this case --

11               THE COURT:  That's why I raised the issue.

12               MS. ROBERTS:  That is absolutely false.

13               THE COURT:  Please --

14               MR. ARTIANO:  Throughout this case, they wouldn't

15  let us ask certain questions, saying we did this on a basis

16  of advice of counsel.

17               THE COURT:  Just one moment, please.  Is the vote

18  that is made in closed session made public?

19               MS. ROBERTS:  Correct.  And they had been

20  questioned about it at their deposition.

21               THE COURT:  Just -- I think the only testimony --

22  first of all, I raised the issue as you did.

23               Second, I think the only testimony that I am

24  receiving -- I think the only testimony I am receiving is

25  with respect to the publicly disclosed vote.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1              MS. ROBERTS:  That's correct, Your Honor.

2              THE COURT:  And I think this is cumulative.

3   BY MS. ROBERTS:

4   Q     Miss Sartin, was there any other reason why you voted

5   to terminate Mr. Klune other than your concern about the

6   finances in keeping the hospital open?

7   A     Yes.

8   Q     What else?

9   A     There was numerous issues.  This is my personal reason

10  why I voted to terminate Mr. Klune.

11             The hospital had a terrible decline.  It was

12  filthy.  I had never seen it like that in all the years I

13  had serviced my community, just the financial status.

14             Mr. Klune had been gone.  I lost confidence in

15  him.  He didn't seem to care about our community.

16             When the community went to the board meetings and

17  addressed the board, Mr. Klune didn't make any eye contact

18  with him.  He didn't apologize.  He didn't seem to be

19  empathetic to their feelings.  Health care and compassion go

20  hand in hand.  Not only that --

21             THE COURT:  All right.  Let's stop there, please.

22             I think that concludes your time.  So please be

23  seated.

24             MS. ROBERTS:  Okay.

25             MR. ARTIANO:  May I move to strike the portion --
```

1    incumbents were invited.  Everybody was.

2            THE COURT:  Did you ever write anything about your

3    campaign, why you were running?

4            THE WITNESS:  The newspaper interviewed us, yes.

5            THE COURT:  At any time during your campaign --

6    campaign.  Any time during your candidacy for a position on

7    the board of directors, did you ever make any comments about

8    Mr. Klune?

9            THE WITNESS:  May have -- I may have about the --

10   just in general about the enormous pay.

11           THE COURT:  Did you recall if you made any

12   comments about Mr. Rutherford?

13           THE WITNESS:  No.

14           THE COURT:  Were you aware -- are you aware of any

15   information provided by Mr. Klune to the district attorney

16   with respect to matters related to the operation of

17   Palo Verde?

18           THE WITNESS:  No.

19           THE COURT:  Are you aware of any information

20   provided by Mr. Rutherford to the district attorney about

21   anything related to the operations of Palo Verde?

22           THE WITNESS:  Absolutely not, no.

23           THE COURT:  Are you aware of anything that either

24   of them communicated to the federal Government?

25           THE WITNESS:  Are you asking me now as I sit here?

TESTIMONY OF TRINA SARTIN
April 29, 2015, Afternoon Session

118

1              THE COURT:  As you sit here today.

2              THE WITNESS:  I was aware at their deposition.

3     That was the first I had heard about anything like that.

4              THE COURT:  When did -- when was the deposition?

5     What year?

6              THE WITNESS:  It was 2014, late, I think, in the

7     fall.  I'm not sure.

8              THE COURT:  You testified that you attended a

9     hearing in a court concerning litigation involving

10    Palo Verde.  Do you recall that testimony?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Did somebody ask you to attend?

13             THE WITNESS:  No.  I went on my own.

14             THE COURT:  How did you learn that there would be

15    a hearing?

16             THE WITNESS:  I don't remember.  I think that -- I

17    can't recall, but I think that -- it was at a meeting -- I

18    don't remember, Your Honor.

19             THE COURT:  You testified that you voted -- is

20    this correct?  Did you vote to terminate the contract of

21    Mr. Klune?

22             THE WITNESS:  Yes, sir, I did.

23             THE COURT:  And did you vote not to renew the

24    contract of Mr. Rutherford?

25             THE WITNESS:  I did.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

APP00187                              EXHIBIT A

TESTIMONY OF TRINA SARTIN
April 29, 2015, Afternoon Session

119

1    THE COURT:  At the time you became -- first became

2    a board member, had you made a decision about whether you

3    would vote to do either of those things?

4           THE WITNESS:  No.

5           THE COURT:  Okay.  Thank you for your testimony,

6    Miss Sartin.  You may step down.

7           THE WITNESS:  Thank you, Your Honor.

8           THE COURT:  Now, Mr. Artiano, same direction.  If

9    there is deposition testimony that you wish me to review,

10   you may submit it with your closing brief.

11          And you may submit, if there are objections within

12   it, I will consider the objections.

13          MS. ROBERTS:  Thank you.

14          THE COURT:  Just a minute.  Okay.  All right.

15   Here's what I need you to do.

16          First, you need to confer with each other.  Please

17   do it collaboratively because I need to know what -- we need

18   to complete the process of exhibit admission.  So you are

19   going to need to work collaboratively on that.

20          Second, as I have stated, your closing argument

21   should be submitted in writing.  Can you do that within two

22   weeks?

23          MS. ROBERTS:  Yes, Your Honor.

24          MR. ARTIANO:  Yes, Your Honor.

25          THE COURT:  Okay.  How many pages do you propose

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  April 29, 2015.

11

12

13

14            /S/ CHIA MEI JUI _____

15         Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA