Exhibit B

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD, an individual;  )
PETER KLUNE, an individual; and    )
TARA BARTH, an individual,         )
                                   )
          Plaintiffs,              )
                                   )
     vs.                           ) Case No.:
                                   ) ED CV 13-01247
                                   ) JAK(SPx)
PALO VERDE HEALTH CARE DISTRICT,   )
a public entity; TRINA SARTIN, an  )
individual; SANDRA HUDSON, an      )
individual; SAMUEL BURTON, an      )
individual; and DOES 1 to 50,      )
inclusive,                         )
                                   )
          Defendants.              )
_____)

VIDEOTAPED DEPOSITION OF DENNIS E. RUTHERFORD

VOLUME I - PAGES 1 THROUGH 342

SAN DIEGO, CALIFORNIA

AUGUST 11, 2014

REPORTED BY:  JULIE A. McKAY, CSR NO. 9059

Peterson Reporting, Video & Litigation Services

1    District and that he reached out to you about the

2    position?

3        A.   Uh-huh.  Yes.  That's correct.

4        Q.   Okay.  And can you tell me what role, if any,

5    you had, Mr. Rutherford, in directing Palo Verde Health

6    Care District's counsel to investigate any board

7    members?

8        A.   What role I had?

9        Q.   Yes.

10       A.   Well, I don't know.  That's kind of -- I don't

11   quite understand the question.

12       Q.   Okay.  Let me see if I can clear it up for you.

13           Did you, at any point in time, Mr. Rutherford,

14   direct the district's outside counsel to investigate any

15   elected board member?

16       A.   Not directly, no.

17       Q.   What do you mean when you say "not directly"?

18       A.   Well, in my role as CFO I would be responsible

19   for evaluating the bills, agreements to make sure

20   whether they were compliant with what the legal team was

21   performing at the time.  I did review those.  I did have

22   discussions with him.  So that role.

23       Q.   Okay.  So you did not ever direct any attorney

24   that was retained on behalf of the district to

25   specifically investigate an elected board member; is

1  that correct?

2          MR. KOSTIC:  Asked and answered.

3  Argumentative.

4          Go ahead.

5          THE WITNESS:  I'm not aware the timing of the

6  specific order or instruction to counsel to investigate

7  a specific board member.  I don't recall any.

8          MS. ROBERTS:  Can you read that question back,

9  the beginning is confusing to me.  I mean the answer.

10          (Record read.)

11          MS. ROBERTS:  Okay.  I'm going to move to

12  strike as nonresponsive.

13  BY MS. ROBERTS:

14     Q.  I want to just see if I can ask it one more

15  time.

16          Did you ever direct any attorney that was

17  retained on behalf of Palo Verde Health Care District to

18  specifically investigate an elected board member?

19          MR. KOSTIC:  Argumentative.  Asked and

20  answered.

21          Please go ahead.

22          THE WITNESS:  Not that I'm aware of.

23  BY MS. ROBERTS:

24     Q.  Okay.

25     A.  Or I can recall.  Better answer.

APP00192                          EXHIBIT B

1      Q.   All right.  Did you ever tell any elected board

2  member that district counsel had been directed to

3  investigate them?

4      A.   No, I didn't.

5      Q.   Did you ever communicate with any member of the

6  Palo Verde Health Care District board of directors

7  regarding reporting that board member to any

8  governmental agency or law enforcement?

9           MR. KOSTIC:  Let me have that read back,

10  please.

11          (Record read.)

12          MS. ROBERTS:  It's not a good question.  I'll

13  restate it.

14  BY MS. ROBERTS:

15      Q.   Did you ever direct anyone to report an elected

16  board member to law enforcement or a governmental

17  agency?

18          MR. KOSTIC:  Asked and answered.

19          Go ahead.

20          THE WITNESS:  Did I ever elect -- instruct any

21  board member?

22  BY MS. ROBERTS:

23      Q.   Let me ask the question again.

24          Did you ever direct anyone to report an elected

25  board member to law enforcement or a governmental

APP00193                          EXHIBIT B

1   agency?

2          MR. KOSTIC:  Compound.

3          Please go ahead.

4          THE WITNESS:  No.

5   BY MS. ROBERTS:

6      Q.   Did you ever advise any elected board member at

7   Palo Verde Health Care District that they were being

8   reported to any governmental agency?

9      A.   No, I didn't.

10     Q.   Did you ever advise any elected member of the

11  Palo Verde Health Care District board of directors that

12  they were being reported to law enforcement?

13     A.   Not that I recall.

14     Q.   Have you had any communications with any

15  governmental employee regarding potential criminal

16  charges against any elected board member at Palo Verde

17  Health Care District?

18         MR. KOSTIC:  Please read that back to me.

19         (Record read.)

20         MR. KOSTIC:  It's vague as to "government

21  employee."

22         Please go ahead.

23         THE WITNESS:  The -- Dan Stack, the

24  investigator.

25

          Peterson Reporting, Video & Litigation Services     27

1    specifically?

2    BY MS. ROBERTS:

3        Q.   Do you -- as you sit here right now, do you

4    know whether or not you spoke to the newly configured

5    board about these issues of legalities before Mr. Klune

6    was terminated or was it simply afterwards?

7        A.   No -- yes, I did speak to them before Mr. Klune

8    was terminated.  The exact dates and times of the

9    conversations, I can't recall.

10        Q.   As you sit here right now, do you recall

11    meeting separately from a duly noticed board meeting

12    with Trina Sartin and/or Sandy Hudson at any time before

13    Mr. Klune was terminated?

14        A.   I don't recall.

15        Q.   All right.  And you said that you met

16    extensively with Trina Sartin and Sandy Hudson.

17            Is that -- did I understand that correctly?

18        A.   Might have been a poor choice of word.

19    "Extensive" can mean a lot of things, but I met on

20    several occasions.

21        Q.   How many occasions did you meet separate --

22    outside of a formal board meeting with Trina Sartin or

23    Sandra Hudson?

24        A.   After Peter was terminated it was a regular

25    event.  So it was frequent.  Almost daily.

1      Q.   All right.  Now, at any point in time did you

2  tell Mr. Burton that you were investigating anything

3  related to him?

4      A.   No.

5      Q.   Did you, at any point in time, tell Ms. Sartin

6  that you were having anything investigated with respect

7  to her?

8           MR. KOSTIC:  Vague as to "you" on both

9  questions.

10           Please go ahead.

11           THE WITNESS:  Yes.  That I was investigating,

12  no.

13  BY MS. ROBERTS:

14      Q.   Okay.  My question was, did you, at any point

15  in time, tell Ms. Sartin that you were having anything

16  about her investigated?

17           MR. KOSTIC:  Same objection.

18           Go ahead.

19           THE WITNESS:  No.

20  BY MS. ROBERTS:

21      Q.   Did you ever tell Ms. Hudson that you were

22  having any issues that related to her investigated?

23      A.   Not that I'm aware.

24      Q.   All right.  Did you ever have any email

25  communications with any governmental agency or member of

Peterson Reporting, Video & Litigation Services        81

1    have you.

2        Q.   Did Ms. Hudson tell you that she could,

3    whatever, consider a raise for you if you stopped an

4    investigation of a hostile work environment?

5        A.   Well, yes, pretty much.

6        Q.   What investigation were you undertaking after

7    January 22, 2012 regarding a hostile work environment?

8        A.   I sent -- sorry.

9             I sent numerous emails to Jeff Scott, legal

10   counsel, and asked him to follow up on the continuing

11   hostility that Dr. Sahlolbei was exhibiting in the

12   hospital.

13       Q.   Okay.  So your investigation as of January 22,

14   2012 regarding Palo Verde Hospital involved sending

15   emails to Jeff Scott and asking him to help address

16   Dr. Sahlolbei's basically workplace conduct?

17       A.   Yes.  And if I heard it correctly, you said as

18   of January 22nd, but following that in my role as CEO,

19   yes.

20       Q.   Okay.  So other than sending emails to district

21   counsel asking him to assist in -- in getting

22   Dr. Sahlolbei to improve his workplace conduct, was

23   there any other investigation that you were doing in

24   January or February of 2012 -- sorry -- January,

25   February of 2013?

1         Go ahead.

2         THE WITNESS:  Well, I think our recommendations

3    were to bring in additional surgeons, was one of the

4    recommendations, increase.

5    BY MS. ROBERTS:

6      Q.   And if you brought in an additional surgeon,

7    how much -- how -- how would that change the cash basis

8    for the hospital when it was facing a potential decline

9    to the point where it had less than $650,000 in cash?

10        MR. KOSTIC:  Same objections.  And

11   argumentative, if I didn't have that.

12        THE WITNESS:  Well, since we're dealing with

13   hypotheticals, if we brought in --

14   BY MS. ROBERTS:

15     Q.   No.  No.  I'm -- you're not here -- let me --

16   let me just ask the question.  Do you -- did you do any

17   analysis -- actually, strike that.

18        In 2000 -- in the three years that you worked

19   at Palo Verde Health Care District, what specific payor

20   contracts did you renegotiate as far as the rates that

21   were being paid versus renewing those contracts?

22     A.   Well --

23        MR. KOSTIC:  Overbroad.  Lacks foundation.

24        Go ahead.

25        THE WITNESS:  Sorry.

APP00198                                    EXHIBIT B

1          I don't recall.

2   BY MS. ROBERTS:

3      Q.   Okay.  Were you personally involved in

4   renegotiating any payor contract that Palo Verde Health

5   Care District had during the three years that you were

6   the CFO?

7      A.   Yes.

8      Q.   What payor contracts were you personally

9   involved in renegotiating?

10     A.   I don't recall.

11     Q.   When did you renegotiate a payor contract, you

12  personally?

13     A.   I don't recall the specific date.

14     Q.   What year was it that you renegotiated a payor

15  contract?

16     A.   Fiscal 2011, I think.

17     Q.   Okay.  And what was the -- you don't know who

18  the payor was?

19     A.   I just don't remember which payor, no.

20     Q.   Okay.  Palo Verde Health Care District didn't

21  have a lot of contracts with various payors, correct?

22          MR. KOSTIC:  Vague.

23          THE WITNESS:  Yeah.  I don't know what you mean

24  by "a lot."  They had several.

25

1    BY MS. ROBERTS:

2        Q.   How many?

3        A.   I don't remember the exact number.

4        Q.   Was it more than five?

5        A.   Yeah, I think it was.

6        Q.   Okay.  Did Palo Verde Health Care District,

7    during the time that you were there, have more than 20

8    payor contracts?

9        A.   No.

10       Q.   Did you renegotiate the payor contracts with

11   Blue Shield Blue Cross?

12       A.   I think it was 2011, yes, we renegotiated.

13   Actually, we went through -- we had a third party.  I

14   don't recall their name.  But they went and we

15   renegotiated where we could on all of the contracts.

16       Q.   I don't know what that means, they went and we

17   negotiated -- let me -- let me just ask the question.

18            Did you personally renegotiate a contract with

19   Blue Cross Blue Shield during the time that you worked

20   at Palo Verde Hospital?

21            MR. KOSTIC:  Vague as to "you personally."

22            THE WITNESS:  So you're asking if I personally

23   made a call to Blue Cross, no.

24   BY MS. ROBERTS:

25       Q.   Were you involved personally in any

                 Peterson Reporting, Video & Litigation Services      288

APP00200                                          EXHIBIT B

1   negotiations with Blue Cross Blue Shield for the -- any

2   rate changes or increases on its payor contract with

3   Palo Verde Health Care District while you worked at --

4   at -- for the district?

5              MR. KOSTIC:  Same ambiguity.

6              Please go ahead.

7              THE WITNESS:  No.

8   BY MS. ROBERTS:

9       Q.   Did anyone at Palo Verde Health Care District

10   or on its behalf renegotiate rates, payor rates, with

11   Blue Cross or Blue Shield from the time you started in

12   2010 until the time you left in 2013?

13      A.   To the best of my recollection, yes.

14      Q.   Okay.  And what were the -- what were the

15   results of those negotiations?

16      A.   I don't remember the specific particulars.

17      Q.   Okay.  And as you sit here right now, you can't

18   state specifically that you have personal knowledge of

19   any rate increases with Blue Cross Blue Shield during

20   the time that you were at Palo Verde, correct?

21              MR. KOSTIC:  I'm sorry.  I need that read back.

22              (Record read.)

23              MR. KOSTIC:  Go ahead.

24              THE WITNESS:  Rate increases, no.

25

APP00201                                        EXHIBIT B

1   BY MS. ROBERTS:

2      Q.   So is that a correct statement?

3      A.   Yes.

4      Q.   All right.  And did you personally -- were you

5   personally involved in any renegotiations of the

6   contract with Inclusive Care during the time that you

7   worked at Palo Verde Health Care District?

8      A.   I don't recall.

9      Q.   Okay.  Do you know if anyone else renegotiated

10   a contract with Inclusive Care with Palo Verde Health

11   Care District during the time that you were employed

12   there?

13      A.   I don't recall.

14      Q.   Do you recall if there were any rate

15   negotiations with Aetna during the time that you worked

16   at Palo Verde Health Care District?

17      A.   Specifically Aetna?  Like I stated previously,

18   there was a project undertaken in 2011 -- if I remember

19   the year correctly -- where all the contracts were

20   looked at and -- and discussed with the payors.

21         MS. ROBERTS:  Move to strike as nonresponsive.

22   BY MS. ROBERTS:

23      Q.   Mr. Rutherford, do you know whether there were

24   any rate negotiations with Aetna during the time that

25   you worked at Palo Verde Health Care District?

Peterson Reporting, Video & Litigation Services       290

APP00202                                        EXHIBIT B

1          MR. KOSTIC:  Asked and answered.

2          Can't help it if you're going to strike the

3  answer when you don't like it.

4          You can tell us again, Mr. Rutherford.

5          THE WITNESS:  Same -- same response.  There was

6  negotiations.  I don't remember the specifics.

7  BY MS. ROBERTS:

8      Q.   Okay.  Did -- were there any rate increases by

9  Aetna Health Care during the time that you worked at

10  Palo Verde Hospital as a result of rate negotiations

11  with that company?

12      A.   I don't recall.

13      Q.   Okay.  Were there any negotiations with United

14  Health Care for increase in rates during the time that

15  you worked at Palo Verde Hospital?

16      A.   I don't know.

17      Q.   Were there any rate increases offered by United

18  Health Care during the time you worked at Palo Verde

19  Hospital?

20      A.   I don't know.

21      Q.   During the time that you -- the three years

22  that you worked at Palo Verde Hospital, did you or

23  anyone else bring any new payors or payor contracts to

24  Palo Verde Hospital?

25      A.   Well, actually if you'd attribute the prison

           Peterson Reporting, Video & Litigation Services      291

```
 1   2012?

 2       A.   As compared to when?  2011?

 3       Q.   As compared to any time.  Did you reduce your

 4   cost of labor in response to the decline of the finances

 5   of the hospital?

 6       A.   Are you talking total labor cost or --

 7       Q.   Any labor.  Did you make a concerted effort

 8   to -- to cut your overall labor cost in the year 2012 in

 9   response to the loss of the prison patient population

10   and other challenges that the hospital was facing?

11       A.   Yes.

12       Q.   Okay.  And what were the reductions in labor

13   costs?

14       A.   Well, the actions taken were to introduce

15   productivity management and limit hiring where we could.

16       Q.   What reductions were there in labor costs

17   overall in the year 2012?

18       A.   I don't have -- I don't recall.

19       Q.   Well, does Exhibit 29 in any way address labor

20   expenses?

21       A.   No.  I don't see any labor expenses on here,

22   no.

23       Q.   All right.  What percentage -- or what was the

24   savings from the reduction in labor costs in 2012?

25       A.   I don't recall.
```

APP00204                                    EXHIBIT B

1      Q.   In the year 2012 did you freeze pay increases?

2      A.   I don't remember.

3      Q.   Did you do anything in the year 2012 to reduce

4   nonlabor operating expenses?

5      A.   I'm sure we did.  I just can't remember.

6      Q.   You just -- you don't recall one way or the

7   other whether or not you took steps in 2012 to reduce

8   nonlabor operating expenses?

9           MR. KOSTIC:  Argumentative and misstates prior

10   response.

11          Go ahead, Mr. Rutherford.

12          THE WITNESS:  Attempts to manage costs are an

13   ongoing process.  The specific savings, I can't

14   remember.  Specific impact, I don't recall.

15   BY MS. ROBERTS:

16     Q.   Okay.  Do you recall what you did to cut

17   nonlabor operating expenses in the year 2012?

18     A.   Not specifically, no.  I don't recall.

19     Q.   Did you do anything to reduce your dependence

20   on vendor support throughout the organization in the

21   year 2012?

22          MR. KOSTIC:  Objection.  Vague.

23          THE WITNESS:  I don't know what that question

24   is.

25

1    Q.   When was that?

2    A.   Again, obviously, I don't recall by your

3  reaction the correct date, but we analyzed Sodexo cost

4  and Sodexo food service and analyzing the potential for

5  bringing them in-house and the potential savings there.

6    Q.   But you didn't actually do that, did you,

7  Mr. Rutherford?

8    A.   Evidently I don't recall, huh?

9    Q.   All right.  Did you -- when you received the

10  notice from Medi-Cal that there was a $2,147,000

11  repayment owed to Medi-Cal, what was your response to

12  that notice, learning that news from Medi-Cal?

13        MR. KOSTIC:  Overbroad.  Calls for a narrative.

14        Go ahead.

15        THE WITNESS:  What was my response?

16  BY MS. ROBERTS:

17    Q.   Yeah.  How did you -- how did the district

18  respond to Medi-Cal's notice to you that you had to

19  repay them almost $2,150,000?

20    A.   How did the district respond, or how did I

21  respond?

22    Q.   You.

23    A.   How did I respond?  I evaluate -- I asked for

24  further investigation on the third party liabilities,

25  and then we entered into a payment arrangement.

Peterson Reporting, Video & Litigation Services       297

1      Q.   Okay.  When you asked for further investigation

2   on the third party liability, who did you ask for that

3   investigation from?

4      A.   I don't recall.  Rick White or Krista.

5      Q.   Okay.  And what did Rick White or Krista do to

6   investigate third party liabilities?

7           MR. KOSTIC:  Calls for speculation and lacks

8   foundation.

9           THE WITNESS:  I don't recall.

10  BY MS. ROBERTS:

11     Q.   Well, what do you mean by that when you said

12  that you requested that further investigation on the

13  third party liabilities?

14     A.   Just what I said.  I asked them to take a look

15  at it.  I don't recall the results or what they did

16  specifically.  I don't have the data in front of me

17  right now.  But that's what I meant.

18     Q.   So the purpose of having Krista or Rick on your

19  staff further investigate the third party liabilities is

20  to make sure that Medi-Cal's numbers were correct and

21  that there had, in fact, been an overpayment of

22  $2,147,000, correct?

23     A.   Yes.

24     Q.   And then you satisfied yourself that there had

25  been an overpayment of $2,147,000, and then you entered

1      A.   I'm sure I did.

2      Q.   And what did Rod Phillips say, if you remember?

3      A.   He verified the accuracy of the data.

4      Q.   So he said it looks like Medi-Cal's numbers are

5   correct and that you owe the money?

6      A.   That's a good summation.

7      Q.   Okay.  Did Mr. Phillips communicate with

8   Medi-Cal at all about this $2,147,000 overpayment?

9      A.   I don't recall.

10     Q.   At any point in time did anyone on behalf of

11  Palo Verde Hospital communicate or file an appeal with

12  Medi-Cal regarding the $2,147,000 overpayment to Palo

13  Verde Hospital?

14     A.   Not that I'm aware of.

15     Q.   Okay.  During the year 2012 it is my

16  understanding that Medi-Cal billing was brought

17  in-house.  Is that -- do you have any recollection of

18  that at all?

19     A.   I have recollection of the event that was

20  brought in-house, meaning the third party provider was

21  changed to bringing it -- doing it inside, yes.

22     Q.   And who was in charge of Medi-Cal billing at

23  Palo Verde Hospital once it was brought in-house in

24  2012?

25     A.   The business office.

1    A.   It's specialized, yes.

2    Q.   Do you recall in the year 2012 learning that

3  the emergency department was not billing for some of its

4  services?

5    A.   I don't -- no, I don't recall.

6    Q.   Do you recall in the year 2012 or early 2013

7  learning that the emergency department was not billing

8  for its supplies?

9    A.   I recall some of the supplies, yes.

10   Q.   And what was the reason -- strike that.

11        Did you turn that around so that they started

12 billing for the supplies?

13   A.   I don't remember the exact specifics, but it

14 had to do with getting them scanned and into the system

15 to bill.

16   Q.   Who at Palo Verde Hospital in the year 2012 was

17 handling Medi-Cal and Medicare appeals?

18   A.   I don't recall specifically.

19   Q.   So you don't know if anyone was handling those

20 appeals in 2012?

21   A.   I don't know who specifically today.

22   Q.   Okay.  What position would have handled appeals

23 for Medi-Cal and Medicare denials or reductions in the

24 year 2012 at Palo Verde Hospital?

25   A.   Typically the business office.

Peterson Reporting, Video & Litigation Services     303

```
 1     Q.   Okay.  And, again, you don't know who in the
 2  business office or what position the business office was
 3  involved in that, correct?
 4     A.   I just don't remember who it was assigned to,
 5  no.
 6     Q.   Okay.  And what appeals were handled by the
 7  business office in 2012 as far as payor decisions on
 8  invoices from the district?
 9          MR. KOSTIC:  Overbroad.  Calls for a narrative.
10          THE WITNESS:  I -- I don't know how to answer
11  that.
12  BY MS. ROBERTS:
13     Q.   Okay.  Do you know whether any appeals were
14  pursued in the year 2012 as a result of reductions or
15  declinations by payors?
16          MR. KOSTIC:  Compound.
17          Go ahead.
18          THE WITNESS:  I don't know specifics, no.
19  BY MS. ROBERTS:
20     Q.   Were there any vendors that you were using in
21  2012 that you stopped using as a result of the financial
22  decline at Palo Verde Hospital?
23     A.   I think we answered this previously.  I just
24  don't recall the names, but I'm sure there were.
25     Q.   Okay.  Do you recall the type of vendor that
```

```
 1   Emergency Medical was reasonable in light of the

 2   decline -- the financial decline that the hospital was

 3   in the midst of?

 4           MR. KOSTIC:  Argumentative.

 5           Go ahead.

 6           THE WITNESS:  I don't recall.

 7   BY MS. ROBERTS:

 8      Q.   Do you recall any steps at all that were taken

 9   in the year 2012 that impacted, reduced the -- strike

10   that.

11           Do you recall any steps that were taken in 2012

12   to minimize the losses that were actually suffered by

13   the hospital that year?

14           MR. KOSTIC:  Overbroad.  Calls for a narrative.

15   Asked and answered.  Vague and ambiguous.  Lacks

16   foundation.  Calls for speculation.

17           Go ahead, please.

18           THE WITNESS:  I just can't remember the

19   specifics sitting here today, no.  I don't recall.

20           MS. ROBERTS:  What exhibit are we on?

21           THE WITNESS:  This is number 29.

22           MS. ROBERTS:  Thank you.  Show you Exhibit 30.

23           (Defendants' Exhibit No. 30 marked for

24            identification.)

25           THE WITNESS:  Thank you.
```

1          MS. ROBERTS:  I'm not finished with my

2     question.  Let me ask it a different way.

3     BY MS. ROBERTS:

4          Q.   Had the hospital's financial outlook been not

5     good for more than a month before January 16, 2013?

6          A.   I would say yes.

7          Q.   Had the financial -- the hospital's financial

8     outlook been not good for more than six months before

9     January 16, 2013?

10         A.   I don't know how you would define "not good" in

11    that context.  I'm using it in a context here that may

12    be totally different than there, but let's just say

13    there were questions about the financial outlook for a

14    few months previously.

15         Q.   In the year 2012 was there any consideration

16    given to reducing the pay of the executive management

17    team at the hospital?

18         A.   By myself or by me?

19         Q.   Yeah, by you.

20         A.   Any -- no.

21         Q.   Did you ever have any communication with

22    Mr. Klune about the prospect of reducing the

23    compensation of more than $1 million that was going to

24    the executive management team in an effort to try to

25    reduce costs at Palo Verde Hospital?

1       A.    I don't recall.

2       Q.    Did you ever have that kind of a conversation

3  with Tara Barth?

4       A.    I don't recall.

5       Q.    Now, when you were the CFO, Mr. Klune was the

6  CEO, Ms. Barth was the CNO.

7       A.    Uh-huh.

8       Q.    None of you had ever served in those roles at a

9  hospital before, correct?

10            MR. KOSTIC:  Argumentative.  Lacks foundation.

11  Calls for speculation.

12            THE WITNESS:  I don't know.

13  BY MS. ROBERTS:

14      Q.    Do you recall noting that you believed Tara

15  Barth was a disaster as a CNO?

16            MR. KOSTIC:  Vague as to time and context.

17            Go ahead.

18            THE WITNESS:  I don't recall.

19  BY MS. ROBERTS:

20      Q.    Do you recall communicating with Bob Honaker

21  about wanting to terminate Tara Barth and Michael Murphy

22  from the emergency department?

23      A.    I don't recall the specific, no.

24      Q.    Okay.  As you sit here right now, do you recall

25  when you were the acting CEO having the belief that Tara

1            MR. KOSTIC:  Lacks foundation.  Calls for

2  speculation.

3            THE WITNESS:  I don't know.

4            MR. KOSTIC:  Incomplete hypothetical.

5  BY MS. ROBERTS:

6      Q.   Is that -- is that something -- exclusive

7  surgical services, is that something that had been in

8  place previously at Palo Verde Hospital, correct?

9            MR. KOSTIC:  Lacks foundation.

10  BY MS. ROBERTS:

11      Q.   Had Palo Verde Hospital, previous to January

12  of -- or excuse me -- previous -- had Palo Verde

13  Hospital before November 2012 ever had a contract for

14  the provision of exclusive surgical services?

15            MR. KOSTIC:  Lacks foundation.

16            Go ahead.

17            THE WITNESS:  Not that I'm aware of.

18  BY MS. ROBERTS:

19      Q.   Okay.  So do you think that it would have taken

20  at least 60 days if it had been approved for the

21  hospital to negotiate and enter into a contract for the

22  exclusive provision for surgical service?

23            MR. KOSTIC:  Same objection.

24            Go ahead.

25            THE WITNESS:  I think if we could expedite the

1          MR. KOSTIC:  Argumentative in addition to the

2  other objections.

3          Go ahead.

4          THE WITNESS:  I don't know that I'd agree to

5  that.

6  BY MS. ROBERTS:

7      Q.    If you couldn't even have an exclusive surgical

8  contract negotiated until sometime into 2013, how could

9  that -- the failure to have that impacted the finances

10  in calendar 2012?

11      A.    Well, in --

12          MR. KOSTIC:  Same objections.

13          THE WITNESS:  Well, in the past, no, it

14  wouldn't have in the past.  No.  Sorry.  I must have

15  misunderstood.

16  BY MS. ROBERTS:

17      Q.    Okay.  Go to the bottom of the second page of

18  Exhibit 30, please.

19      A.    Uh-huh.

20      Q.    It talks about prison volume.

21          Do you see that?

22      A.    Yes.

23      Q.    All right.  And the very last sentence reads,

24  "It will not increase significantly in the near term or

25  long term based upon administration's discussions with

1  prison officials."

2         What discussions are you referring to there?

3    A.   The prison had told us that they didn't

4  anticipate sending us more patients.  That's what it

5  says.

6    Q.   Can you turn to the next page of Exhibit 30,

7  under the heading "Cash Forecast Slide."  And what you

8  told the board, according to these notes, "Cash is

9  deteriorating.  Current projections without a change in

10  course would take the hospital down to a balance of

11  $650,000 at June 30, 2013."

12         Do you see that?

13    A.   Yes.

14    Q.   And that would have been a decline in the cash

15  at the hospital for fiscal 2013 of more than $6 million,

16  correct?

17    A.   Where are you getting your numbers there?

18    Q.   Well, I'm looking at the cash and liability

19  part of Exhibit 29, where it shows the balance as of

20  June 30, 2012, cash balance was $7,284,000.

21    A.   Okay.

22    Q.   And if one year later that cash balance is down

23  to $650,000, that's more than a $6 million reduction in

24  cash, correct?

25    A.   Yeah.

Peterson Reporting, Video & Litigation Services        331

1    needed -- things needed to be done so strategies need to

2    be discussed, yes.

3         Q.    When were you going to begin discussing

4    strategies for turning Palo Verde Health Care District

5    around?

6         A.    In what time frame are you talking about?

7         Q.    Well, as of the date that you presented to the

8    board on the notes that we've marked as Exhibit 30,

9    which would be June 16, 2013.

10        A.    Immediately.

11        Q.    Okay.  So relative to June 16, 2013, your

12   proposal to implement strategies to turn things around

13   at Palo Verde Health Care District would have

14   prospective changes, correct?

15        A.    Yes.

16        Q.    All right.  Let me ask you to look at the very

17   last page of Exhibit 29, which is the PowerPoint from

18   the January 16 meeting.

19        A.    Okay.

20        Q.    And it says, "CFO board update."  Was this your

21   recommendations to the board as of January 16, 2013 as

22   far as addressing the financial condition of the

23   hospital?

24             MR. KOSTIC:  May I have that read back, please?

25             (Record read.)

1           MR. KOSTIC:  Overbroad.  Misstates prior

2    testimony.  Calls for a narrative response.

3           Go ahead.

4           THE WITNESS:  This is what I told the board at

5    that time, that action had to be taken.  These aren't my

6    recommendations.  These are some initiatives that needed

7    to be taken.

8    BY MS. ROBERTS:

9       Q.   Okay.  So as of January 16, 2013, what you were

10   saying on this last page of Exhibit 29 is "This needs

11   everybody's attention and we need to start employing

12   strategies to turn things around," correct?

13      A.   Yes.

14      Q.   All right.  Now, if I may, sir, direct your

15   attention back to Exhibit 30.  I would like you to go to

16   the very bottom of the second page where it says

17   "Summary and Conclusion."

18           Do you have that in front of you?

19      A.   Yes.

20      Q.   And you told the board and wrote here, "It is

21   imperative that the hospital address ongoing operating

22   losses.  A strategy to increase volume such as the

23   addition of surgical specialties needs to be discussed

24   and implemented."

25           And you were talking about doing that

1  prospectively, correct?

2          MR. KOSTIC:  The question is compound,

3  overbroad and argumentative.

4          Go ahead, Mr. Rutherford.

5          THE WITNESS:  Yes.

6  BY MS. ROBERTS:

7      Q.  All right.  And then you wrote, and presumably

8  said to the board, "The hospital's current cost

9  structure is not sustainable."

10          MR. KOSTIC:  That's two questions, Ms. Roberts,

11  so let's break them down.  Did you tell the board --

12          MS. ROBERTS:  Just --

13          MR. KOSTIC:  And did you write --

14          MS. ROBERTS:  -- just --

15  BY MS. ROBERTS:

16      Q.  Do you recall that being part of your

17  presentation to the board on January 16, 2013?

18      A.  No, I don't.  To clarify my response, if it

19  helps, these are my notes.  I did not read verbatim off

20  of these.

21      Q.  Okay.  So you don't know what you said and

22  didn't say to the board?

23      A.  I don't recall.

24      Q.  But the audiotape would tell us what you said

25  and didn't say, correct?

1     A.   Yes, ma'am.

2     Q.   Okay.  But one of your sentiments that you may

3     or may not have communicated to the board was the

4     hospital's current cost structure is not sustainable,

5     correct?

6     A.   Yes.

7     Q.   And you believe that --

8     A.   Yes.

9     Q.   -- the cost that the hospital was operating at

10    was not sustainable, given the utilization rates,

11    correct?

12    A.   Yes.

13    Q.   All right.  Let's go a couple paragraphs above

14    that, "CEO compensation analysis."  And then you

15    wrote -- actually, right below that where it says,

16    "Based upon my analysis" --

17    A.   Uh-huh.

18    Q.   -- "the CEO was paid appropriately according to

19    the financial terms of development contracts as approved

20    by the district's board of directors."

21         So my question to you is, was your analysis

22    just making sure that whatever Mr. Klune was paid was

23    consistent with his contract?

24    A.   Yes.

25    Q.   You didn't actually do any analysis of the

Peterson Reporting, Video & Litigation Services      336

1   propriety of him being paid, you know, a total of,

2   whatever, $475,000 relative to other CEO's of small

3   hospitals, correct?

4       A.   I don't recall.

5       Q.   All right.  Now, the very end of page 2 of

6   Exhibit 30, you write, "Cost containment and cash

7   management should be addressed as well."

8           And, again, that was a recommendation for

9   something to be done prospectively to assist in the

10  financial deterioration of the hospital, correct?

11      A.   I'm sorry.  I'm lost.  Where are we?

12      Q.   The very bottom of the second page of

13  Exhibit 30?

14      A.   30.

15      Q.   Right.  Second page.

16      A.   I'm on the second page.  Have I got the wrong

17  one?  I've got 30.  Is that it?

18      Q.   Okay.  Turn the page.  I probably meant the

19  third page.

20      A.   Okay.  Thank you.

21      Q.   You're right.  My apologies.  I'm very sorry

22  about that, Mr. Rutherford.

23          If I can direct your attention to the bottom of

24  the third page of Exhibit 30 --

25      A.   Uh-huh.

1      Q.    -- under "Summary and Conclusion," go to the

2   very end of that.  And there is a sentence there that

3   reads, "Cost containment and cash management should be

4   addressed as well."

5           And that was something that you were

6   recommending prospectively to deal with the financial

7   crisis at the hospital, correct?

8      A.   Yes.

9      Q.   And then you wrote, "Administration has

10  alternatives in all these areas and is ready to present

11  this information to the board and obtain direction as to

12  which alternatives the board thinks are appropriate."

13          Did I read that accurately?

14     A.   Yes.

15     Q.   Which of those alternatives had been presented

16  and approved by any prior board, if any?

17          MR. KOSTIC:  Vague.  Lacks foundation.  Calls

18  for a narrative response.  Overbroad.

19          Go ahead.

20          THE WITNESS:  I don't recall.

21  BY MS. ROBERTS:

22     Q.   Do you recall in the year 2012 or 2013 having

23  any communications with anyone about the importance of

24  cutting back the legal expenses that the hospital was

25  incurring?

DECLARATION UNDER PENALTY OF PERJURY

    I hereby declare under penalty of perjury that the foregoing is my deposition under oath; that I have read my deposition and have made the necessary corrections, additions or changes to my answers that I deem necessary.

    In witness thereof, I hereby subscribe my name this _15th_ day of _September,_ 2014.

_DENNIS E. RUTHERFORD_

APP00223    EXHIBIT B

```
 1    STATE OF CALIFORNIA    )

                           :  ss.

 2    COUNTY OF SAN DIEGO    )

 3         I, Julie A. McKay, Certified Shorthand Reporter in

 4    and for the State of California, Certificate No. 9059,

 5    do hereby certify:

 6         That the witness in the foregoing deposition was by

 7    me first duly sworn to testify the truth, the whole

 8    truth, and nothing but the truth in the foregoing cause;

 9    that the deposition was taken before me at the time and

10    place herein named; that said deposition was reported by

11    me in shorthand and transcribed, through computer-aided

12    transcription, under my direction; and that the

13    foregoing transcript is a true record of the testimony

14    elicited at proceedings had at said deposition.

15         I do further certify that I am a disinterested

16    person and am in no way interested in the outcome of

17    this action or connected with or related to any of the

18    parties in this action or to their respective counsel.

19         In witness whereof, I have hereunto set my hand

20    this  August 18, 2014

21

22

                  _____

                       Julie A. McKay

23                     CSR No. 9059

24

25
```

Peterson Reporting, Video & Litigation Services

APP00224                                          EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DENNIS RUTHERFORD, an individual;   )
PETER KLUNE, an individual; and     )
TARA BARTH, an individual,          )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             ) Case No.:
                                    ) ED CV 13-01247
                                    ) JAK(SPx)
PALO VERDE HEALTH CARE DISTRICT,    )
a public entity; TRINA SARTIN, an   )
individual; SANDRA HUDSON, an       )
individual; SAMUEL BURTON, an       )
individual; and DOES 1 to 50,       )
inclusive,                          )
                                    )
            Defendants.             )
_____)

VIDEOTAPED DEPOSITION OF DENNIS E. RUTHERFORD

VOLUME II - PAGES 343 THROUGH 638

SAN DIEGO, CALIFORNIA

AUGUST 27, 2014

REPORTED BY:  JULIE A. McKAY, CSR NO. 9059

Peterson Reporting, Video & Litigation Services

Dennis Rutherford, V2, 8-27-14

1    A.  Yes, I do.

2    Q.  Was it -- did you determine once you took over

3  as the CEO at Palo Verde that during the time that you

4  were employed there that the emergency department

5  procedures were not being billed?

6    A.  Well, I don't know what procedures she's

7  referring to here, so the particular procedures that

8  she's talking to -- whatever they are, I don't

9  remember -- were not on the bills.  So there's a

10  potential for that, yes.

11    Q.  All right.  Now, Mr. Rutherford, in -- at the

12  board meeting of February 19, 2013, members of the board

13  of directors voted to not renew your contract as the CFO

14  at Palo Verde Hospital, correct?

15        MR. KOSTIC:  Lacks foundation and calls for

16  speculation.

17        Go ahead.

18        THE WITNESS:  From what I was told, yes.

19  BY MS. ROBERTS:

20    Q.  Do you know why the members of the board that

21  voted to not renew your contract, what they had taken

22  into consideration in making that decision?

23        MR. KOSTIC:  Same objections.

24        Go ahead.

25        THE WITNESS:  I wasn't there, so no.

APP00226                                    EXHIBIT B

Dennis Rutherford, V2, 8-27-14

1  BY MS. ROBERTS:

2      Q.   All right.  Do you know what the board of

3  directors took into consideration in voting not to renew

4  the contract of Tara Barth on February 19, 2013?

5           MR. KOSTIC:  Same objections.

6           THE WITNESS:  No, I don't.

7  BY MS. ROBERTS:

8      Q.   Do you know what the board of directors took

9  into account in determining to -- that they would

10  terminate the contract with Peter Klune on January 22nd,

11  2013?

12          MR. KOSTIC:  Same objections.

13          THE WITNESS:  No, I don't.

14  BY MS. ROBERTS:

15      Q.   When you were the interim CEO at Palo Verde

16  Health Care District beginning January -- shortly after

17  January 22, 2013 --

18      A.   Uh-huh.

19      Q.   -- what steps did you take to -- well, I've got

20  to start -- I have to start my question over.  I'm

21  sorry.

22          When you were the interim CEO at Palo Verde

23  Health Care District beginning shortly after January 22,

24  2013, what steps did you take or pursue to try to

25  improve the financial condition of the District?

Dennis Rutherford, V2, 8-27-14

1           MR. KOSTIC:  Overbroad.

2           THE WITNESS:  I'm trying to think specifically.

3    I don't recall specific steps.  It's -- it's late in the

4    afternoon.

5           MS. ROBERTS:  Okay.  Can we just take a quick

6    break?

7           MR. KOSTIC:  Okay.  Sure.

8           VIDEO TECHNICIAN:  Time off the record is

9    4:01 p.m.

10          (Recess.)

11          VIDEO TECHNICIAN:  This begins Media Number 4

12   in the deposition of Dennis Rutherford, Volume

13   Number II.

14          Today's date is August the 27th, 2014.  The

15   time is 4:16 p.m.

16          Back on the record.

17   BY MS. ROBERTS:

18     Q.   Mr. Rutherford, are you ready to proceed?

19     A.   Yes.

20     Q.   Did you get a little caffeine?

21     A.   Caffeine infused.

22     Q.   Okay.  Were there any meetings of the Palo

23   Verde board of directors between January 22, 2013 and

24   February 19, 2013?

25          Did the board convene at all during that time?

Dennis Rutherford, V2, 8-27-14

1   to tell you the truth.

2   BY MS. ROBERTS:

3        Q.   Okay.  In 2012, January of 2012, the outside

4   general counsel for Palo Verde Health Care District

5   issued a letter to the Centers for Medicare and Medicaid

6   Services self-reporting certain violations of Medicare

7   law.

8             Do you recall that?

9        A.   This is January of 2012?

10       Q.   Yes.

11       A.   Is that the -- I think I recall it, if you're

12   referring to the rent issues.

13       Q.   The leases?

14       A.   Yes.

15       Q.   Okay.  And I'm going to show you what we'll

16   mark as Exhibit 87.

17            (Defendants' Exhibit No. 87 marked for

18            identification.)

19            MR. KOSTIC:  Just for the record, Exhibit 87

20   appears to be a compilation that does not -- the Bates

21   numbers are not consecutive.

22   BY MS. ROBERTS:

23       Q.   Mr. Klune -- I mean, Mr. Rutherford, if you can

24   look at the second page of Exhibit 87, which is Bate

25   Page 9070.

Peterson Reporting, Video & Litigation Services        570

Dennis Rutherford, V2, 8-27-14

1      A.    Uh-huh.  Yes.

2      Q.    This is a letter to the Centers for Medicare

3   and Medicaid Services dated January 30, 2012 from Best

4   Best & Krieger.

5            Do you see that?

6      A.    Yes.

7      Q.    And the subject line is "Palo Verde Hospital

8   disclosure under self-referral disclosure protocol."

9      A.    Yes.

10     Q.    Have you seen a copy of this letter before

11   today?

12     A.    Yes, I have.

13     Q.    All right.  And the -- what was your

14   understanding of why this self-referral disclosure

15   letter had to be or was sent to CMS on January 30, 2012?

16           MR. KOSTIC:  Calls for a legal conclusion and

17   an expert opinion.

18           THE WITNESS:  Can I glance through it briefly?

19           MS. ROBERTS:  Sure.

20           MR. KOSTIC:  It's a 40-page document.

21           THE WITNESS:  Yeah.  I just wanted to make

22   sure that -- yes.  And just in summary, it relates to

23   rents -- renting of space to doctors who refer patients

24   to the hospital.

25

Dennis Rutherford, V2, 8-27-14

1  BY MS. ROBERTS:

2      Q.   And what had happened that necessitated or

3  prompted the transmission of this letter dated

4  January 30, 2012 attached to Exhibit 87?

5      A.   To the best of my recollection, it was --

6  self-reporting issue was that the physicians had moved

7  into office space that required a lease payment from

8  them to the hospital without a written agreement in

9  place.

10     Q.   And when was that that they moved into the

11 office space?

12          MR. KOSTIC:  Calls for speculation.

13          THE WITNESS:  It was before my tenure, so I

14 don't recall.

15 BY MS. ROBERTS:

16     Q.   And what was the -- what difference did it make

17 as to whether or not they had a lease agreement, if you

18 know?

19          MR. KOSTIC:  Calls for an expert opinion, legal

20 conclusion.

21          THE WITNESS:  Well, my understanding is that

22 under Stark, anytime a referring physician is paid --

23 generally paid any money from the hospital, a written

24 agreement is required.

25

APP00231                                    EXHIBIT B

Dennis Rutherford, V2, 8-27-14

1 BY MS. ROBERTS:

2     Q.   A written agreement for the provision of

3 services?

4     A.   No.  A written agreement related to, in this

5 case, rental space to determine and confirm that the

6 rental agreement is -- does meet fair market value

7 considerations.

8     Q.   Okay.  And when did you first discover -- or

9 strike that.

10          When did you first become aware of this

11 situation where physicians had moved into office space,

12 but didn't have signed -- written signed leases?

13     A.   I don't remember specifically.

14     Q.   Do you recall what year it was?

15     A.   I would assume it was -- I'd assume, but I

16 would say in 2011.

17     Q.   All right.  And ultimately did you get the

18 signed leases from the physicians?

19     A.   Yes, we did.

20     Q.   When was that?

21     A.   I don't know.  Don't remember exactly.

22     Q.   How long had -- so the physicians had gone

23 without signed leases for some period of time before you

24 started through 2011?

25     A.   To the best of my recollection, yes.

Peterson Reporting, Video & Litigation Services      573

APP00232                              EXHIBIT B

Dennis Rutherford, V2, 8-27-14

1      Q.    And why did you -- why didn't the hospital get

2   the signed leases from the physicians in that time

3   period?

4             MR. KOSTIC:  Calls for speculation.  Overbroad.

5             THE WITNESS:  Yeah.  Peter was handling these

6   negotiations, so I'm not aware of why or how.

7   BY MS. ROBERTS:

8      Q.    Did Mr. Klune ever share with you why the

9   leases had not been obtained prior to 2011?

10     A.    I don't recall.

11     Q.    Do you know why January 30, 2012 was the

12   approximate time period in which the report -- the

13   self-report was made to the Centers for Medicare and

14   Medicaid Services?

15     A.    If I remember correctly, I think there was a

16   self-harbor provision that the reporting had to occur

17   within a certain time frame.

18     Q.    And what was that time frame, if you know?

19     A.    Again, I don't know.  That was a Best Best &

20   Krieger question.

21     Q.    Do you know why Palo Verde Hospital didn't

22   self-report in 2009, '10 or '11 this absence of leases

23   with the physicians?

24             MR. KOSTIC:  Lacks foundation.  Calls for

25   speculation.  Calls for an expert opinion, a legal

Dennis Rutherford, V2, 8-27-14

1  conclusion.  And compound.

2           THE WITNESS:  No, I don't know.

3  BY MS. ROBERTS:

4      Q.   Were you told by anyone that the absence of

5  signed leases between the hospital and the physicians

6  could constitute a violation of the Stark law?

7           MR. KOSTIC:  Vague as to time.

8           THE WITNESS:  I don't remember if I was told by

9  anyone, but my general understanding from my experience

10  in industry experience was that the event -- once that

11  the infraction has occurred, there is no cure.  That

12  you, basically, have a reportable event.

13           So timing of that is not of benefit one way or

14  the other once it's occurred.  And we were collecting

15  rent payments from the doctors, so...

16  BY MS. ROBERTS:

17      Q.   That's what I was going to ask you,

18  Mr. Rutherford.

19           During that period of time that there were no

20  leases -- written, signed leases between the hospital

21  and the physicians, were the physicians still paying the

22  fair market value rent?

23      A.   Yes.  The best of my knowledge, yes.

24      Q.   Did the -- where were the physicians' offices

25  located?

APP00234                          EXHIBIT B

Dennis Rutherford, V2, 8-27-14

1      A.    They were located in that building across -- I

2    don't know the address.  Across the street from the main

3    hospital facility, there's a office building complex

4    that's owned by the County that was leased by the

5    hospital.  I don't remember the address.  It probably is

6    in here.

7            But they were in the same building as the

8    business office and the accounting services office was.

9    And the hospital board meetings were held across there

10   as well.

11     Q.    Did the hospital own the building?

12     A.    Not to my knowledge, no.  They leased it.

13     Q.    The hospital leased the office building from a

14   third party and then rented it out to the physicians?

15     A.    That was my understanding, yes.

16     Q.    Okay.  What was the result or what was the --

17   strike that.  Let me start over.

18          Mr. Rutherford, what response did the Centers

19   for Medicare and Medicaid Services provide to the

20   self-reporting that was sent to CMS on January 30, 2012?

21     A.    I don't remember receiving a response myself.

22          THE REPORTER:  "I don't remember" what?

23          THE WITNESS:  I don't remember receiving a

24   response myself, so I don't recall.

25

Dennis Rutherford, V2, 8-27-14

1    way.

2    BY MS. ROBERTS:

3        Q.   What is your understanding, if you have one, as

4    to the role -- the fact that Mr. Slovak hadn't been

5    paid, what role did that have in his decision to move to

6    be relieved as counsel in the lawsuit against

7    Dr. Sahlolbei?

8            MR. KOSTIC:  Same objections.

9            Go ahead.

10           THE WITNESS:  I don't know.

11   BY MS. ROBERTS:

12       Q.   Did you discuss that with Mr. Slovak?

13       A.   Not that I recall.

14       Q.   Do you ever recall Mr. Slovak communicating

15   with you and/or Mr. Klune about the fact that if he

16   didn't get paid, he would file a motion to be relieved

17   as counsel?

18       A.   Yeah, I remember that.

19       Q.   Okay.  And that -- those were comments that he

20   made in November, December and January, correct?

21       A.   I -- I don't recall.

22       Q.   All right.  What was the Provident Bank account

23   or the Provident account that Palo Verde Health Care

24   had?

25       A.   Provident Bank is where the hospital's

Peterson Reporting, Video & Litigation Services     591

MR. KOSTIC: -- Ms. Jacques meant.

THE WITNESS: I'm sorry. I don't read it that way, but I read it the -- a missing link is the charge for ED procedures could be one of the components.

BY MS. ROBERTS:

Q. But she didn't call it "a missing link." She called it "the missing link," correct?

A. Okay.

Q. Did Ms. --

A. Okay.

Q. -- Jacques --

Did Ms. Jacques provide you with any other explanation in response to your email where you're trying to figure out why aren't you getting the $2.1 million increase that you had expected?

A. She may have. I just don't recall.

Q. How about in the email that you have in front of you? Did she list anything other than the failure to charge for emergency department procedures?

A. No, she doesn't.

Q. All right. Do you know why the hospital was not billing for emergency department procedures prior to February 4, 2013?

A. Specifically, no.

Q. Who was -- who had ultimate responsibility for

Dennis Rutherford, V2, 8-27-14

1   making sure that the hospital did something as

2   fundamental as bill for the procedures performed in the

3   emergency department?

4          MR. KOSTIC:  Argumentative.  Lacks foundation.

5   Overbroad.

6          THE WITNESS:  Who has ultimate responsibility?

7   I assume I would take that responsibility as the chief

8   financial officer.

9   BY MS. ROBERTS:

10      Q.   Mr. Rutherford, how did you come up with the

11  numbers that are on the third page of Exhibit 86 in this

12  sort of table that you put together of rate increase

13  analysis?

14      A.   This table was put together by HFS.  This is

15  their table.  I'm just sending it back to them.

16      Q.   All right.  Did you ever communicate with

17  anyone at Palo Verde or HFS regarding how much revenue

18  could be expected through the process of back-billing

19  for emergency department procedures?

20      A.   Yes, I'm sure we did.  Remember, this process

21  here was instigated -- initiated by me to verify the

22  revenue cycle and make sure that we were billing for

23  everything that we were entitled to.  That's why we were

24  doing it.

25      Q.   And why hadn't that been discovered sooner than

Dennis Rutherford, V2, 8-27-14

1        DECLARATION UNDER PENALTY OF PERJURY

2

3        I hereby declare under penalty of perjury that the

4    foregoing is my deposition under oath; that I have read

5    my deposition and have made the necessary corrections,

6    additions or changes to my answers that I deem

7    necessary.

8        In witness thereof, I hereby subscribe my name this

9    ___6th___ day of _October_ , 2014.

10                              _Dennis E. Rutherford_

11                              DENNIS E. RUTHERFORD

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP00239                              EXHIBIT B

1    STATE OF CALIFORNIA     )

                          :   ss.

2    COUNTY OF SAN DIEGO     )

3         I, Julie A. McKay, Certified Shorthand Reporter in

4    and for the State of California, Certificate No. 9059,

5    do hereby certify:

6         That the witness in the foregoing deposition was by

7    me first duly sworn to testify the truth, the whole

8    truth, and nothing but the truth in the foregoing cause;

9    that the deposition was taken before me at the time and

10   place herein named; that said deposition was reported by

11   me in shorthand and transcribed, through computer-aided

12   transcription, under my direction; and that the

13   foregoing transcript is a true record of the testimony

14   elicited at proceedings had at said deposition.

15        I do further certify that I am a disinterested

16   person and am in no way interested in the outcome of

17   this action or connected with or related to any of the

18   parties in this action or to their respective counsel.

19        In witness whereof, I have hereunto set my hand

20   this *September 10, 2014.*

21

22                          _____

                            Julie A. McKay

23                          CSR No. 9059

24

25

Peterson Reporting, Video & Litigation Services

APP00240                                    EXHIBIT B